https://research.txcourts.gov/CourtRecordsSearch/ui/casePrintView/8402c8382eee494fa15a62c8f2941366

## Case Information

WILL STEWARD,CICI STEWARD vs. CAMP MYSTIC, LLC,NATURAL FOUNTAINS PROPERTIES, INC.,MYST...

D-1-GN-26-000758

Location

Travis County - District Clerk

Case Category

Civil - Other Civil

Case Type

Other Injury or Damage

Case Filed Date

2/4/2026

Judge

459TH, DISTRICT COURT

Case Status

Closed (Bankruptcy Filed)

## Parties 20

| Type | Name | Nickname/Alias | Attorneys |
|---|---|---|---|
| Plaintiff | CICI STEWARD | | BRADLEY E BECKWORTH |
| Plaintiff | WILL STEWARD | | BRADLEY E BECKWORTH |
| Defendant | CAMP MYSTIC, LLC | | CARLOS A. BALIDO , Jeffry H Ray , KENNETH JASON FAIR , Mikal Watts , THOMAS C WRIGHT |
| Defendant | NATURAL FOUNTAINS PROPERTIES, INC. | | Mikal Watts |
| Defendant | MYSTIC CAMPS FAMILY PARTNERSHIP, LTD. | | Mikal Watts |
| Defendant | MYSTIC CAMPS MANAGEMENT, LLC | | Mikal Watts |
| Defendant | GEORGE ALBRITTON "BRIT" EASTLAND REPRESENTATIVE OF THE ESTATE OF RICHARD G. EASTLAND | | CARLOS A. BALIDO , Jeffry H Ray |
| Defendant | WILLETTA A. "TWEETY" EASTLAND DIRECTOR OF CAMP MYSTIC, LLC | | Mikal Watts |
| Defendant | WILLETTA A."TWEETY" EASTLAND VICE PRESIDENT OF CAMP MYSTIC, LLC | | Mikal Watts |
| Defendant | WILLETTA A. "TWEETY" EASTLAND SECRETARY OF NATURAL FOUNTAINS PROPERTIES, INC. | | Mikal Watts |
| Defendant | WILLIAM NEELY BONNER, III | | LYNN S. CASTAGNA |
| Defendant | EDWARD S. EASTLAND | | CARLOS A. BALIDO , LYNN S. CASTAGNA |
| Defendant | MARY L EASTLAND | | CARLOS A. BALIDO , LYNN S. CASTAGNA |
| Defendant | WILLETTA A. EASTLAND | | Mikal Watts |
| Attorney General | DEPARTMENT OF PUBLIC SAFETY | | BRADLEY RANDOLPH WURSTER |
| Other | ESTATE OF CECILIA "CILE" STEWARD | | |
| Other | ESTATE OF RICHARD G. EASTLAND | | CARLOS A. BALIDO , Jeffry H Ray |
| Other | KUT-FM | | JAMES ALAN HEMPHILL |
| Other | CARPENTER RICHARD | | |
| Other | CROUSE WILLIAM | | |

## Hearings 13

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 3/4/2026 09:00 AM | Setting Date | | | |
| 4/2/2026 02:00 PM | Setting Date | | | |
| 4/13/2026 09:01 AM | Setting Date | | | |
| 4/13/2026 09:01 AM | Setting Date | | | Canceled - Passed by Court |
| 5/13/2026 09:00 AM | Setting Date | | | |
| 6/10/2026 09:00 AM | Setting Date | | | |
| 7/15/2026 09:00 AM | Setting Date | | | |
| 8/13/2026 09:00 AM | Setting Date | | | |
| 9/24/2026 09:00 AM | Setting Date | | | |

| Date/Time | Hearing Type | Judge | Location | Result |
|---|---|---|---|---|
| 10/22/2026 09:00 AM | Setting Date | | | |
| 11/23/2026 09:01 AM | Setting Date | | | |
| 12/21/2026 09:01 AM | Setting Date | | | |
| 5/3/2027 09:01 AM | Setting Date | | | |

## Events 115

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 5/3/2027 | Hearing | Setting Date | - | |
| 12/21/2026 | Hearing | Setting Date | - | |
| 11/23/2026 | Hearing | Setting Date | - | |
| 10/22/2026 | Hearing | Setting Date | - | |
| 9/24/2026 | Hearing | Setting Date | - | |
| 8/13/2026 | Hearing | Setting Date | - | |
| 7/15/2026 | Hearing | Setting Date | - | |
| 6/30/2026 | Filing | 5415DC | LETTER FROM THE THIRD COURT OF APPEALS | LETTER FROM THE THIRD COURT OF APPEALS.pdf |
| 6/30/2026 | Filing | 5415DC | MEMORANDUM OPINION FROM THE THIRD COURT OF APPEALS | MEMORANDUM OPINION FROM THE THIRD COURT OF APPEALS.pdf |
| 6/30/2026 | Filing | 8225DC | JUDGMENT FROM THE THIRD COURT OF APPEALS | ORDER.pdf |
| 6/24/2026 | Filing | 5436DC | SUGGESTION OF BANKRUPTCY | SUGGESTION OF BANKRUPTCY.pdf |
| 6/15/2026 | Filing | 5415DC | NOTICE OF CHANGE OF ADDRESS | NOTICE OF CHANGE OF ADDRESS.pdf |
| 6/10/2026 | Hearing | Setting Date | - | |
| 6/9/2026 | Filing | 5415DC | DEFENDANTS' NOTICE OF APEARANCE OF COUNSEL | DEFENDANTS' NOTICE OF APEARANCE OF COUNSEL.pdf |
| 6/8/2026 | Filing | 5415DC | NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSEL TO THE | NOTICE OF APPEARANCE AND DESIGNATION OF LEAD COUNSELTO THE.pdf |
| 6/3/2026 | Filing | 5153DC | PLAINTIFFS RESPONSE TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | PLAINTIFFS RESPONSE TO DEFENDANTS MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 6/3/2026 | Filing | 5153DC | RESPONSE TO STEWARD PLAINTIFFS MOTION FOR SANCTIONS | RESPONSE TO STEWARD PLAINTIFFS MOTION FOR SANCTIONS.pdf |
| 5/27/2026 | Filing | 5265DC | PLAINTIFFS' MOTION FOR SANCTIONS | PLAINTIFFS' MOTION FOR SANCTIONS.pdf |
| 5/19/2026 | Filing | 4899DC | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.pdf |
| 5/19/2026 | Filing | 4899DC | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS MANAGEMENT, LLC | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS MANAGEMENT, LLC.pdf |
| 5/19/2026 | Filing | 4893DC | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD | RETURN OF SERVICE OF SERVICE - MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.pdf |
| 5/13/2026 | Hearing | Setting Date | - | |
| 5/12/2026 | Filing | 5415DC | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATION AND MOTIONS TO STAY PROCEEDINGS | DEFENDANTS NOTICE OF WITHDRAWAL OF MOTIONS FILED MARCH 24, 2026 TO COMPEL ARBITRATIOIN AND MOTIONS.pdf |
| 5/12/2026 | Filing | 5153DC | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS CONSOLIDATED REPLY IN SUPPORT OF THEIR MOTIONS TO COMPEL ARBITRATION AND STAY.pdf |
| 5/12/2026 | Filing | 5265DC | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS | DEFENDANTS' AMENDED MOTIONS TO COMPEL ARBITRATION AND STAY PROCEEDINGS.pdf |
| 5/7/2026 | Filing | 5265DC | REQUEST TO RECORD PROCEEDINGS PURSUANT TO TRAVIS COUNTY DISTRICT COURT LOCAL RULE 16 | REQUEST TO RECORD PROCEEDINGS PURSUANT TO TRAVIS COUNTY DISTRICT COURT LOCAL RULE 16.pdf |
| 5/6/2026 | Filing | 5153DC | PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 5/6/2026 | Filing | 5415DC | NOTICE OF FILING AFFIDAVITS | NOTICE OF FILING OF AFFIDAVITS.pdf |
| 5/6/2026 | Filing | 5411DC | | Exhibit Receipt..pdf |
| 4/20/2026 | Filing | 5415DC | SUPPLEMENTAL CLERKS RECORD SUBMISSION CONFIRMATION | SUPPLEMENTAL CLERKS RECORD SUBMISSION CONFIRMATION.pdf |

| Date | Event | Type | Comments | Documents |
| --- | --- | --- | --- | --- |
| 4/20/2026 | Filing | 112DC | BILL OF COST FOR SUPPLEMENTAL CLERKS RECORD | BILL OF COST FOR CLERK_S RECORD.pdf |
| 4/20/2026 | Filing | 5415DC | LETTER- SMITH CLARK PENNINGTON | LETTER- SMITH CLARK PENNINGTON.pdf |
| 4/20/2026 | Filing | 5415DC | LETTER FROM THE THIRD COURT OF APPEALS | LETTER FROM THE THIRD COURT OF APPEALS.pdf |
| 4/17/2026 | Filing | 5415DC | DEFENDANTS' AMENDED NOTICE OF APPEAL | DEFENDANTS' AMENDED NOTICE OF APPEAL.pdf |
| 4/16/2026 | Filing | 5415DC | SUPPLEMENTAL CLERKS RECORD REQUEST | SUPPLEMENTAL CLERKS RECORD REQUEST.pdf |
| 4/16/2026 | Filing | 5415DC | SUPPLEMENTAL REPORTERS RECORD REQUEST | SUPPLEMENTAL REPORTERS RECORD REQUEST.pdf |
| 4/15/2026 | Filing | 8236DC | ORDER GRANTING TEMPORARY INJUNCTION | ORDER GRANTING TEMPORARY INJUNCTION_AU.pdf |
| 4/13/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURES 176 - WILLETA A. ('TWEETY") EASTLAND, INDIVIDUALLY AND AS DIRECTOR AND VICE PRESIDENT OF CAMP MYSTICS, LLC AND SECERETARY OF NATURAL FOUNTAINS PROPERTIES, INC. | SUBPOENA FOR HEARING PURSUANT TO.pdf |
| 4/13/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURES 176 - .CRAIG ALTHAUS | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURES 176 - .CRAIG ALTHAUS.pdf |
| 4/13/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURES 176 - CRAIG ALTHAUS - GEORGE ALBRITTON EASTLAND AS REPRESENTATIVE OF THE ESTATE OF RICHARD ("DICK") EASTLAND, DECEASED | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURES 176 -.pdf |
| 4/13/2026 | Filing | 5265DC | REQUEST FOR ORDER TO ALLOW MEDIA COVERAGE WITHOUT CONSENT OF PARTIES | REQUEST FOR ORDER TO ALLOW MEDIA COVERAGE WITHOUT CONSENT OF PARTIES.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/13/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 4/13/2026 | Hearing | Setting Date | - | |
| 4/13/2026 | Hearing | Setting Date | - | |
| 4/10/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-WILLETTA A. | Document is hidden |
| 4/10/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-EDWARD S. EASTLAND | Document is hidden |
| 4/10/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-MARY E. EASTLAND | Document is hidden |
| 4/10/2026 | Filing | 5415DC | SUBPOENA FOR HEARING | SUBPOENA FOR HEARING.pdf |
| 4/10/2026 | Filing | 5415DC | SUBPOENA FOR HEARING - RETURN SERVICE TO MARY E. EASTLAND | SUBPOENA FOR HEARING - RETURN SERVICE TO MARY E. EASTLAND.pdf |
| 4/10/2026 | Filing | 5415DC | LETTER FROM 3RD COA | LETTER FROM 3RD COA.pdf |
| 4/10/2026 | Filing | 8225DC | ORDER FROM 3RD COA | ORDER FROM 3RD COA.pdf |
| 4/9/2026 | Filing | 5153DC | DEFENDANTS RESPONSE TO PLAINTIFFS NOTICE REGARDING THE COURT S APRIL 2, 2026 ORDER FOR CONTINUATION OF TEMPORARY INJUNCTION HEARING | DEFENDANTS RESPONSE TO PLAINTIFFS NOTICE REGARDING THE COURTS APRIL 2,2026 ORDER FOR CONTINUATION.pdf |
| 4/9/2026 | Filing | 5415DC | SUPPLEMENTAL CLERKS RECORD SUBMISSION CONFIRMATION | SUPPLEMENTAL CLERKS RECORD SUBMISSION CONFIRMATION.pdf |
| 4/9/2026 | Filing | 112DC | BILL OF COST FOR SUPPLEMENTAL CLERKS RECORD | BILL OF COST FOR SUPPLEMENTAL CLERK_S RECORD.pdf |
| 4/9/2026 | Filing | 5415DC | LETTER FROM 3RD COA | LETTER FROM 3RD COA.pdf |
| 4/8/2026 | Filing | 5415DC | SUPPLEMENTAL CLERKS RECORD REQUEST | SUPPLEMENTAL CLERKS RECORD REQUEST.pdf |
| 4/8/2026 | Filing | 5415DC | SUPPLEMENTAL REPORTERS RECORD REQUEST | SUPPLEMENTAL REPORTERS RECORD REQUEST.pdf |
| 4/8/2026 | Filing | 5265DC | Motion to allow Camera Access for Dateline NBC at Hearing scheduled for April 13, 2026 at 9:00AM | Motion (No Fee).pdf |
| 4/8/2026 | Filing | 5265DC | REQUEST FOR ORDER TO ALLOW MEDIA COVERAGE WITH CONSENT OF PARTIES OR | MOTION.pdf |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| | | | WITNESSES | |
| 4/7/2026 | Filing | 5415DC | PLAINTIFFS' NOTICE REGARDING THE COURT'S APRIL 2, 2026 ORDER FOR CONTINUATION OF TEMPORARY INJUNCTION HEARING | Notice.pdf |
| 4/2/2026 | Hearing | Setting Date | - | |
| 4/1/2026 | Filing | 5153DC | DEFENDANTS RESPONSE TO PLAINTIFFS MOTION FOR EMERGENCY STATUS CONFERENCE | DEFENDANTS RESPONSE TO PLAINTIFFS MOTION FOR EMERGENCY STATUS CONFERENCE.pdf |
| 4/1/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE GAMBLE | LETTER TO COUNSEL FROM JUDGE GAMBLE_AU.pdf |
| 3/31/2026 | Filing | 5265DC | PLAINTIFFS MOTION FOR EMERGENCY STATUS CONFERENCE | PLAINTIFFS MOTION FOR EMERGENCY STATUS CONFERENCE.pdf |
| 3/31/2026 | Filing | 5415DC | DEFENDANTS OBJECTION TO THE APRIL 3 ,2026 EMERGENCY HEARING | DEFENDANTS OBJECTION TO THE APRIL 3 ,2026 EMERGENCY HEARING.pdf |
| 3/31/2026 | Filing | 6515DC | ORDER TRANSFERRING CASE | ORDER TRANSFERRING CASE DC TO DC (OCA).pdf |
| 3/27/2026 | Filing | 5415DC | CLERKS RECORD SUBMISSION CONFIRMATION | CLERKS RECORD SUBMISSION CONFIRMATION.pdf |
| 3/27/2026 | Filing | 5415DC | LETTER FROM 3RD COA | LETTER FROM 3RD COA.pdf |
| 3/26/2026 | Filing | 5415DC | CLERKS RECORD REQUEST | CLERKS RECORD REQUEST.pdf |
| 3/26/2026 | Filing | 5415DC | REPORTERS RECORD REQUEST | REPORTERS RECORD REQUEST.pdf |
| 3/25/2026 | Filing | 5415DC | LETTER FROM THE THIRD COURT OF APPEALS | *No Documents* |
| 3/24/2026 | Filing | 5553DC | DEFENDANTS NOTICE OF APPEAL | DEFENDANTS NOTICE OF APPEAL.pdf |
| 3/24/2026 | Filing | 5265DC | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY | DEFENDANTS' MOTION TO COMPEL ARBITRATION AND MOTION TO STAY.pdf |
| 3/13/2026 | Filing | 5442DC | LETTER TO COUNSEL FROM JUDGE AMY CLARK MEACHUM | LETTER TO COUNSEL FROM JUDGE AMY CLARK MEACHUM_AU.pdf |
| 3/5/2026 | Filing | 8236DC | ORDER GRANTING TEMPORARY INJUNCTION | ORDER GRANTING TEMPORARY INJUNCTION _AU.pdf |
| 3/5/2026 | Filing | 8225DC | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS | ORDER ALLOWING RECORDING OF COURT PROCEEDINGS_AU.pdf |
| 3/4/2026 | Filing | 8225DC | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS | ORDER ALLOWING AUDIO RECORDINGS OF COURT PROCEEDINGS_AU.pdf |
| 3/4/2026 | Filing | 8225DC | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS | ORDER ALLOWING STILL PHOTOGRAPHY OF COURT PROCEEDINGS_AU.pdf |
| 3/4/2026 | Filing | 5423DC | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE | ASSIGNMENT LETTER - JUDGE AMY CLARK MEACHUM REGARDING JUDGE MAYA GUERRA GAMBLE_AU.pdf |
| 3/4/2026 | Hearing | Setting Date | - | |
| 3/3/2026 | Filing | 5415DC | REQUEST FOR ORDER PERMITTING RECORDING | REQUEST FOR ORDER PERMITTING RECORDING.pdf |
| 3/3/2026 | Filing | 5153DC | DEFENDANTS RESPONSE TO PLAINTIFFS APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION SUBJECT TO FIRST AMENDED MOTION TO TRANSFER VENUE | DEFENDANTS RESPONSE TO PLAINTIFFS APPLICATION FOR TEMPORARY.pdf |
| 3/3/2026 | Filing | 5265DC | NON-PARTY CAPTAIN JOHN JOSEPH MILLER S MOTION TO QUASH DEFENDANT S SUBPOENA AND MOTION FOR PROTECTIVE ORDER | NON-PARTY CAPTAIN JOHN JOSEPH MILLER S MOTION TO QUASH DEFENDANTS SUBPOENA AND MOTION.pdf |
| 3/3/2026 | Filing | 5415DC | OTHER | OTHER.pdf |
| 3/3/2026 | Filing | 5415DC | AFFIDAVIT OF RANGER CAPTAIN JOHN J MILLER | AFFIDAVIT OF RANGER CAPTAIN JOHN J MILLER.pdf |
| 3/2/2026 | Filing | 5415DC | LETTER TO JUDGE MAYA GUERRA GAMBLE | LETTER TO JUDGE MAYA GUERRA GAMBLE.pdf |
| 3/2/2026 | Filing | 5265DC | CAMP MYSTIC DEFENDANTS FIRST AMENDED MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS FIRST AMENDED MOTION TO TRANSFER VENUE.pdf |
| 3/2/2026 | Filing | 5150DC | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO FIRST AMENDED MOTION TO TRANSFER VENUE - STEWARD | CAMP MYSTIC DEFENDANTS ORIGINAL ANSWER SUBJECT TO FIRST AMENDED MOTION TO TRANSFER VENUE - STEWARD.pdf |
| 3/2/2026 | Filing | 5415DC | LETTER - RESPONSE TO PRESS REQUEST TO RECORD TRO HEARING | LETTER - RESPONSE TO PRESS REQUEST TO RECORD TRO HEARING.pdf |
| 3/2/2026 | Filing | 5415DC | REQUEST TO PHOTOGRAGH HEARING | No Fee Documents.pdf |
| 2/27/2026 | Filing | 5415DC | REQUEST TO RECORD PROCEEDINGS PURSUANT | REQUEST TO RECORD PROCEEDINGS PURSUANT TO TRAVIS COUNTY DISTRICT COURT.pdf |

| Date | Event | Type | Comments | Documents |
|---|---|---|---|---|
| 2/25/2026 | Filing | 5265DC | CAMP MYSTIC DEFENDANTS MOTION TO TRANSFER VENUE | CAMP MYSTIC DEFENDANTS MOTION TO TRANSFER VENUE.pdf |
| 2/23/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176.pdf |
| 2/23/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176.pdf |
| 2/23/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176.pdf |
| 2/23/2026 | Filing | 5415DC | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176 | SUBPOENA FOR HEARING PURSUANT TO TEXAS RULES OF CIVIL PROCEDURE 176.pdf |
| 2/11/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-EDWARD S. EASTLAND | EXECUTED SERVICE CITATION-EDWARD S. EASTLAND.pdf |
| 2/11/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-GEORGE ALBRITTON BRIT EASTLAND RESPRESENTATIVE OF THE ESTATE OF RICHARD G. EASTLAND | EXECUTED SERVICE CITATION-GEORGE ALBRITTON BRIT EASTLAND RESPRESENTATIVE OF THE ESTATE OF.pdf |
| 2/11/2026 | Filing | 4893DC | EXECUTED SERVICE CITATION-MARY E. EASTLAND | EXECUTED SERVICE CITATION-MARY E. EASTLAND.pdf |
| 2/10/2026 | Filing | 5415DC | LETTER - REQUEST FOR ISSUANCE OF CITATION | LETTER - REQUEST FOR ISSUANCE OF CITATION.pdf |
| 2/10/2026 | Filing | 5415DC | NOTICE OF HEARING ON PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAING ORDER AND TEMPORARY INJUNCTION | NOTICE OF HEARING ON PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAING ORDER AND TEMPORARY INJUNCTION.pdf |
| 2/6/2026 | Filing | 5265DC | PLAINTIFFS APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION | PLAINTIFFS APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION.pdf |
| 2/6/2026 | Service | - | - | |
| 2/6/2026 | Service | - | - | |
| 2/4/2026 | Filing | 5050DC | PLAINTIFF'S ORIGINAL PETITION | PLAINTIFF'S ORIGINAL PETITION.pdf |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |
| 2/4/2026 | Service | - | - | |



© 2026 Tyler Technologies, Inc. | All Rights Reserved | Version: 2026.5.4.2291

2/4/2026 7:27 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-26-000758
Ruben Tamez

D-1-GN-26-000758

CAUSE NO. ______________________

| | | |
|---|---|---|
| WILL and CiCi STEWARD, Individually and as Representatives and Heirs of the Estate of CILE STEWARD, a Deceased Minor | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc. MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased, WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC. EDWARD S. EASTLAND, MARY E. EASTLAND and WILLIAM NEELY BONNER, III | § | 200TH, DISTRICT COURT |
| Defendants. | § | _____th JUDICIAL DISTRICT |

**PLAINTIFFS' ORIGINAL PETITION**

COMES NOW, Will Steward and CiCi Steward, Individually and as Representatives and Heirs of the Estate of Cecilia ("Cile") Steward, a Deceased Minor (collectively referred to as "Plaintiffs"), and files their Plaintiffs' Original Petition complaining of Camp Mystic, LLC, Natural Fountains Properties, Inc. d/b/a Camp Mystic, Inc., Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC (collectively referred to as "Camp Mystic Defendants" or "Camp"), George Albritton ("Britt") Eastland, as Representative of the Estate of Richard G. Eastland, Deceased, Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc., Edward S.

Copy from re:SearchTX

Eastland, Mary E. Eastland (collectively referred to as "Eastlands"), and William Neely Bonner, III, ("Bonner"), (collectively referred to as "Defendants"), and respectfully would show unto the Court the following:

Copy from re:SearchTX

# TABLE OF CONTENTS


I. INTRODUCTION: CILE STEWARD'S DEATH WAS DUE TO AN ACT OF MAN, NOT AN ACT OF GOD. ....1

A. Promises Made and Broken: The Eastlands Create an Illusion that Camp Mystic was a Safe Haven ....2
B. The Eastlands Prioritized Profits and Property over People ....5
C. Warnings Received and Ignored: A Flood that Came with Timestamps ....11
D. Cile's Last Day ....12
E. Shelter in Place: Obedience is Cile's Death Sentence ....16
F. Cile's Death ....19
G. There Were Heroes at Camp Mystic. But None were Named Eastland. ....23
H. Post-recovery ....24
I. The Eastlands Refuse to Take Accountability ....25
J. Back to Business: Post-Flood Pressure Campaign to Reopen ....27
K. The Eastlands Should Never Be Responsible for Children Again ....28
L. Acknowledgement of the State of Texas ....29

II. DISCOVERY CONTROL PLAN ....30

III. PARTIES ....30

IV. JURISDICTION AND VENUE ....33

V. THE EASTLANDS BLAME THE FLOOD ON AN ACT OF GOD: BUT THEY RECEIVED A CENTURY OF WARNINGS THAT A CATASTROPHIC FLOOD WAS COMING. INSTEAD OF LISTENING, THEY BUILT CABINS DIRECTLY IN THEIR PATH. ....37

A. The Eastlands Chose to Keep Camp Mystic Located in the Most Dangerous Flood Zone in the United States ....37
B. Camp Mystic's Location in "Flash Flood Alley" Made It a Chokepoint Particularly Vulnerable to Flooding with No Means of Escape ....38
C. The Eastlands Received a Century of Flood Warnings as Old as the Camp Itself ....40
1. *The Eastlands Were Warned by the 1932 Flood* ....40
2. *The Eastlands Were Warned by the 1951 Flood* ....42
3. *The Eastlands Were Warned by the 1978 Flood* ....42




Copy from re:SearchTX

4. *The Eastlands Were Warned by the 1984, 1987 and 1988 Floods* ....................44
5. *The Eastlands Were Warned by Their Own Flood Experiences* ....................45
6. *The Upper Guadalupe River Authority Told Dick Eastland a Flood Was Coming* ....................47

D. Like the Man in the Parable, the Eastlands Refused These Warnings ....................49

VI. THE EASTLANDS WERE SENT WARNINGS IN THE FORM OF REGULATIONS, STANDARDS, AND GUIDELINES: THE EASTLANDS REFUSED AND CHOSE COMPLACENCY OVER PREVENTION. ....................50

A. The State of Texas told the Eastlands: YOU MUST HAVE A PLAN ....................50
B. The American Camp Association told the Eastlands: YOU MUST HAVE A PLAN ....................51
C. Numerous State and Federal Authorities told the Eastlands: YOU MUST HAVE A PLAN ....................52
1. *OSHA* ....................52
2. *The Federal Government* ....................52
3. *The Texas Land Office* ....................53

D. The Eastlands Refused to Follow Any Safety Standards Except Their Own ....................53
E. Britt Eastland Even Opposed the Camp Safety Transparency Bill ....................53
F. Like the Man in the Parable, the Eastlands Refused Help From these Resources ....................54

VII. THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS FROM THE TEXAS DEPARTMENT OF EMERGENCY MANAGEMENT: THE EASTLANDS IGNORED THEM, CONCEALED THEM FROM CAMPERS AND COUNSELORS, AND CARRIED ON WITH BUSINESS AS USUAL. ....................54

A. The Eastlands Were Specifically Warned on July 2, 2025: TDEM Activates Emergency Response ....................55
B. The Eastlands Were Given an Intensified Warning on July 3, 2025: TDEM Escalates to Level II Response ....................55
C. The Eastlands Were Given Simple, Easy to Understand, Instructions About How to Receive Emergency Warnings ....................56
D. Despite These Clear Warnings, the Eastlands Concealed them from Cile and her Counselors ....................57



Copy from re:SearchTX

E. Like the Man in the Parable, the Eastlands Refused These Warnings ..... 60

VIII. THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS THAT THEY NEEDED TO EVACUATE. THE EASTLANDS DEFIANTLY DID NOTHING. ..... 61

A. The Cypress Lake Campus Was the Safest Muster Site ..... 61
B. The Commissary Was an Alternative Muster Site for Cile as Options Narrowed ..... 62
C. The Cricket Corner/Sky High Trail Was a Safe Alternate Muster Site ..... 63
D. The Equipment Shed Was a Safe Alternate Muster Site ..... 64
E. The Recreation "Rec" Hall Was Another Alternate Muster Site ..... 64
F. Like the Man in the Parable, the Eastlands Refused Rescue ..... 65

IX. A TALE OF TWO CAMPS: UNLIKE CAMP MYSTIC, CAMP MO-RANCH LISTENED TO THE WARNINGS, TOOK ACTION BEFORE THE FLOOD, FOLLOWED SAFETY GUIDELINES, AND SAVED EVERY LIFE. ..... 65

X. THE EASTLANDS CONTINUED TO RECEIVE WARNINGS AND THEY KEPT IGNORING THEM: 11:36 a.m. JULY 3RD – 2:26 a.m. JULY 4TH. ..... 65

A. The Eastlands Wasted Over 12 Hours of Precious Time From TDEM's Notice Until Midnight on July 3rd ..... 67
B. The Eastlands Wasted Another Hour From Midnight Until 1:14 a.m. ..... 69
C. The Eastlands Received a Flash Flood Warning at 1:14 a.m. ..... 69
D. The Eastlands Ignored Three More Warnings From 2:00 to 2:26 a.m. ..... 70
E. Like the Man in the Parable, the Eastlands Rejected these Final Warnings to Avoid Catastrophic Loss of Life ..... 72

XI. AS THE WATER ROSE, THE EASTLANDS DOUBLED DOWN: THEIR ONLY PLAN WAS TO SHELTER IN PLACE. ..... 73

XII. THE TERROR AND CHAOS AT CAMP MYSTIC: CILE'S FINAL HOUR OF LIFE ON JULY 4, 2025. ..... 75

A. The Eastlands' Desperate Attempt at an Improvised Evacuation ..... 75
B. Cile's Final Moments ..... 82




Copy from re:SearchTX

XIII. POST-FLOOD: THE EASTLANDS CHASE ACCOUNTS INSTEAD OF ACCOUNTABILITY. ....84

A. The Eastlands Prioritize Reopening Over Reflection and Responsibility ....84
B. The "New" Safety Measures Only Reinforce its Failures ....86
C. The Eastlands Have No Business Watching Over Children Ever Again ....86
D. The Eastlands Have Spoliated Evidence....86

XIV. CAUSES OF ACTION ....90

A. Negligence ....90
B. Negligence *Per Se* ....91
C. Gross Negligence ....93
D. Premises Liability ....93
E. Intentional Infliction of Emotional Distress ....94
F. Respondeat Superior, Agency, and Ratification ....95
G. Joint Enterprise ....96
H. Veil Piercing and Alter Ego ....96

XV. DAMAGES ....97

A. Wrongful Death ....97
B. Survival Action ....97
C. Exemplary Damages ....98

XVI. INJUNCTIVE RELIEF AND PRESERVATION OF EVIDENCE SOUGHT ....98

XVII. NOTICE OF SELF-AUTHENTICATION ....99

XVIII. RESERVATION OF RIGHTS ....99

XIX. PRE-JUDGMENT AND POST-JUDGMENT INTEREST ....99

XX. REQUEST FOR JURY TRIAL ....99

XXI. CONDITIONS PRECEDENT ....100

XXII. CLAIM FOR RELIEF ....100

XXIII. PRAYER ....100



Copy from re:SearchTX

## I.
## INTRODUCTION: CILE STEWARD'S DEATH WAS DUE TO AN ACT OF MAN, NOT AN ACT OF GOD

1. There is no greater transfer of trust than that which occurs when a parent entrusts her child to the care of another. On June 29, 2025, Will and CiCi Steward dropped their eight-year-old daughter Cile off for her first time at sleepaway camp, an entire month at Camp Mystic, where Cile's mother, aunt, grandmother, and countless cousins had attended as campers and counselors. This year was Cile's turn. Tragically, the Eastlands and Camp Mystic Defendants violated their trust in every conceivable way.

2. Cile's parents did not know that when they kissed Cile goodbye, it would be the last time they would ever hold her. The last thing Cile said to her mother, misty-eyed, seeing her firstborn off to camp for the first time, was "Mom, don't worry, I'm going to be okay." Cile is not worried about her safety. She doesn't know she needs to be. No child expects the adults in charge to abandon them.



3. CiCi was not worried about Cile's safety either. The Eastland family had run Camp Mystic for nearly a century. It was a family dynasty: Dick and Tweety Eastland at the top, their sons,



Copy from re:SearchTX

Edward, Britt, and Richard, running the rest. The family made millions of dollars every summer. CiCi worried about social dynamics, mean girls, homesickness. Never in her wildest dreams did she consider that the Eastland family would cut corners on safety.

4. The Eastlands promised to protect, safeguard, and prioritize Cile's safety and well-being in exchange for her parents' enrollment, trust, and money. When a business houses, safeguards, and cares for other people's children, it steps into the parents' shoes. The Eastland family would violate that borrowed trust and its heightened duties in every conceivable way.

5. On July 4, 2025, Cile would be one of twenty-seven campers and counselors needlessly killed as a direct result of the Eastlands' conduct, inaction, and decisions.

## A. Promises Made and Broken: The Eastlands Create an Illusion that Camp Mystic was a Safe Haven

6. The Eastlands marketed Camp Mystic as a Christian sanctuary for young girls, "heaven on earth," a place where faith, tradition, and safety converged under the watchful eyes of the Eastland family. Their communications to families consistently invoked scripture, closing with blessings such as "Until we see you again, may 'the Lord watch over you.'" Psalm 121:5. They cultivated an atmosphere of absolute trust, authority, and obedience rooted in tradition. Generations of campers and their families believed the Eastlands could do no wrong.

7. The Eastlands also invoked the camp as a legacy-builder and a bridge to future social standing — a place where the girls lucky enough to attend would meet their future college roommates and sorority sisters. Between the Eastlands' marketing and the power dynamic they created within the camp, Camp Mystic commanded an almost cult-like following.

8. The camp's culture reinforced this hierarchy at every level. Each camper was assigned a tribe, Kiowa or Tonkawa, through which they competed, connected, and learned deference to the rules and to those in authority. The camp's entire philosophy taught young girls that they could



Copy from re:SearchTX

earn their own leadership positions by following directions from a clear chain of command. At the top of that chain, for every camper, counselor, and staff member, was the Eastland family.



*Photograph of Cile drawing Kiowa, her tribal assignment, on June 29, 2025.*

9. Cile's assigned cabin was Twins II, one of three cabins housing the youngest and most vulnerable campers: Twins I, Twins II, and Bubble Inn. All three were located in an area of Camp Mystic's Guadalupe River campus known as "the Flats." Twins I and Twins II shared a single building, divided by a common wall, with a shared front porch. Each had two counselors — teenagers and former campers themselves. The cabins' location was centralized, within easy walking distance of common camp buildings: the Recreation Hall, the Commissary, the Main Office, and the Dining Hall ("Harrison Hall"). Cabins for older campers were located on higher ground in an area called "Senior Hill."



Copy from re:SearchTX




10. While every counselor and camper was expected to obey the Eastlands' rules and directives, none were more obedient, more reliant, and more deferential than the youngest campers in their first year at camp.

11. Joy and growth cannot exist without safety. CiCi and Will Steward entrusted Cile's life to the Eastland family under explicit promises and assurances that her safety and well-being were the Eastlands' paramount priority.

12. On and before July 4, 2025, common-sense safety measures were absent. Protocols and plans that should have been in place were ignored. Cile was killed not because of an unavoidable act of nature, but because of preventable failures and broken promises.

13. Behind the veneer of Christian tradition and rustic charm, the Eastlands operated Camp Mystic as something very different from its outward image. Their promises of protection were hollow. Their invocations of faith masked a reckless disregard for the lives of the children entrusted to their care. Camp Mystic is a for-profit enterprise, and for decades the Eastlands treated it as one,



Copy from re:SearchTX

rejecting industry safety standards, fighting legislation designed to protect campers, avoiding regulatory oversight, and refusing to join the American Camp Association. They constructed a deliberately layered corporate structure designed to shield their personal assets from accountability. They even sued one another, spending more than $6 million in a bitter family lawsuit accusing Dick Eastland of fraud and corruption. While they told parents their focus was on the campers, their focus was equally or greater on the money.

## B. <u>The Eastlands Prioritized Profits and Property over People</u>

14. Camp Mystic sits in the middle of *the* deadliest flood zone in the United States, a region known as "Flash Flood Alley." The National Weather Service has issued more than 100 flash flood warnings for the area surrounding Camp Mystic over the last 30 years. The entire camp lies within the 500-year floodplain, surrounded by high cliffs, a river, and three creeks that act as a funnel for rainwater falling upstream. Access to the camp is over a narrow land bridge crossing all three creeks. Anytime the Guadalupe, Cypress Creek, Edmundson Creek, or Bubble Gum Creek floods, which happens often, the entire camp is cut off from ingress, egress, evacuation, and rescue. The camp's topography makes it a deadly chokepoint. When Camp Mystic floods, as it has many times in its 99-year history, campers get stranded because there is no way out. The location alone makes it no place for children to sleep overnight.






Copy from re:SearchTX

15. The Eastlands did not deny Camp Mystic's history of flooding. They celebrated it. The Eastlands heralded the Great Flood of 1932 as part of the camp's folklore. Every year, including 2025, campers participated in trivia contests about Camp Mystic's history and traditions. One of the history questions they are asked is: “What was the year of the great flood? 1932.”



HISTORY

When was Camp Mystic established? 1926

What kind of trees are behind Harrison Hall? Pecan

When was Harrison Hall dedicated? May 26, 1990

How do you spell the Byrd in Byrd House? B-Y-R-D

What kind of tree is found in the river? Cypress

6. What is the name of the river Mystic is on and how do you spell it? Capital G

7. What is the name of a frog in Cypress Creek? Orpheus

8. What cabin on Senior Hill was once a log cabin? Look Out

9. Where were Sunday Vespers held before Chapel Hill was dedicated? On the

10. What is the elevation of Camp Mystic? 2200 feet

11. What was the original name of Camp Mystic? Camp Stewart for Girls

12. What years did the U.S. Air Force use Mystic as a rehabilitation center? 194

13. How did Mystic get its name? Mrs. Former, a nurse at Mystic in 1926, notice magical and MYSTIC the camp looked...thus the name.

14. What was the original name of Senior Hill? Indian Hill

15. What was the year of the great flood? 1932

16. What was the original length of one term at Mystic? 8 weeks

17. When was Rec Hall built? 1928

18. What year did Ag and Pop Stacy buy Mystic? 1939

19. How many acres of land are owned by Mystic? 750 acres

20. What is the name of the Mystic newspaper? Mystic Murmurs

21. When was Chapel Hill dedicated? 1959

*One of Cile's few possessions that survived the July 4th Flood.*

16. Both floods of July 2, 1932, and July 4, 2025, share strong and foreboding similarities. Both originated on the Guadalupe River and directly impacted Camp Mystic. Both occurred in the first week of July. Both were caused by intense, concentrated rainfall that triggered flash flooding. In both, campers had to be evacuated. In both, Camp Mystic cabins and structures were swept away. And the gauge data is remarkably close: on July 2, 1932, the river at Hunt peaked at 36.60 feet; on July 4, 2025, it peaked at 37.52 feet — ***a difference of less than one foot***. The 2025 flood was essentially a repeat of what the river had already shown it could do 93 years earlier.

17. The critical difference between the two: the 1932 flood occurred during the daytime. A local newspaper noted at the time that it would have been far worse had it happened at night. Although the Eastland family now calls the 2025 flood unprecedented, the river had already



Copy from re:SearchTX

reached nearly this same height, at this same location, in the same month — within the lifetime of the camp itself. The 1932 flood was not just a historical event. It was an explicit warning to take precautions and make plans. That warning went unheeded.

18. Nor was it the only warning. Subsequent floods reminded the Eastland family of the river's dangers again and again: floods that forced evacuations to higher ground, floods that left counselors and campers stranded without food for days. In 1987, a flood killed 10 campers and counselors at a neighboring camp downriver. One flood even forced the evacuation of Tweety Eastland by Army helicopter so she could give birth to one of her children. Flooding was so commonplace that in the camp's 99-year history, campers on Senior Hill were routinely cut off from the rest of camp.

19. Yet despite this history — despite every flood, every evacuation, every warning — the Eastlands kept cabins in a known floodplain and at a chokepoint for floodwater. Worse, the Eastlands consistently opposed or sought to remove any designation of those cabins as being located in a floodplain. They did not merely fail to protect the children in their care. They actively resisted the regulations and guidance designed to do so.

20. The floods themselves were warnings. But the Eastlands also received direct, specific knowledge of the imminence of a major flood and the urgent need to safeguard the camp. Dick Eastland sat on the board of the Upper Guadalupe River Authority, the very agency charged with protecting the river corridor. The UGRA told him that the county lacked necessary warning systems and infrastructure. It told him that a catastrophic flood, outside the standard 100- or 500-year definitions, was likely within the next three years. Dick Eastland did not learn this secondhand. He was in the room.



Copy from re:SearchTX

21. Camp Mystic did nothing. The Eastlands never adopted an appropriate emergency evacuation plan. They never installed warning infrastructure. They never purchased walkie-talkies for counselors (just themselves), battery-powered radios, or a back-up generator. A basic communication bundle for every cabin would have cost roughly $100. They would not spend the money.

22. But they did spend money on themselves. The Eastlands built and improved large personal residences on the camp property — every one of which had a second story.

23. Any business that houses children overnight bears a heightened duty to implement safety measures against foreseeable disasters. This is not just common sense. It is the law.

24. The State of Texas, OSHA, FEMA and authorities like the American Camp Association ("ACA") (which the Eastlands refused to join) all require and urgently recommend that any facility exposed to flood risk ***must*** maintain and follow a flood emergency and evacuation plan.

25. The principle is basic and universally accepted: when children are housed in foreseeable danger zones, evacuation planning is not optional. The Eastlands were bound by this principle through regulation, through industry standards, and through the most fundamental obligations of decency and care.

26. On July 4, 2025, under Texas Administrative Code § 265.15(k), the Eastlands were required to have:

a. Maintained a written emergency plan for evacuation in the event of a flood, with detailed procedures to follow;
b. Reviewed that plan and specifically assigned staff members and counselors to defined roles and protocols in the event of a flood;
c. Designated emergency shelters (also called "muster sites") providing a reasonable degree of safety;
d. Established clear chains of command with specific assignments for each staff member and counselor;
e. Posted the emergency plan in each cabin; and



Copy from re:SearchTX

f. Trained and instructed every camper, counselor, and staff member on the emergency plan and evacuation procedures.

27. The Eastlands knew a major flood was not a possibility but an inevitability. Why they did not regard the flooding hazards at their camp with greater care, particularly for children sleeping in the very zone of danger, remains unclear. But they did not.

28. The Eastlands did not merely ignore these requirements. They defied them. The single most important piece of safety equipment the Eastlands should have had was an emergency response and evacuation plan. Not only is such a plan required, it's also free.

29. The Eastlands did post plans in its cabins and in its counselor training manuals but to call what they posted an "evacuation plan," as required by law, is generous.




*"Emergency Instructions" posted on bulletin board in Twins II, photographed July 7, 2025.*



Copy from re:SearchTX

30. These "Emergency Instructions," posted on the bulletin board next to the Twins II door on July 4th, miraculously survived the flood even as half of the Twins II campers did not. At some point after July 7, 2025, these instructions will suspiciously disappear from the bulletin board of Twins II and other cabins at the camp.

31. The entirety of Camp Mystic's guidance to campers and counselors on what to do in the event of a flood is found in Section II of these instructions:

> **II. Floods**
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

32. These instructions were also the embodiment of the Eastlands' promises to parents to keep their children safe. And the very foundation of those promises was false.

33. The Eastlands promised Cile and her parents that Twins II was safe and built on high ground.

34. The Eastlands promised Cile and her parents that, in the event of an emergency, Cile would be given instructions over the loudspeaker and that if the electricity was off, a walkie-talkie would be used.

35. The Eastlands promised Cile and her parents that, to keep Cile safe, she must "NEVER" wander from her cabin and must stay in her cabin unless told otherwise by the office, i.e., the Eastland family.

36. The Eastlands never trained counselors, campers, or staff on what to do in the event of a flood: not how to prepare, not where to go, not how to reach the safety of higher ground.

37. CiCi, Will and Cile knew none of this. They believed, and relied upon, the Eastlands' promises to keep Cile safe.



Copy from re:SearchTX

38. The Stewards relied on every one of these promises. Every one was false. The cabins were not on high ground. The loudspeakers were never used. No one provided Cile or her counselors with walkie-talkies. What the Eastlands called an emergency plan was, at best, an order to shelter in place at all costs.

39. Rather than keep Cile safe, the Eastlands' conduct on July 2, 3, and 4 sealed her fate the moment the water began to rise. The National Weather Service and the State of Texas put the Eastlands on notice of the threat of deadly flooding beginning on July 2, 2025. Those notices were updated regularly as the threat escalated.

## C. Warnings Received and Ignored: A Flood that Came with Timestamps

40. The July 4, 2025 flood did not come out of nowhere. It came with timestamps. The Eastlands received multiple warnings and had multiple opportunities to prepare. Weather forecasters repeatedly told them the storm would stall over the camp Thursday night into early Friday morning.

41. Cile had no way to know about the growing threat. The Eastlands had deprived her, and her counselors, of any ability to receive information from the outside world. Camp Mystic was marketed as a phone-free camp, an idyllic retreat where children could experience nature free from the distractions of modern technology.

42. Camp Mystic's "Final Instructions 2025 Guadalupe River" included strict policies and procedures prohibiting campers and counselors from having phones or any electronic communication devices in their cabins. The Eastlands marketed this policy as a benefit. What they did not tell parents was that it would leave their children completely dependent on camp leadership to warn them of imminent danger — warnings the Eastlands would never give.



Copy from re:SearchTX

43. As the threat intensified, the Eastlands told no counselor or camper what was happening. The cabins had no weather radios and no communication devices of any kind. When Cile went to sleep on the night of July 3rd, she felt safe and protected. She had no idea of the storm building outside her cabin walls.

44. Cile did not need the Eastlands to monitor a rain gauge. She needed them to have a flood emergency plan. An evacuation plan. A designated muster site. Most of all, she needed the Eastlands to heed the active flash flood warning and tell her and her counselors, ***clearly and urgently***, that her life was in immediate danger and that she needed to move to higher ground without delay.

45. The Eastlands did none of these things. Not one.

**D. <u>Cile's Last Day</u>**

46. Cile's final full day of life began like any idyllic childhood day at camp: banana bread for breakfast, morning arts and crafts, tidying up her cabin with new friends, pesto pasta for lunch.

47. When she wakes up on the morning of July 3rd, she does not know that government agencies are already escalating their emergency flood response plan, urging Texans to prioritize flood preparedness and warning of imminent danger.

48. During the daily rest period, Cile sits down and writes a letter home, carefully decorating the envelope with her art and her love.





Copy from re:SearchTX

49. These daily letters, placed in the mail, are the only way she can communicate with her parents. Cile sent her last letter home out on July 3rd but it was not postmarked until July 5th.




50. For a few blissful hours that afternoon, the sun breaks through. Cile plays *Steal the Bacon* with her friends, cheering enthusiastically even when they lose. She is happy and making friends. And she is led to believe she is safe.



51. Cile does not know that just hours earlier. the National Weather Service had issued a Flood Watch for Kerr County, or that by the afternoon the Texas State Emergency Operations Center had escalated to Level II, activating additional emergency resources in anticipation of severe



Copy from re:SearchTX

rainfall and flash flooding. She has no way to know. She is eight years old. She is fully dependent on the Eastlands to warn her and protect her from danger.

52. That evening, she eats fajitas and Jell-O cake for dinner. At approximately the same time, the National Water Center issued an intensified warning to the Eastlands of *"considerable"* flooding risks in areas including Camp Mystic. Still the Eastlands tell her nothing; and they did nothing to prepare.

53. At around 7:30 p.m., Cile and the other campers, dressed in white, walk uphill to Chapel Hill for Ags Vespers, a cherished Camp Mystic tradition meant for reflection, worship, and peace, overlooking the Guadalupe River. During the candlelight service, at 8:12 p.m., the Flood Watch is extended in another warning to the Eastlands of the camp's considerable flooding risks. Still, they do nothing to prepare. At 8:30 p.m., Cile watches "Counselor Stunts" at Rec Hall, complete with a surprise appearance of an animal from the stables. She is happy. She feels safe.

54. By 10:00 p.m., Cile returns to her Twins II cabin and climbs into her top bunk, excited for her first Fourth of July with her new friends at camp. "Taps" plays over the loudspeaker mounted just 49 feet from the door of Twins II, signaling bedtime. It would have been so easy for the Eastlands to use that loudspeaker, the one they had promised would deliver emergency instructions, to warn campers and counselors to be on alert. It also would have been just as easy for the Eastlands to move the girls to the massive Jones Hall building at Camp Mystic's Cypress Lake campus, over 60 feet higher in elevation and less than 1,900 feet away. But still, the Eastlands say and do nothing to warn or protect the campers.

55. At 10 p.m. and again at 2 a.m., the Eastlands move their canoes to higher ground. They do not move the campers. Property is protected. Children are not.



Copy from re:SearchTX

56. At 1:14 a.m., while Cile sleeps, the NWS issues a ***Flash Flood Warning***, for Kerr County with a "***Considerable***" threat tag, the second-highest alert possible. The NWS uses the "Considerable" tag only rarely, "when indications of flash flooding capable of unusual severity or impact are imminent or ongoing and urgent action is needed to protect lives and property."




57. The 1:14 a.m. warning is explicit: **LIFE THREATENING CONDITIONS EXIST. MOVE IMMEDIATELY TO HIGHER GROUND.** Dick Eastland receives this warning on his phone. Dick Eastland ignores it. The only affirmative action he takes for at least the next hour is to order his team to move the *rest* of Camp Mystic's canoes to higher ground. Every safe evacuation route is still open and available.

58. A safe two-story shelter stands 20 paces from Cile's bunk. But rather than evacuate her to safety, the Eastlands leave Cile asleep in her top bunk, exposed to a multitude of hazards she knows nothing about. Three hours will pass before she is swept away by the raging river.

59. Over the next hour, the routes of escape from Camp Mystic will be cut off one by one as the river and the three creeks begin to rise higher and higher. By 2:15 a.m., the Eastlands know that even little Bubble Gum Creek is impassable. However, even as late as 3:00 a.m., a clear evacuation route for all cabins remains open and passable.



Copy from re:SearchTX



"Swept Away," *New York Times*, November 15, 2025 (3:00 a.m. graphic).

**E. <u>Shelter in Place: Obedience is Cile's Death Sentence</u>**

60. Despite the clear, urgent warning, and visual confirmation of normally dry creeks and rivers rising with their own eyes, the Eastlands continue to do nothing. Even when counselors from Bug House, the cabin closest to the river, run to tell them they are taking on water, the Eastlands order them to return to their cabin and tell them to stay put. At least one counselor turns to her Camp Mystic manual for guidance. The manual confirms the instructions given: stay put, do not leave the cabin, wait for further instructions. The manual does not say that the "high ground" the cabins are supposedly built on is, in fact, in a known floodplain. Nor does the manual identify *any* evacuation route.

61. These instructions are no different than the ones posted in the cabins. It is particularly horrific to know that, by following the rules the Eastlands gave them, so many girls would lose their lives.



Copy from re:SearchTX

62. At approximately 3:00 a.m., Dick Eastland decides he needs to evacuate some of the cabins closest to the river. But Camp Mystic has no evacuation plan. And no one has been trained what to do if they ever do have to evacuate. So, Dick and Edward Eastland and the night watchman, Glenn Juenke, improvise a plan in the midst of the chaos of a deadly flash flood. They decide to evacuate, one at a time, the five cabins closest to the river in order: Bug House, Look Inn, Hangout, Tumble Inn, and Jumble House. It is chaos.

63. The Eastlands have admitted there was no plan and they were improvising. You don't improvise with children's lives.

64. No one tells the rest of the camp what is happening. No announcement over the loudspeakers. No communication by walkie talkie. Nothing.

65. Cile and the other campers in Twins II can see the lights of Dick, Edward, and Glenn's vehicles as they pass back and forth between other cabins and Rec Hall. Flashes of lightning reveal creeping levels of water. Some counselors remind themselves of their orientation training and the reassurances given that the cabins are built on safe, high ground and that a dangerous flood will "never happen." The campers and counselors in Twins II hear the voices of other campers yelling and shrieking as they walk *past their cabin* on the way to Rec Hall. For the first time, they hear from someone in charge—Edward Eastland. He yells out to the counselors and orders them to stay put in their cabins until the water gets "so high they couldn't stay any longer." Edward leaves them there. They are the youngest campers. They follow their orders just like the Eastlands taught them to do.

66. That order was a death sentence. It defied every policy and guideline every federal and state agency provides for flood emergencies.



Copy from re:SearchTX

67. When evacuations finally began, the youngest and most vulnerable girls were left for last. There was time. There were routes. There were safe places to go. But there was no plan and no leadership. Every evacuation route was available when they started evacuating. Every evacuation route was still available at 3 a.m. and afterward.

68. Eventually, around 3:30 a.m., Edward comes back. The counselors, desperate for a rescue plan, are told they cannot leave. He tells them the water is too high and will soon recede. The two cabins are able to communicate with each other through slats in the wall; the counselors try to calm everyone and reassure them by telling them to get on the highest bunk bed.



69. The water continues to rise, inch by inch, filling the concrete box. The girls flee to the top bunks, but they are running out of room to breathe. Edward yells to a Twins II counselor, asking for a screwdriver, hoping to remove an air conditioning vent in the Twins II's low ceiling. There is no screwdriver.

70. The girls are screaming. They can hear the screaming of their friend in Twins I and Bubble Inn. Edward begins audibly praying, yelling out the Twins II door: "Lord Jesus, please stop the rain." But the water keeps coming. The girls' trunks are floating as the girls huddle on two top bunks by the windows, terrified and desperate. The water in Twins I rises faster than in Twins II. A Twins I counselor screams that girls are being swept out of the cabin. By this time, Edward is



Copy from re:SearchTX

at the Twins II doorframe, bracing the doorframe, facing out toward the river. Twins I campers float down the porch toward the Twins II door. Chaos reigns. Girls start fleeing, rather than drown, through the doors and windows on the shared porch.

71. At or by 4:09 a.m., Edward is swept away from the Twins II doorframe and downstream with two Twins I campers clinging to him. Ultimately, he arrives at a tree about 200 yards downstream at the archery range near Bug House (the "Bug House Tree").

**F. <u>Cile's Death</u>**

72. Cile and the other Twins II campers are still in their cabin. The water continues to rise. The Twins II ceilings are flat, not vaulted, so the girls quickly run out of room and air. The girls are terrified. Some are silent, so shocked they cannot speak. Most are crying hysterically, wanting to go home, wanting to be with their parents. Some are screaming "help" so many times that those who survive will be hoarse the next day. The counselors realize that if they stay in the cabin, everyone will drown. Eventually, the water rises so high it floats and tips the bunks, spilling the girls into the churning water inside the cabin. The girls cannot stand.

73. Once the water rises to the counselor's shoulder height, one counselor decides to try to break out the side windows with a camper's trunk. The water continues to rise to above the top of the Twins II front door.





Copy from re:SearchTX

74. The counselors prepare to guide the campers downriver out of the second Twins II window on top of mattresses. They tell the girls to be brave and hold on to anything they can get their hands on, including clotheslines. They put girls on mattresses and push them underwater to get them through the window. Some girls are sucked out of the window by the current. The water is churning and violent. For some of the girls, the current carries them to the cabins and a stand of trees lining the road and soccer field. Some girls are flung from tree to tree, holding on as long as they can, until they reach the Bug House Tree where most of the survivors will be found. Some campers report later being approximately thirty feet high in the tree but still touching water.

75. Cile's cabinmate and best friend is swept away. Incredibly she survives after being found in trees miles down-river. Six months later, she is asked to write a paragraph in school about a time she persevered. This is what she writes about the morning of July 4, 2025:




76. Cile also does all she can to persevere. Cile is on a mattress with two or three other Twins II campers. At one point, Cile falls off the mattress. Cile is one of the only girls in her cabin who,



Copy from re:SearchTX

when they took the swim test, made it to the next level. She is a strong swimmer. On information and belief, Cile does not go from tree to tree but takes a more direct path to the Bug House Tree. She makes it to the tree, where the majority of the survivors are found. She is so close to survival.

77. She calls for help. She grabs for branches. But she keeps grabbing leaves.

78. The current is too strong. She almost makes it. She is unable to secure her grip on the tree.

79. Cile is swept away.

80. Because of the Eastland family, Cile was left with an impossible choice: drown in her cabin or fight violent floodwaters in the dark in a blind effort of escape and survival. My baby was a fighter. She was a strong swimmer and a great climber.

81. Cile did not die because there was nowhere to go. She died because she was told not to go.

82. She did not die because there wasn't time. She died because time was wasted.

83. Cile did not die because there was no time to save her. She died because the Eastland family did not have a plan and ran out of time.

84. At 9:01 a.m., CiCi receives the call from Camp Mystic that Cile is "unaccounted for."

85. As of February 4, 2026, Cile still has not been found. Recovery efforts are ongoing.

86. Cile's death was a tragedy, not only because it was tragic, violent and horrifying for her but because it was also completely avoidable. Camp Mystic was the only camp on the Guadalupe River where children died. Other camps received the same warnings. They evacuated. Every child lived.

87. Cile's death has deprived her parents of their firstborn daughter. It has deprived her younger sister not merely of companionship, but also of the singular bond, guidance, and emotional security that exists uniquely between sisters. Cile's life, though tragically brief, left an



Copy from re:SearchTX

unmistakable and enduring impact on all who knew her. Her absence leaves a permanent void in the lives of her parents, sister, and all who loved her.



88. Cile was a vibrant, intelligent, and deeply loved child and older sister. She possessed a rare combination of joy, curiosity, independence, humor, pluck, athleticism, and creativity that drew others to her. A natural leader, Cile was known for her confident and spirited presence that brightened every room she entered. Beneath that commanding exterior lived a sweet, sensitive, and generous soul whose warmth, vulnerabilities, and already evident maternal instincts endeared her to all who knew her.

89. As an older sister, Cile was a teacher, protector, best friend, and playmate to her younger sister. The two shared an exceptionally close and inseparable bond, moving through childhood hand in hand as partners in growth, play, and mischief. Cile modeled for her sister the intrinsic value and freedom to develop her own unique style and personality. When she left home to go to



Copy from re:SearchTX

Camp Mystic, she was sad to leave her mom, dad, sister and dog. But Cile was so excited to go and experience camp with her friends. And make new ones.

**G. <u>There Were Heroes at Camp Mystic. But None were Named Eastland</u>.**

90. While there were many heroes at Camp Mystic on July 4, 2025, ***none of them were named Eastland***. The true heroines were the young counselors of the camp, teenagers themselves, too young to have been burdened with the responsibilities and trauma of that morning. They were left to make split-second, life-or-death decisions in an emergency for which the Eastlands had never warned them, never trained them, and never given them an evacuation plan. They received no communication by radio, walkie-talkie, or loudspeaker. They had no idea the camp had been under a flood watch for two days. They did not know they had been under a flash flood warning for two hours. They relied on their courage, their strength, their perseverance, and their sheer will to survive and saved hundreds of children.

91. The counselors with Cile in her final moments were braver than the adults who put them in that impossible situation. They did everything they could to save Cile and every girl in Twins I, Twins II, and Bubble Inn. Those that survived in Twins I and Twins II did so because of their counselor's heroic efforts. Cile's counselors gave her a fighting chance when the people in charge did not.

92. Without the Camp Mystic counselors, the loss of life on July 4th would have far exceeded twenty-seven.

93. Camp Mystic was not safe for Cile. It will never be safe for any child as long as the Eastlands are associated with it. They can never be allowed to operate a camp again.



Copy from re:SearchTX

## H. Post-recovery

94. In the days and weeks following July 4th, twenty-six Camp Mystic campers who perished were recovered in valiant and ambitious efforts still underway by the State of Texas and its Emergency Operations Center ("EOC"). Cile is the only camper missing somewhere in the destruction field of the flood, over seven months later. The State and EOC are still conducting their recovery efforts. These efforts can only be characterized as inspiring and heroic and so incredibly "Texan." The boots on the ground efforts of Texas and its leaders in finding Cile stands in dark contrast to the Eastlands' tone-deaf, self-serving and self-sanitizing response to the deaths of twenty-seven children on their watch.



95. The fact that Cile has not yet been recovered and returned to her parents and family is an ongoing and devastating deprivation, distinct and in addition to, the wrongful loss of her life.



Copy from re:SearchTX

## I. The Eastlands Refuse to Take Accountability

96. The Eastlands now blame God for what happened. They claim this tragedy occurred because of an unprecedented flood. The truth is that this flood was precedented. The Eastlands dismiss the warnings embedded in Camp Mystic's own history by insisting the July 4 flood was a 1,000-year event, that the last time a flood like this occurred, Noah had to build an ark. That is not true. But even if it were, both Noah and the Eastlands were warned a flood was coming. The difference is that Noah prepared. The Eastlands did not.

97. Rather than accept responsibility for their complete defiance of every rule, guideline, and warning, the Eastlands have waged a public relations campaign designed to sanitize the reality and convince the public and regulators that what happened to Cile on July 4, 2025, was an unavoidable act of God. It was not. Gilbert White, the geographer known as the "father of floodplain management," wrote that "floods are acts of God, but flood losses are largely acts of man." White's observation proved true at Camp Mystic. The tragedy was not caused by an act of God. It was caused by the Eastlands.

98. There is an old spiritual parable about a devout man caught in a flood. As the waters rise, a neighbor comes by offering help. "No," the man says, "God will protect me." The waters continue to rise and a boat arrives, offering rescue. "No," the man insists, "God will save me." The waters rise higher still, and the man climbs to his roof. A helicopter hovers overhead and drops a ladder. The man refuses: "God will not bring me harm." The man drowns. Upon meeting God in Heaven, he asks, "Why didn't you save me?" God replies: "I tried. I gave you time. I sent you a neighbor, a boat, and a helicopter."

99. Like the devout man, the Eastlands refused every form of help that was offered. Now, after a catastrophic and preventable loss of life, they ask: "How could we have known?" The answer is



Copy from re:SearchTX

obvious. Camp Mystic and the Eastland family received warning after warning, scientific, historic, and regulatory, that they must act to protect the children in their care from foreseeable floods. They chose to ignore every one. They moved the horses. They moved the canoes. They did not move the children.

100. It is not clear why the Eastlands concealed the warnings and did nothing to protect Cile. Perhaps greed. Perhaps complacency or sheer arrogance. Whatever their reasons, the Eastlands' conduct leading up to and during July 2 through 4, 2025, caused Cile's death.

101. The Eastlands now make three claims in their defense. Each is false.

102. First, they claim they did nothing wrong because nobody told them there would be a catastrophic flood at Camp Mystic's specific address. That is false. The National Weather Service issued a flash flood warning for the area that included Camp Mystic. The warning did not need to name the camp by street address to be understood.

103. Second, they claim nobody told them there was a life-threatening situation or instructed them to evacuate until after 3:30 a.m. That is also false. The NWS's 1:14 a.m. warning said, in all capital letters, that there was "LIFE THREATENING FLASH FLOODING" and directed recipients to move to higher ground immediately.

104. Third, they claim they should be congratulated for safely evacuating 166 campers. In reality, the Eastlands evacuated only a few cabins. Everyone else was on their own. More than 30 girls fled uphill to Sky High by themselves. The rest defied the Eastlands' orders and self-evacuated. Nearly half of the young women at Camp Mystic on July 4 either perished or escaped without any help from the Eastlands. The only acceptable evacuation number was 100%.



Copy from re:SearchTX

**J. Back to Business: Post-Flood Pressure Campaign to Reopen**

105. Less than three months after the flood, while families are still burying their daughters, it was back to business as usual for the Eastlands. While the Stewards and the State of Texas searched for Cile, Tweety Eastland focused on accepting awards on behalf of Dick.




106. Less than 60 days after 27 children died, the Eastlands began recruiting again. While families planned funerals, the Eastlands solicited deposits for summer 2026. While parents consoled children who had survived, authorities investigated what went wrong, and the State of Texas scoured the river for Cile, whom the Eastlands would not acknowledge as still missing, the Eastlands were seeking deposits. It was a time for reflection and accountability. The Eastlands chose commerce.

107. The Eastlands sent handwritten letters addressed specifically to the children, bypassing their parents, imploring them to return. They followed with email after email pressuring families to send their daughters back. In doing so, they invoked the memories of the dead campers and counselors as a *marketing tool*, telling families that a return would bring healing, that the deceased campers would have wanted them to come back, that the legacy of Camp Mystic lives on even while twenty-seven of its campers do not.



Copy from re:SearchTX

108. The Eastlands are tone deaf to the horrifying realities of what transpired at their camp. The Eastlands' only focus is on reopening Camp Mystic—immediately. They are aggressively soliciting deposits from parents who do not know of the dangers that still exist, both in the camp and the family that runs it. The stark reality is that the Eastlands will do and say anything to keep their cash flow from camper tuition to stay in business, fund their lifestyles and avoid bankruptcy.

109. The Eastlands invoke God while simultaneously blaming Him for their complete failure to prepare for or protect Cile from the flood they were warned was coming in every way imaginable.

## K. The Eastlands Should Never Be Responsible for Children Again

110. This case is about what happens when parents trust the wrong people with their children, people who choose profit over safety, secrecy over transparency, and self-preservation over the lives of the girls entrusted to their care. The Eastlands knowingly operated a camp for children in a location with a known history of deadly floods. Rather than spend money on moving cabins to higher ground, fortifying infrastructure, or even modernizing emergency plans and systems, the Eastlands kept that money to sustain their lifestyles, building large personal residences on the campus while refusing to update the cabins where children slept.

111. As the Eastlands promote the illusion that they did nothing wrong and that newly implemented safety measures will prevent future tragedy, nothing about them has changed. They rushed to reopen. They pressured families with a relentless campaign of letters insisting that daughters need to return so they can heal. But the image of Camp Mystic as "heaven on earth" is, and should be, forever shattered. It was only a matter of time before a flood swept someone away. And if the Eastlands are permitted to continue, it is only a matter of time before it happens again.



Copy from re:SearchTX

112. Any parent considering sending their child to Camp Mystic — and any authority charged with deciding whether anyone associated with the Eastlands should ever be allowed to operate a camp again — should read this Petition. Then they should ask two questions:

a. Should the Eastlands be allowed to operate a camp for children at a location with a known history of deadly floods — including one that swept cabins downriver and another that killed 27 children?

b. Should the Eastlands be allowed to have supervisory authority over the health, safety, or well-being of any child, at any location, when their negligence killed 27 children?

113. The obvious answer to both questions is: No, never.

114. Every parent the Eastlands try to convince to send their daughter back will hear the same things the Stewards were told: your daughter will be safe; we are the Eastlands; we've been doing this for decades; trust us. Those parents should remember one thing: the Eastlands have already shown exactly how they supervise and protect children. But when someone shows you who they are, believe them.

115. A place where 27 children died because adults ignored warnings is not a camp. It's a crime scene.

116. Camp Mystic was not safe for Cile. It will never be safe for any child as long as the Eastlands are associated with it. They can never be allowed to operate a camp again.

**L. <u>Acknowledgement of the State of Texas</u>**

117. Other camps will be safer in the future thanks to the Texas Legislature, which passed the Heaven's 27 Safety Act during the Second Special Legislative Session of 2025. The Act is codified in Chapter 141 of the Texas Health & Safety Code. Governor Abbott signed the Act into law on September 5, 2025. Governor Abbott, Lieutenant Governor Patrick, and the Legislature should be



Copy from re:SearchTX

commended for their leadership. These new laws will help ensure that summer camps throughout Texas take the necessary steps to keep children safe.

118. The State of Texas, the Governor, the Lieutenant Governor, and the dedicated teams at the Texas Division of Emergency Management have committed to continuing the search for Cile. They believe in the importance of their mission. They are searching the grounds and searching the water. They are taking steps to protect future generations, engaging in cleanup and research efforts for future flooding events. Their tireless commitment stands as a testament to the best of what Texas represents.

## II.
## DISCOVERY CONTROL PLAN

119. Plaintiffs intend discovery be conducted under Level 3 of Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE.

## III.
## PARTIES

120. Plaintiff Cecilia "Cile" Steward, was an eight-year-old minor child residing in Travis County, Texas. Cile was at Camp Mystic on July 3-4, 2025. Cile is the last remaining Camp Mystic camper that has not been found. Cile is presumed to be deceased. At the time of Cile's presumed death, she was only 8 years old. No administration of the estate is pending, and none is necessary.

121. Cile Steward is represented by and through her biological father, Will Steward. Will Steward is a plaintiff in his own capacity and is the Representative and heir of the Estate of Cecilia Steward. Will Steward is a resident of Travis County, Texas.

122. Plaintiff Catherine "CiCi" Williams Steward is a resident of Texas and the biological mother of Cile Steward. CiCi is a plaintiff in her individual capacity.



Copy from re:SearchTX

123. The Defendants are composed of Camp Mystic, LLC; Natural Fountains Properties, Inc. d/b/a Camp Mystic Inc.; Mystic Camps Family Partnership, LTD.; Mystic Camps Management, LLC; Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc.; George Albritton ("Britt) Eastland, as Representative of the Estate of Richard G. Eastland, Deceased; Edward S. Eastland; Mary E. Eastland; and William Neely Bonner, III, (collectively, "Defendants").

124. Defendant Camp Mystic, LLC is a Texas limited liability company with its principal place of business located at 2689 Highway 39, Hunt, Kerr County, Texas 78024. Defendant can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

125. Defendant Natural Fountains Properties, Inc. d/b/a Camp Mystic Inc. is a Texas corporation with its principal place of business located at 2689 Highway 39, Hunt, Kerr County, Texas 78024. Defendant may be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

126. Defendant Mystic Camps Family Partnership, Ltd. is a limited partnership whose registered office is located at 2404 Scenic Drive, Austin, Travis County, Texas 78703—the same address as the personal homestead address of Defendant Tweety Eastland. Mystic Camps Family Partnership, Ltd., can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.



Copy from re:SearchTX

127. Defendant Mystic Camps Management, LLC, is a domestic limited liability company whose registered office is located at 2404 Scenic Drive, Austin, Travis County, Texas 78703. Defendant can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

128. Defendant Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc., is an individual residing in Travis County, Texas. Defendant may be served with process at 2404 Scenic Drive, Austin, Texas 78703, or wherever she may be found. She has served as an owner and Executive Director of Camp Mystic since 1974.

129. Defendant George Albritton ("Britt") Eastland, as Representative of the Estate of Richard ("Dick") G. Eastland, Deceased, is an individual residing in Kerr County, Texas. Defendant may be served with process at 401 West Main Street, Kerrville, Texas 78028, or wherever he may be found.

130. Defendant Edward S. Eastland is an individual residing in Kerr County, Texas. Defendant may be served at 1105 Louis Street, Kerrville, Texas 78028, or wherever he may be found. At all times material to this lawsuit, he was, and still is, a Director of Camp Mystic.

131. Defendant Mary E. Eastland is an individual residing in Kerr County, Texas. Defendant may be served at 1105 Louis Street, Kerrville, Texas 78028, or wherever she may be found. At all times material to this lawsuit, she was, and still is, a Director of Camp Mystic.

132. Defendant William Neely Bonner III ("Neel Bonner") is an individual residing in Harris County, Texas. Defendant may be served with process at 4147 Lanark Lane, Houston, Texas



Copy from re:SearchTX

77057, or wherever he may be found. At all times material to this lawsuit, he was, and still is the President of Defendant, Natural Fountains Properties, Inc.

133. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos of parties named herein. Alternatively, Plaintiffs contend any such "corporate veils" should be pierced to hold such parties properly accountable in the interest of justice.

134. Pursuant to Rule 28 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs are suing any partnership, unincorporated association, private corporation, or individual whose name contains the words, or who does business under the name of the Defendants.

## IV.
## JURISDICTION AND VENUE

135. This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

136. Pursuant to the forum-defendant rule, this case cannot be removed because all Defendants are citizens of Texas with residence and/or their principal places of business in Texas. *See* 28 U.S.C. § 1441(b)(2), § 1332(c).

137. This Court may exercise personal jurisdiction over Defendants because they are citizens of the State of Texas and/or conduct a substantial and continuous amount of business in Texas, and because all acts, omissions, and conduct giving rise to Plaintiffs' claims occurred wholly within the State of Texas. Defendants' wrongful conduct was directed at Texas residents, performed in Texas, and caused injury in Texas.

138. Venue is proper in Travis County, Texas, under TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002(a)(2) because one or more Defendants reside in this county, and/or the principal office of a defendant that is not a natural person is located in this county. Specifically, Defendant Tweety



Copy from re:SearchTX

Eastland is a natural person that resided in Travis County at the time this cause of action accrued. According to property records, the property listed as her homestead is located in Travis County.

139. Tweety Eastland is a properly joined Defendant. Plaintiffs have pleaded valid causes of action against Tweety Eastland for negligence, negligence *per se*, gross negligence, premises liability, and intentional infliction of emotional distress based on her own acts and omissions.

140. At all relevant times, Tweety Eastland acted as an owner, operator, and Executive Director of Camp Mystic, exercising control over camp operations, safety decisions, communications, and post-flood conduct.

141. Tweety Eastland personally authored, signed, and disseminated post-flood communications to grieving parents, child survivors, and the broader Camp Mystic community. Those communications form the factual basis of Plaintiffs' intentional infliction of emotional distress claims and were undertaken in her individual capacity and within the scope of her managerial authority.

142. Furthermore, venue is proper in Travis County because Defendants Mystic Camps Family Partnership Ltd. and Mystic Camps Management, LLC are not natural persons and have their principal offices in Travis County. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3).

143. Mystic Camps Management, LLC's public filings confirm that its principal office is at 2404 Scenic Drive, Austin, Travis County, Texas. Dick and Tweety Eastland are the company's only members and both list that same Travis County address.



Copy from re:SearchTX

**<u>Mystic Camp Management, LLC's Public filings:</u>**

05-102 (Rev.9-15/33)

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ Tcode 13196 Franchise

■ Taxpayer number: 3 2 0 8 1 5 2 9 0 3 7

■ Report year: 2 0 2 4

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

| | | | |
|---|---|---|---|
| Taxpayer name: MYSTIC CAMPS MANAGEMENT, LLC | | | ○ Blacken circle if the mailing address has changed. |
| Mailing address: 2404 SCENIC DR | | | Secretary of State (SOS) file number or Comptroller file number |
| City: AUSTIN | State: TX | ZIP code plus 4: 78703 | 0804275960 |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2404 SCENIC DR, AUSTIN, TX, 78703

Principal place of business: 2404 SCENIC DR, AUSTIN, TX, 78703

1000000000015

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| RICHARD G EASTLAND | MEMBER | ○ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| WILLETTA A EASTLAND | MEMBER | ○ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| | | ○ YES | |
| Mailing address: | City: | State: | ZIP Code: |

144. Mystic Camps Family Partnership, Ltd.'s public filings also confirm that it maintains its principal office and principal place of business at 2404 Scenic Drive, Austin, Travis County, Texas. Mystic Camps Management, LLC is the partnership's general partner and maintains that same Travis County address. Mystic Camps Family Partnership wholly owns Camp Mystic, LLC and Natural Fountains Properties, Inc.



Copy from re:SearchTX

**Mystic Camps Family Partnership LTD's public filings:**

05-102 (Rev.9-15/33)

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ Tcode 13196 Franchise

■ Taxpayer number: 3 2 0 8 1 5 6 8 6 2 1

■ Report year: 2 0 2 4

*You have certain rights under Chapter 552 and 55[illegible] Government Code, to review, request and correct informatio[n] we have on file about you. Contact us at 1-800-252-138[illegible]*

Taxpayer name: MYSTIC CAMPS FAMILY PARTNERSHIP LTD

■ ◯ Blacken circle if the mailing address has changed.

Mailing address: 2404 SCENIC DRIVE

Secretary of State (SOS) file number or Comptroller file number: 0804281844

City: AUSTIN | State: TX | ZIP code plus 4: 78703

◯ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2404 SCENIC DRIVE, AUSTIN, TX, 78703

Principal place of business: 2404 SCENIC DRIVE, AUSTIN, TX, 78703

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

1000000000015

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| MYSTIC CAMPS MANAGEMENT LL | GENERAL PARTNER | ◯ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| Name | Title | Director ◯ YES | Term expiration |
| Mailing address | City | State | ZIP Code |
| Name | Title | Director ◯ YES | Term expiration |
| Mailing address | City | State | ZIP Code |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| CAMP MYSTIC, LLC | TX | 0804296074 | 100.000 |
| NATURAL FOUNTAINS PROPERTIES, INC | TX | 0013315900 | 100.000 |

**SECTION C** Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*

Agent: RICHARD G. EASTLAND

*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

Office: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

sign here: RICHARD G EASTLAND | Title: PARTNER | Date: 09/01/2024 | Area code and phone number: ( 830 ) 238 - 4660

145. Alternatively, venue is also proper in Travis County under TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002(a)(1) because a substantial part of the events giving rise to Plaintiffs' claim for intentional infliction of emotional distress occurred in Travis County. At all relevant times, Plaintiffs Will and CiCi Steward resided in Travis County. Defendants, through letters signed by Tweety Eastland, intentionally directed post-flood communications to Plaintiffs at their



Copy from re:SearchTX

Travis County residence. Those communications were received, read, and caused severe mental anguish to Plaintiffs in Travis County, and they constitute the acts forming the basis of Plaintiffs' intentional infliction of emotional distress claim.

146. Because proper venue is established against at least one Defendant, and because all of Plaintiffs' claims arise out of the same series of transactions or occurrences, venue is proper for all Defendants in this action. *See* TEX. CIV. PRAC. & REM. CODE § 15.005.

## V.
## THE EASTLANDS BLAME THE FLOOD ON AN ACT OF GOD: BUT THEY RECEIVED A CENTURY OF WARNINGS THAT A CATASTROPHIC FLOOD WAS COMING. INSTEAD OF LISTENING, THEY BUILT CABINS DIRECTLY IN THEIR PATH.

### A. The Eastlands Chose to Keep Camp Mystic Located in the Most Dangerous Flood Zone in the United States

147. The Eastlands bought Camp Mystic over 100 years ago. It is located in Kerr County, Texas. According to the *Texas Tribune*, "Kerr County … is one of the most flash flood-prone areas in the nation." Camp Mystic's location and topography places it in a deadly zone within Flash Flood Alley. Flash Flood Alley is known to be the deadliest flood zone in the United States.




148. Over the past century, the Guadalupe River basin has experienced more than 42 major floods, many of them deadly. The area's geography, topography and geological features make it



Copy from re:SearchTX

a hot zone for flooding. Its geography attracts storms from the Gulf of Mexico. Sometimes those storms stall over Flash Flood Alley and sometimes they combine with other storms. Due to the elevation, those storms often increase in intensity. The steep slopes and thin, rocky soil cause rain to run off very quickly. In areas where a river is fed by small creeks and streams, those creeks and streams can fill rapidly, adding to the flood potential of area rivers.

149. According to data from the National Oceanic and Atmospheric Administration ("NOAA"), the "minor" flood stage for the Guadalupe River at Hunt is 10 feet. A flood stage of 12 feet is considered a "moderate" flood. Major flooding occurs at a stage of 22 feet. Past historical events show that severe damage occurs at low-lying levels at each of these stages. Defendants were well-aware from prior events that the Guadalupe River had crested at "major flood" heights near Hunt at least five times since 1932 and at "moderate flood" levels at least nine more times.

### B. Camp Mystic's Location in "Flash Flood Alley" Made It a Chokepoint Particularly Vulnerable to Flooding with No Means of Escape

150. Camp Mystic sits at the convergence of at least four bodies of water that flood. Just below Camp Mystic's entrance. The Guadalupe River flows into a steep and narrow section with Highway 39 on one side and a high cliff on the other. When a flash flood occurs, the camp is positioned in such a way that water can rise rapidly from at least four different water sources that converge on the property. Campers and counselors can become quickly trapped with no way out.

151. The road to and from Camp Mystic runs along Highway 39. Less than a quarter mile below Camp Mystic, Highway 39 crosses a low-lying culvert over the river. When the Guadalupe floods above and below this crossing, there is no route onto Highway 39. Camp Mystic has a guard building and gate just above this crossing off Highway 39. The river washed the guard building and the guard herself down the river earlier in the morning on July 4th. When the river floods over



Copy from re:SearchTX

the low-lying crossing and up to the Camp Mystic gate, as it did on July 4th, there is no way to escape along Highway 39.




152. Once inside the gate, there are only two ways in or out. The first route is over the main driveway called "Camp Mystic Way."




153. This route crosses over a single, two-lane land bridge. However, this land bridge crosses Cypress Creek, Edmunson Creek, and Bubble Gum Creek.



Copy from re:SearchTX



If either of these creeks flood above or below the land bridge—which they often do—there is no way in or out. And, even if they do not flood, evacuation may still not be possible (other than by air or boat) past the gate along Highway 39.

154. The dangers associated with flooding are exacerbated by the remote nature of the property. The Eastlands acknowledged the campgrounds are located in a "delayed response area"—meaning that the facility was located miles from medical care and first responders. The Eastlands knew that in the event of an emergency of any type they would likely be left to fend for themselves for at least some time.

### C. <u>The Eastlands Received a Century of Flood Warnings as Old as the Camp Itself</u>

155. Camp Mystic opened in 1926—almost 100 years ago. The Eastlands knew Camp Mystic's location was prone to catastrophic flooding. Prior to July 4, 2025, they did not deny it. They romanticized it.

#### 1. *The Eastlands Were Warned by the 1932 Flood*

156. The Great Flood of 1932 is a staple of the Camp's folklore. On July 2, a flash flood caused catastrophic damage to the Camp. Cabins were flooded. Three cabins were swept down the river. More than 14 inches of rain fell above Hunt, Texas between July 1 and 2, 1932. The rain caused the river to reach a height of over 36 feet at Hunt. The damage to the town of Hunt was devastating.



Copy from re:SearchTX

According to reports chronicled in Jonathan Burnett's "Flash Floods in Texas:"

> [The town of Hunt] was swept off the map so far as all the buildings are concerned. The post office, filling station and general store were all washed away. The only building left standing was the school. Twenty houses were lost, and more than three hundred people were left homeless. As one account summed up the situation in Hunt, 'Nothing is left there.'

157. Summer camps along both forks of the Guadalupe River were filled with campers "during the peak of the camping season." The flash flooding inundated several camps on both forks. Stewart, Waldemar, and Rio Vista all flooded. The owner of Camp Stewart had to seek refuge in an oak tree. An airplane flew over the camps to drop supplies to stranded campers and survey the scene. One pilot observed that some of the buildings looked like they had been "flattened as though they had been stepped on by a giant foot."

158. The raging waters did not spare Camp Mystic. The flash flood damaged several cabins. Three of the cabins located near the river were swept away. The dining hall also flooded.

159. One Camp Mystic counselor ("Miss Plunkett") described the flooding in an interview with the *Austin American-Statesman* a few days later. She remembered that the flood waters "persistently arose over cabins and came lapping up against the mess hall." They evacuated out of the back door of the mess hall. She went on to say that "from the way we did it, we didn't even realize that we might have all drowned if we had gone out the front door and walked face-into a sheet of water."

160. Fortunately, no one drowned at Camp Mystic on July 2, 1932—something authorities attributed to the fact that the flooding occurred during broad daylight. Despite the horrifying parallels of the 1932 flood, the Eastlands still claim publicly that the July 4th flood was unprecedented. That is just not true. History provided an unmistakable warning of the flooding to come at Camp Mystic.



Copy from re:SearchTX

### 2. *The Eastlands Were Warned by the 1951 Flood*

161. Camp Mystic flooded again on May 15, 1951. That day, flooding severely damaged the highway along the Guadalupe River. News reports stated that the water at Camp Mystic reached a height of 10-12 feet.

### 3. *The Eastlands Were Warned by the 1978 Flood*

162. History repeated itself—as it often does—in 1978. From August 1-2, 1978, flash flooding again hit Camp Mystic. Much like what happened in July 2025, remnants of the tropical storm stalled over the Hill Country. In an eerily familiar report, experts described what happened next: "These new cells grew rapidly in size and intensity and moved very slowly through Bandera, Kerr, Gillespie and Kendall counties, producing torrential rain in the early morning hours of Wednesday, August 2." "How a largely forgotten 1978 storm foreshadowed Texas' deadly July 4th flood," *San Antonio Express News*, July 12, 2025. Torrential rains fell over the Hill Country, killing 33 people across Texas. The flash flood destroyed over 400 homes in Comfort, located just a few miles from Camp Mystic. The floods destroyed numerous buildings at the Hermann Sons Youth Summer Camp, leaving 7 feet of mud in some cabins. Over 150 campers, ages 9-13, had to be evacuated.

163. This photo from the *New York Times* shows the severity of the flooding that occurred in Kerrville, Texas, on August 2, 1978:





Copy from re:SearchTX

164. This photograph from the *San Antonio Express News* shows a bridge that washed out on Highway 27:



165. The floods also damaged Camp Mystic. The flood waters ultimately reached the second step from the top of the Dining Hall stairs. Erin Paisan, a camper at Camp Mystic in 1978, recounted her story of the flood in a recent *New York Times* podcast. She was sleeping in Bug House—*the same cabin that Defendants evacuated first on July 4, 2025*.

166. Paisan said she woke up during the night and saw the river had risen into a large cypress tree by her cabin. She remembered that the water rose all the way up to the top. Even though she was only 13 years old, it was she who woke up her counselor and said, "we've got to get out of here." Her entire cabin evacuated to a cabin at a higher elevation.

167. The campers were stranded without food for days. She remembered parts of Camp Mystic looked like "the Pacific Ocean" and she saw cars floating down the river:

> The water was starting to recede a little bit, but it was still raging. And I remember watching with horror as a counselor, they were trying to get food over to us, like peanut butter sandwiches or something from the dining hall, and they got on a horse. And I remember watching them try to get across. And I was like, please, God, please, please don't let anything happen to these people. Like, everyone was



Copy from re:SearchTX

> just waiting. Just couldn't believe they were trying to get to us because it was still really dangerous.[1]

168. Paisan also recalled that Camp Mystic never gave her any warning about the flood or training about what to do in a flood. Thankfully, at 13 years old, she had enough awareness and maturity to alert her counselor and call for an evacuation. Forty-seven years later, campers and counselors would again have to fend for themselves.

**4. *The Eastlands Were Warned by the 1984, 1987 and 1988 Floods***

169. Edward S. Eastland came into this world during a flood. His mother, Defendant Tweety, had to be airlifted to the hospital to give birth to Edward. Floodwaters prevented her from going to the hospital by car. The Court of Appeals decision in the Eastlands fight over Camp Mystic even cites testimony from Stacy Eastland about the property: "it floods."

170. The 1987 flash flood on the South Fork of the Guadalupe River was strikingly similar to what happened at Camp Mystic on July 4, 2025. On July 16 and 17, 1987, over 11 inches of rain fell less than 10 miles west of Hunt. The massive rains caused a flood wave that traveled along the Guadalupe River from Ingram to Kerrville and down to Comfort. The river rose 29 feet. It crested at 31.50 feet. The Guadalupe River reached its second highest crest (now third) at both Kerrville and Hunt. According to the NWS, the Guadalupe River was estimated to be over two-thirds of a mile outside its banks at Comfort.

171. The Pot O' Gold Ranch was a summer camp located only 30 miles east of Camp Mystic. The camp was in session on July 16, 1987 and was supposed to end on the afternoon of July 17th. Despite flood warnings, camp officials tried to evacuate the campers after the river had already started to flood. The camp loaded campers on buses and vans. When they reached a low water

---

[1] Erin Paisan, *A Love Letter to Camp Mystic*, *The Daily*, *N.Y. Times* (July 8, 2025).



Copy from re:SearchTX

crossing, the lead bus decided to try to take a different route. The last bus in the group stalled in the rising water.

172. Rescuers attempted to rescue the campers who were trapped but a wave of water swept many of them away. Forty-three campers and adults were swept down the river. Ten campers drowned.

173. The 1987 tragedy was yet another example of how history repeats itself in Flash Flood Alley near Hunt, Texas. In fact, a warning that was issued at 2:45 a.m. on July 17th said the following about the flooding near Camp Mystic:

> The highest ever reported stage at Hunt was 36.6' in July 1932 but this is a very dangerous flood. Camp Mystic officials say they have polled camps in the area and all campers are accounted for.

174. Another flash flood hit near Camp Mystic a year later on July 11, 1988. The floods killed two people in Kerr County. The water also washed out a bridge near the camp. Buses carrying over 150 campers on their way to Camp Mystic could not get into the camp. Camp Mystic had to divert its bus to an auditorium in Kerrville and wait until the flood waters receded.

175. These are just a few of the severe floods that hit Camp Mystic and the Hunt area in the 97 years prior to July 4, 2025. Many more floods stranded campers on Senior Hill over the years.

**5. *The Eastlands Were Warned by Their Own Flood Experiences***

176. On May 10, 2012, Camp Mystic posted on its own Facebook page photographic evidence of Cypress Lake and Bubble Gum Creek flooding the main areas of the Flats. The Camp's album titled, "Flood of May 10, 2012," shows photos of rushing waters blocking the land bridge at the entrance to camp as well as the passage over Bubble Gum Creek to the Camp's main office. The parking lot is also photographed being submerged as well as a photo of Defendant Edward Eastland himself smiling with rapids behind him.



Copy from re:SearchTX







There is no way to count all the times that part of the property flooded like this—or worse.

177. On or about December 17, 2025, Richard Eastland Jr., son of Dick and Tweety Eastland and head chef at Camp Mystic, reached out to Camp Mystic alumni with a Facebook post on a private page called "Byrd Chatter." According to Eastland, he believed his father and a now-deceased former foreman had information about these prior floods that he did not possess. Eastland asked Camp Mystic's loyalists to provide him with information about the 1978 and 1987 floods at Camp Mystic to try to prove that those floods were not as bad as the July 4, 2025 flood. Eastland admitted that both floods impacted Camp Mystic and destroyed at least one building. He



Copy from re:SearchTX

also admitted that he knew the guard gate had flooded to the roof line and the flood water reached the second highest step during the 1978 flood and that both the Bug House and Look Inn cabins were evacuated in 1987.

178. One alum responded that the 1978 flood reached the bottom of her cabin's windows and flooded several counselors' cars. Another camper remembered a priority during the 1978 flood was to evacuate the "kitchen help" because the bottom of the dining hall was flooding. Another alum remembered that the 1987 flood washed away a car and "got close to the cabins."

179. Richard Eastland Jr.'s attempt to try to defend his family's actions by comparing 2025 to prior flood events is absurd but also telling: the Eastlands knew Camp Mystic floods. Often.

**6. *The Upper Guadalupe River Authority Told Dick Eastland a Flood Was Coming***

180. Dick Eastland served on the Upper Guadalupe River Authority Board ("UGRA Board"), which is charged with maintaining the health of the Guadalupe River watershed. As a Board Member, Dick Eastland had unique access to information about flood hazards. Defendants knew a catastrophic flood was imminent due to the information they obtained from the Kerr County Hazard Mitigation Plan ("the Plan"). The Plan's sole purpose was to "systematically identify hazards that can affect the County." The Plan determined that:

> [b]ased on the frequency of previous flood events, every jurisdiction ***can expect to experience some type of flooding that may or may not meet the definition of a 100-year or 500-year event on a more regular basis***. The local planning team determined it is likely that Kerr County and the participating jurisdictions ***will experience a flood event in the next year, meaning an event is probable in the next three years***. (*emphasis added*)

Horrifyingly, the Plan also predicted that "future worst-case events in Kerr County and the participating jurisdictions may meet or exceed previous worst-case 10" flood depths." The Plan recommended installing and expanding warning systems and sirens.



Copy from re:SearchTX

181. In a 2018 email, Dick Eastland acknowledged that every minute is "precious" in a flood event and referenced the importance of getting an advanced warning of even 30 minutes.

Gmail Dick Eastland [redacted]

**Old Kerr County Flood system map**
4 messages

Dick Eastland [redacted] Thu, Aug 23, 2018 at 11:22 AM
To: [redacted]
Cc: [redacted]

Dear Matt,

Enjoyed visiting with you yesterday. I hope you got my text but the quality of the map picture was poor. Attached is a better copy of the old Flood System while on the UGRA board in the late 1980s and early 90s. So glad GBRA took over this system and the real time rain gages are fantastic. The only limitations are the river level sensors upstream. During major flood events that info can be crucial to buy precious time before it hits downstream. Back in the old days there was a level sensor at location #9 (South Fork Ranch) but it was removed years ago. To me that is the most critical as it will buy us about 30 minutes during an event. Location #13 at West Perkins would be good as well. We have been here for some critical big floods including 1978, 1984, 2000 and many others.

I am also attaching an old 1988 UGRA report we had commissioned years ago for your info.

Hope this info is useful. Thanks, Dick [redacted]

The UGRA Plan also called for back-up generators. Dick Eastland knew that if there was a power outage, Camp Mystic would need its own power source. Despite this knowledge, the Eastlands had no backup generators in place before July 4, 2025.

182. Further, the Plan outlined that roughly 6% of Kerr County is in a 100-year floodplain and 93% of it is in a 500-year floodplain. The Plan further stated a flood was ***probable*** in the near future. All cabins in "the Flats" were in the 500-year floodplain. In May 2025—less than 45 days before the July 4th flood—Dick Eastland reviewed and voted to approve the Kerr County Hazard Mitigation Plan and was therefore well aware of the vulnerability to which his property was exposed. Despite the UGRA's warnings and recommendations, Camp Mystic had no infrastructure or procedures in place to deal with a flood. The Eastlands never invested in a sophisticated weather tracking or evacuation plan. Nor did they invest in safety equipment, training or even the creation of an evacuation plan.



Copy from re:SearchTX

### D. <u>Like the Man in the Parable, the Eastlands Refused These Warnings</u>

183. The Eastlands knew another catastrophic flood was possible. And they knew Camp Mystic was exposed without any warning systems in place. A reasonable camp operator, knowing this history, would have relocated sleeping facilities out of flood-prone areas, implemented heightened protective measures and heightened flood-warning systems and backup power, created evacuation plans, and paid attention to warnings. The Eastlands did none of these things.

184. Instead, after the 1988 flood the Eastlands authored a letter to a local newspaper acknowledging both the danger of flash flooding and their duty "to take great measures" to keep children safe during flooding. Tragically, they never followed through.

185. The Eastlands own over 700 acres that house Camp Mystic. The Guadalupe River campus occupies a very small part of that acreage. The entire facility sits on the lowest part—all in the 500-year floodplain. The Eastlands had over 93 years since the Great Flood to move their cabins from this lowest lying area. The cabins are simple, spartan structures. The Eastlands could have built new cabins on the massive bluff overlooking "the Flats," which sits well over 50 feet above the lowest cabins. But, rather than spend the money to move those cabins, they chose to spend their money on themselves: purchasing massive houses all over Texas (including on Lake Austin) and building new ones on their property; prolonging their bitter legal fight; spending millions more building new structures across the creek on the Cypress Lake campus so they could handle more campers each year and make more money; and even fighting back against efforts to declare the cabins as being located in the 100-year floodplain.

186. They chose to spend their money on everything but camper safety.



Copy from re:SearchTX

## VI.
## THE EASTLANDS WERE SENT WARNINGS IN THE FORM OF REGULATIONS, STANDARDS, AND GUIDELINES: THE EASTLANDS REFUSED AND CHOSE COMPLACENCY OVER PREVENTION.

187. The number one priority for any business facing a potential flood is to plan ahead. Planning ahead means having an emergency evacuation plan, training your staff how to execute that plan, spending the funds necessary to ensure that you have the infrastructure in place needed to actually execute that plan, and when an emergency occurs. Federal, State, and private groups all have specific procedures and guidelines available for business owners (and camps) to use to prepare for and execute during a flood event. Indeed, FEMA, the ACA, and Texas' own legislature all tried to improve Camp Mystic's safety measures. At every opportunity, however, the Eastlands chose to rebel against these and other outside influences to regulate the camp. The Eastlands have a generations long culture of fighting oversight and regulation. This willful arrogance directly caused the death of Cile Steward.

### A. The State of Texas told the Eastlands: YOU MUST HAVE A PLAN

188. The rules for summer camps in effect as of July 4, 2025, required Camp Mystic to have a specific emergency evacuation plan. TEXAS ADMINISTRATIVE CODE § 265.15(k) expressly requires every youth camp to maintain a written disaster plan. That plan must also include specific procedures for evacuation of each occupied building and the facility. The Code also expressly requires training for *every camper* regarding *how to evacuate*. The camp must also provide the plan to every counselor and staff member. Critically, the camp must also give specific written instructions to each staff member and counselor telling them what their specific duties are during an emergency evacuation. Further, the camp must keep written records documenting the training.



Copy from re:SearchTX

189. The Eastlands rejected these rules in every conceivable way. The only thing Camp Mystic had in place for flood emergencies was this seven-sentence paragraph posted in the cabins and provided in the counselors' orientation notebooks:

> 11. **Floods**
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

190. These instructions did not have any evacuation plan. Campers and counselors confirmed they never received any training whatsoever about how to evacuate. No staff member or counselor received any specific instructions about what to do in an evacuation. There is no written documentation of any training because there was no training. The Eastlands admit that since they had no plan they had to improvise during the chaos of the flood.

**B. <u>The American Camp Association told the Eastlands: YOU MUST HAVE A PLAN</u>**

191. The ACA is the leading organization that establishes safety standards for youth camps. ACA accreditation signifies that a camp has voluntarily submitted to rigorous safety inspections and committed to following industry best practices. ACA Standard OM.8 calls for camps to develop site-specific emergency procedures to respond to natural disasters typical of the area. For years, the ACA has sounded the alarm: floods are not a matter of if, but when, and camps must have emergency plans in place before disaster strikes "to prevent an emergency from turning into a crisis."

192. The Eastlands refused to join the ACA or adopt what should have been deafening recommendations to prepare and plan for an inevitable massive flood. The fees for accreditation by the ACA were less than $1,000. The Eastlands refused to spend this small sum of money (a fraction of a single camper's tuition) to make Camp Mystic safe. They also rejected the primary rule for emergency preparedness because they refused to have an evacuation plan.



Copy from re:SearchTX

## C. Numerous State and Federal Authorities told the Eastlands: YOU MUST HAVE A PLAN

193. In addition to Texas' mandatory requirements and the ACA's rules, the Eastlands also ignored free, publicly available guidelines from the NWS, United States Government, OSHA and the State of Texas, all of which also provide that any camp, employer or head of household should have a flood preparation or flash flood evacuation plan, an evacuation route and evacuate *before* a flood starts. For example:

### 1. *OSHA*

194. OSHA provides that employers should have a plan for "Flood Preparedness and Response."[2] OSHA's primary recommendation for flood planning is to have an e*vacuation plan in place* in advance to help avoid confusion and prevent injuries. Such a plan should include conditions that activate it, a chain of command, emergency functions and who will perform them, specific evacuation procedures, including routes and exits, procedures for accounting for people, equipment, and reviewing the plan with staff.

### 2. *The Federal Government*

195. Ready.Gov, the United States government's emergency preparedness program, states that "Floods are the most common disaster in the United States" and "flash floods can come with no warning." One of its top three recommended steps *is to determine an evacuation route in advance*, an echo of its most obvious and warning: "Failing to evacuate flooded areas or entering flood waters can lead to injury or death." Like Ready.Gov, Texas' Ready.Gov confirms that "when the threat of flooding is high, evacuate early. Don't wait until it's already flooded." One of Ready.Gov's other most important instructions is to pay attention to NWS and NOAA weather

2 https://www.osha.gov/flood/preparedness.



Copy from re:SearchTX

alerts. This means that a camp operator must have reliable communication infrastructure and battery powered NOAA weather radios to ensure they receive all emergency alerts in real time.

### 3. *The Texas Land Office*

196. The Texas Land Office ("TLO") lists having a "Family Evacuation Plan" in its "Top 5" things Texans should do to prepare for a flood, even if "outside a high-risk area." The TLO provides several instructions for developing an evacuation plan. One of the primary steps is to have a *muster site and a planned evacuation route*.

## D. <u>The Eastlands Refused to Follow Any Safety Standards Except Their Own</u>

197. According to all of these authorities, the single most important piece of safety equipment the Eastlands should have had was an emergency response and evacuation plan. Such a plan is free. But the Eastlands' hubris would not allow them to spend the time to develop one. The Eastlands' refusal to follow these guidelines was not an oversight—it was a deliberate choice worsened by their decades of defiance to avoid accountability.

## E. <u>Britt Eastland Even Opposed the Camp Safety Transparency Bill</u>

198. The Eastlands' rejection of oversight was on full display during the 2019 Texas legislative session. In 2019, Camp Mystic—alongside the Boy Scouts of America—testified against the Camp Safety Transparency Bill, which was intended to make camps safer in several ways, including providing additional safeguards against sexual predators. The bill ultimately passed, but not before Britt Eastland tried to defeat it. At a hearing for the proposed bill aimed at enhancing youth camp safety by mandating better sexual abuse reporting, Britt Eastland testified ***against*** the bill stating, "[Y]outh camps in Texas are safer than they have ever been in history with the regulations that are already in place." The fact that any Eastland would oppose such a bill that was ultimately passed is further proof of the efforts they will go to avoid oversight and regulation.



Copy from re:SearchTX

199. Contrary to Mr. Eastland's testimony, on July 4, 2025, Camp Mystic was anything but safe. The Camp was exposed in multiple ways due to the owners' poor judgment and lack of planning. Despite guidance from state and federal agencies, and guidance from private groups like the ACA, the Eastlands did not harden or upgrade Camp Mystic's campus. They had no plan whatsoever.

### F. Like the Man in the Parable, the Eastlands Refused Help From these Resources

200. Like the man in the parable, the Eastlands were offered rescue. Like the man in the parable, they refused. With hundreds of lives relying on Camp Mystic to have an evacuation plan, and all these resources freely available to them, the Eastlands produced only a seven-sentence emergency paragraph in the 93 years since the Great Flood. They rejected industry standards. They testified against safety regulations. And when the flood came, they were forced to improvise after it was too late because they had refused all attempts to modernize the camp's infrastructure and safety plans.

## VII.
## THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS FROM THE TEXAS DEPARTMENT OF EMERGENCY MANAGEMENT: THE EASTLANDS IGNORED THEM, CONCEALED THEM FROM CAMPERS AND COUNSELORS AND CARRIED ON WITH BUSINESS AS USUAL.

201. When you operate a camp located in the middle of Flash Flood Alley, and you've been warned of the dangers by multiple floods, including one where cabins have been swept down river, you better listen when officials warn you that a flood is coming in 48 hours. The Eastlands received very specific warnings on July 2nd and 3rd. The Eastlands were told to prepare. Again, they chose not to listen.



Copy from re:SearchTX

**A. The Eastlands Were Specifically Warned on July 2, 2025: TDEM Activates Emergency Response**

202. Two days before the flood, on July 2, 2025, the TDEM issued a statewide warning announcing it had activated its emergency response resources. The warning specifically addressed flash flooding:

> The Texas Division of Emergency Management (TDEM) today announced that the agency activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend.

Critically, TDEM instructed people in affected areas to "proactively prepare for potential hazards."

203. The Eastlands received this notice. Camp Mystic was located in the impacted area. The Eastlands did nothing. They did not prepare. They did not warn campers or counselors. They did not create an evacuation plan.

**B. The Eastlands Were Given an Intensified Warning on July 3, 2025: TDEM Escalates to Level II Response**

204. Less than 24 hours later, on July 3, 2025, TDEM escalated its state of readiness to Level II. The announcement stated:

> The Texas Division of Emergency Management (TDEM) has increased the readiness level of the Texas State Emergency Operations Center (SOC) to Level II (Escalated Response) and activated additional state emergency response resources as portions of West and Central Texas prepare for continued heavy rainfall and flash flooding threats heading into the holiday weekend.

205. TDEM announced that multiple state agencies were activated, including the Texas Department of Transportation, Texas Department of Public Safety, Texas Parks and Wildlife Department, Texas National Guard, and swift boat rescue teams and helicopters equipped with hoist systems. This escalated warning was issued *more than 12 hours* before Camp Mystic flooded. TDEM expressly warned that "flash flooding will continue to threaten West Texas, Central Texas, and the Hill Country over the next couple of days." TDEM also told the Eastlands



Copy from re:SearchTX

that they should "monitor local weather forecasts from trusted sources and avoid flooded roadways." TDEM even reminded them to go to public resources like TexasReady.Gov to help prepare.

**C. <u>The Eastlands Were Given Simple, Easy to Understand Instructions About How to Receive Emergency Warnings</u>**

206. When you operate a camp located in Flood Alley that you know is prone to flooding, and you receive multiple advanced warnings from TDEM, you must understand how flood watches and warnings work. The Eastlands received easy to understand instructions about how to ensure they received—and understood—these warnings. The NWS created clear, non-technical graphics to help people easily understand NWS' warnings.

207. Here is how the NWS explains Flash Flood Warnings:




The NWS told the Eastlands that a Flash Flood WARNING, like the one received at 1:14 a.m., does not mean a flood *may* happen. It means it *is happening* or will happen soon. The NWS graphic also made it perfectly clear what you must do when you receive a Flash Flood Warning: "MOVE TO HIGHER GROUND."

208. The NWS made flash flood warnings themselves even easier to understand in 2019. The NWS created Impact-Based Warnings located in mandatory "tags" that accompany Flash Flood



Copy from re:SearchTX

WARNINGS. The NWS created these "tags" because there was a perception that the NWS "over warns" during a storm. Flash flood WARNINGS now have one of three "threat tags:"

- Base – used most of the time, when flash flood impact is possible;
- **Considerable – Used rarely, when indications of flash flooding capable of unusual severity or impact are imminent or ongoing and urgent action is needed to protect lives and property;** or
- Catastrophic – Used exceedingly rarely, when a flash flood threat to life and catastrophic damage is occurring or is imminent, and floodwaters have risen or will rise to levels rarely if ever seen.

Only warnings that have a "considerable" or "catastrophic" tag will trigger wireless emergency alerts. The NWS also pushes its warnings to mobile phone devices and social media platforms, such as "X."

### D. Despite These Clear Warnings, the Eastlands Concealed them from Cile and her Counselors

209. When the Eastlands received these warnings, one of the first things they should have done was to alert their staff and every counselor about the very real possibility of a flash flood. Had they done that, everyone would have been aware of the threat. However, the Eastlands did just the opposite: they deprived every camper and counselor of any knowledge of these warnings.

210. Counselors and campers were strictly prohibited from having phones or electronic communication devices in their cabins. While marketed as a charming feature, this policy carried profound safety consequences.

211. Camp Mystic was located miles from medical care and first responders. The Eastlands knew that in any serious emergency, outside assistance would be delayed, and that campers and staff would be dependent on Camp Mystic leadership for timely warnings and instructions. Rather than prepare for the heightened risks created by this isolation, the Eastlands treated remoteness as part of the camp's appeal—without disclosing to parents that it would leave their children entirely reliant on camp leadership to warn them of imminent danger.



Copy from re:SearchTX

212. And those warnings never came.

213. By depriving campers and counselors of any independent means of receiving emergency alerts, Camp Mystic assumed an affirmative duty to maintain reliable, camp-wide communication systems. The Eastlands knew such systems were unreliable at best. Camp Mystic is located in an area with minimal to nonexistent cellular coverage. Internet access is limited and entirely unavailable during a power outage.

214. Nevertheless, while campers and counselors were kept deliberately in the dark, the Eastlands themselves began receiving information about severe and dangerous weather conditions as early as July 2. They did not share this information. When Cile and her cabinmates went to sleep on the night of July 3, they believed they were safe. They had no idea that the outside world was warning the Eastlands about the deadly conditions approaching Camp Mystic.

215. The Eastlands also assured parents that Camp Mystic would use its public address system and loudspeakers to warn campers in the event of an emergency. Speaker towers were installed throughout the camp, including one located just 49 paces from the door of Twins II.





Copy from re:SearchTX

216. A camp that chooses to rely on loudspeakers for emergency communication must ensure those systems function during foreseeable emergencies. Power outages during severe storms are not unexpected—they are inevitable.

217. Effective and redundant communication systems were essential to camper safety. Camp Mystic needed the ability to (1) receive flood and flash-flood warnings, (2) communicate those warnings and instructions to staff and campers, and (3) call for emergency assistance.

218. At a minimum, all of the agencies discussed above recommend the use of battery powered NOAA weather radios. It would have been cheap and simple for the Eastlands to put a camper safety communication bundle in each cabin, office and shelter. A typical bundle would include a battery powered weather radio, three walkie talkies and a flashlight.




Such a bundle cost less than $100, which means the Eastlands could have outfitted every cabin for less than $3,000.



Copy from re:SearchTX

219. At a minimum, the Eastlands should have had the following communications systems and redundancies in place on July 3, 2025—but they did not:

| **Communications Systems Needed on July 3-4, 2025** | | **Communications Systems Actually in place on July 3-4, 2025** |
|---|---|---|
| Reliable Mobile Phone Service | | None |
| Reliable Internet and Wi-FiIFI Service | | None |
| Starlink Internet Service | | None |
| Battery Powered Weather Radios and Walkie Talkies in every cabin | | None |
| Working Public Address System, Speakers and Sirens | | None |
| Backup Power Generator to Ensure Internet and Public Address System, Speakers and Sirens worked during a power outage | | None |

The Eastlands could have installed these systems for less than $28,000. The total cost is less than the total cost of tuition for four campers for a single session.

## E. <u>Like the Man in the Parable, the Eastlands Refused These Warnings</u>

220. Like the man in the parable, the Eastlands were offered rescue in the form of all these warnings. Like the man in the parable, they ignored them. Despite claiming that its mission is the religious education and protection of young girls, Camp Mystic prioritized profit over safety. Its public image rests on the illusion of a simpler, safer, bygone era—a place hidden from modern technology and modern dangers. In reality, the Eastlands collected millions in camp fees each summer while failing to invest even minimally in systems that could have warned, protected, and saved the children entrusted to their care. As Dick Eastland admitted in 2018, even 30 minutes in an emergency are precious. The Eastlands received warnings at least 2,160 minutes in advance of the flood. They just chose not to listen.



Copy from re:SearchTX

## VIII.
## THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS THAT THEY NEEDED TO EVACUATE. THE EASTLANDS DEFIANTLY DID NOTHING.

221. Long before the duty to disclose the TDEM and NWS notices, watches and warnings, the Eastlands should have vetted, established, trained and routinely reevaluated campers, counselor and staff with an evacuation plan, complete with identification of muster sites, safe evacuation routes to higher ground, the delegation of responsibilities in the event of an emergency, and plans for backup generators, communication modules, and emergency aid. Camp Mystic had multiple safe evacuation locations available had the Eastlands evacuated campers in a timely manner. Every guideline for flood preparedness includes an emergency evacuation route and muster site (a single safe gathering spot). The reasonable muster location was the Cypress Lake campus. It was a short, easy walk, has a significantly higher elevation, and has large, permanent buildings that could have sheltered the entire Guadalupe River camp. Once access to Cypress Lake was cut off, there were still multiple routes to safety located a short walk from the Flats. The Eastlands should have had a decision tree that outlined where to relocate or evacuate campers based on the nature and extent of the threat of a flood. Had the Eastlands prepared for the forecasted flood, or taken the time to have an evacuation plan, they would have evacuated the campers to different safe locations depending on the proximity of their cabins to other locations long before 3:30 a.m. on July 4th.

### A. The Cypress Lake Campus Was the Safest Muster Site

222. The Cypress Lake campus adjoins the Guadalupe River campus and sits at a significantly higher elevation. The distance between offices is less than 1,900 feet in a straight line and less than half a mile by road.



Copy from re:SearchTX




Cypress Lake did not flood and includes a large main hall called Jones Hall that was capable of sheltering every camper and counselor from the Guadalupe River campus. It would have taken less than 5 minutes to walk there; and less than 1 minute to drive.

**B. <u>The Commissary Was an Alternative Muster Site for Cile as Options Narrowed</u>**

223. The Commissary, located adjacent to Twins I & II and Bubble Inn, had a second floor accessible by stairs. The stairwell was approximately 20 paces from the door of Twins II—less than a 10-second walk. The second floor was large enough to shelter all campers from those cabins. It has two large rooms with multiple beds. Neither room took on water during the flood.






Copy from re:SearchTX

Despite the close proximity to higher ground, Defendants' written orders required the girls in Twins I & II and Bubble Inn to shelter in place. Edward Eastland reinforced those orders after 3:00 a.m. By the time anyone in management reached Cile and her cabinmates, floodwaters had risen too high to allow safe access to the Commissary stairs. The workers staying there all survived.

## C. <u>The Cricket Corner/Sky High Trail Was a Safe Alternate Muster Site</u>

224. Cricket Corner/Sky High trail was a marked trail that led up a nearby bluff. The distance up the hill to a height above the top of any cabin is less than 100 feet. The distance to the top of the hill and trailhead is only 291 feet from the Cricket Corner/Sky High trail. Although the trail is fairly steep, it is a short hike. It was a suitable muster site. Indeed, some counselors disregarded the Eastlands' warnings and later used this route independently to escape. Campers and counselors could have waited safely at the top of the bluff for floodwaters to recede or continued an additional 1,242 feet to the covered shelter adjacent to the "Camp Mystic" sign. The girls that chose to follow this route all survived.






Copy from re:SearchTX

**D. The Equipment Shed Was a Safe Alternate Muster Site**

225. Located approximately 550 feet from the office, the equipment shed contained multiple second-floor rooms that did not flood. Those rooms are accessible by exterior stairs. The workers housed there remained safe throughout the storm.




**E. The Recreation "Rec" Hall Was Another Alternate Muster Site**

226. Because the Eastlands had no evacuation plan, campers fled to different locations in the chaos. One such location was Rec Hall. It is unclear why the Eastlands did not immediately direct all campers there. Perhaps it is because Rec Hall was so close to the river and the Eastlands knew there was not enough room on the second floor for everyone in the camp. The lower floor was flooding and the interior second-floor balcony lacked sufficient space for everyone in the Flats. More than 100 girls from the Flats would wind up on the second-floor interior balcony of Rec Hall. There was barely enough room for all of them. The water rose to just below their feet. It was a miracle Rec Hall balcony did not collapse.



Copy from re:SearchTX




227. The distance from the door of Twins I to Rec Hall is approximately 315 feet—roughly the length of a football field. Had Defendants ordered Cile to evacuate to Rec Hall before 3:00 a.m., rather than directing her to shelter in place, she could have reached safety in under 30 seconds. Every camper and counselor that made it to Rec Hall survived the flood.

**F. <u>Like the Man in the Parable, the Eastlands Refused Rescue</u>**

228. Like the man in the parable, the Eastlands were offered numerous rescue attempts. Rather than boats and helicopters, the Eastlands had numerous routes to higher ground which they could have reached long before the flood, and even during its earliest moments. All of these options were there; they just chose to reject them. So, when the flood began, nobody knew what to do or where to go.

## IX.
## <u>A TALE OF TWO CAMPS: UNLIKE CAMP MYSTIC, CAMP MO-RANCH LISTENED TO THE WARNINGS, TOOK ACTION BEFORE THE FLOOD, FOLLOWED SAFETY GUIDELINES AND SAVED EVERY LIFE.</u>

229. These same warnings were sent to other camps. The leadership at Camp Mo-Ranch ("Camp Mo") listened. The contrast between Camp Mo and Camp Mystic could not be starker. Camp Mo is a summer camp located near Hunt, Texas, on the North Fork of the Guadalupe River.



Copy from re:SearchTX

Camp Mo's leadership received the same NWS and Texas Division of Emergency Management warnings on July 2 and July 3 that Camp Mystic received.

230. The differences: Camp Mo was ACA accredited. Camp Mystic was not. Camp Mo listened to warnings. Camp Mystic did not. Camp Mo had an established emergency plan and trained staff to follow it. Camp Mystic did not.

231. Camp Mo took action on July 3rd, well in advance of the point of no return, to move campers from lower-lying areas. When Camp Mo's staff observed the river rising during the early morning hours of July 4, they did not debate whether to act. They followed their plan. With over 500 campers and staff on site, Camp Mo relocated campers from lower-lying areas in stages, consolidated them on higher ground, and maintained staff on duty overnight to monitor the river and respond if conditions worsened. Evacuations were orderly, timely, and coordinated.

232. According to Camp Mo's information director, Lisa Winters, Camp Mo "saw it coming well in advance, and they did something about it." Despite flooding that caused significant damage at Camp Mo, no lives were lost. In fact, Camp Mystic was the only camp on the Guadalupe River that lost campers in the flood.

## X.
## <u>THE EASTLANDS CONTINUED TO RECEIVE WARNINGS AND THEY KEPT IGNORING THEM: 11:36 a.m. JULY 3RD – 2:26 a.m. JULY 4TH.</u>

233. Even though the Eastlands kept ignoring the intensified warnings, warnings kept coming. TDEM put out its increased activity alert at 11:36 a.m. on July 3rd. Then, at 1:18 p.m. on July 3rd, the NWS pushed another warning out on social media platforms:



Copy from re:SearchTX




The notices continued on July 3rd:

- 6:10 p.m.: The Weather Prediction Center (WPC) issued three "Mesoscale Precipitation Discussions" for the excessive rainfall event, that indicated the potential for Flash Flooding. This discussion occurred more than 8 hours before Camp Mystic flooded.

- 6:22 p.m.: The National Water Center issued Area Hydrologic Discussion #144. Discussion #144 indicated locally considerable flooding for areas north and west of San Antonio, including Kerrville. The discussion stated that the "National Water Model (NWM) Short Range Forecast (SRF) has been consistent in signaling the potential for rapid onset flooding in an area from near Brady, TX to Austin, San Antonio and Uvalde, TX. The placement of the NWM's responses have shifted from run to run, however the placement has been consistent in the above area." This discussion occurred more than 8 hours before Camp Mystic flooded.

- 11:41 p.m.: The NWS issued a Flash Flood Warning at 11:41 p.m. on July 3rd for Bandera County. This warning issued more than 4 hours before Camp Mystic flooded. Bandera is 40-50 miles from Camp Mystic.

The Eastlands still continued with business as usual.

## A. **The Eastlands Wasted Over 12 Hours of Precious Time From TDEM's Notice Until Midnight on July 3rd**

234. Around 10 p.m., **(still more than 4 hours before it was too late to evacuate Cile),** Camp Mystic played "Taps" over the loudspeaker. Even though the loudspeaker worked, Defendants did not tell the counselors and campers about any of the weather warnings they had received. Over 200 young women turned the lights out and prepared to go to sleep, believing they were safe and sound. They were anything but.



Copy from re:SearchTX

235. Incredibly, the Eastlands gave key staff and counselors all or part of the day off on July 3rd despite the intensifying warnings. Seasonal workers left for the day to tour Austin. Several counselors also were allowed to take the evening off and go to Kerrville for dinner. They did not return until after midnight.

236. The Eastlands should have had an "all hands" meeting after TDEM issued its intensified notice. Every able-bodied person should have been notified about the storm and given an updated emergency and evacuation plan. Every counselor and camper should have been notified as well.

237. It also appears that Camp Mystic's leadership went home and went to bed. By all accounts, Tweety Eastland went home and went to bed. Upon information and belief, Richard and Leslie Eastland left campus. If Mary E. Eastland was on property, she stayed in her home as well. Britt and Catie Eastland were either in their home or at the Cypress Lake campus. Other than Edward and Dick—who came after it was too late—none of them, not one, attempted to help any campers or counselors at the Guadalupe River camp during the flood.

238. What were they doing during the hours before the flood? Why didn't they help prepare? Why didn't they stay up and help inform campers and counselors? Why didn't they do anything to help during this extended period of time? There is no good answer.

239. Although the Eastlands did not tell anyone what dangers were looming, and made no preparations to protect the children, they did take decisive action to protect their property. The Eastlands ordered their largest canoes—the war canoes—to be moved to higher ground. Upon information and belief, the Eastlands also opened the stables and corral so their horses could move to higher ground. Clearly, the Eastlands were concerned about the threat of rising water. Tragically, their concern was limited to protecting the property they use to make money, not the children they promised to protect.



Copy from re:SearchTX

**B. The Eastlands Wasted Another Hour From Midnight Until 1:14 a.m.**

240. The Eastlands continued with business as usual for the next several hours. Other than move the war canoes, the Eastlands took no further action to alert campers or counselor or fortify the camp in any way. At approximately 12:40 a.m. on July 4th, several counselors returned to camp. Camp Mystic allows a certain number of counselors to leave Camp on select days off. The counselors generally have a 1:00 a.m. curfew. When they leave Camp, their mobile phones are given back to them; when they return to camp, they must give them back. The counselors reported that they had driven through a severe storm on the way from Kerrville back to Camp. Still, the Eastlands gave no warnings.

**C. The Eastlands Received a Flash Flood Warning at 1:14 a.m.**

241. ***At approximately 1:14 a.m., (still more than 60 minutes before it was too late to evacuate Cile), the NWS issued a flash flood warning for central Kerr County***. The NWS warned of "life threatening" conditions and that "flash flooding is ongoing or expected to begin shortly" and ***instructed recipients to move to higher ground immediately***. According to various news reports, including an interview with Richard Eastland, members of Camp Mystic's staff received this warning. This warning included the "considerable threat" tag.

242. At this time, every muster site and evacuation route was still available. The Eastlands could have moved the entire camp to the Cypress Lake campus. They could have moved Cile. They could have warned her. Still, they told no one and did nothing.

243. **At approximately 1:15 a.m., (still more than 60 minutes before it was too late to evacuate Cile)** Glenn Juenke was near the dam. Mr. Juenke was the Guadalupe River campus night watchman. Mr. Juenke claims he missed the flash flood warning because the Camp did not have cell phone service and there was no Wi-Fi or internet service near the dam (both problems



Copy from re:SearchTX

known to the Eastlands for years). It is inexcusable that the Eastlands maintained a camp full of children without adequate communication services at any time; it is especially egregious that they did not take steps to make sure all Camp personnel had access to working communication services from the moment TDEM issued the first warning on July 2nd. However, Mr. Juenke did have visual cues and could see that Bubble Gum, Cypress and Edmunson Creeks, which were normally dry, were actively rising.

244. The Eastlands did nothing to alert campers or move them to higher ground. Thirty more precious minutes were lost. The Eastlands gave no warnings; they moved no campers.

245. **Incredibly, at approximately 1:45 a.m., (still more than 30 minutes before it was too late to evacuate Cile),** Dick Eastland radioed his son Edward and told him they had received 2 inches of rain in the last hour and needed to move the waterfront equipment. Members of the grounds crew began to move additional canoes and equipment to higher ground. Despite this threat of imminent danger to human life, the Eastlands again chose to protect canoes, but not children.

246. **Also, around 1:45 a.m., (still more than 30 minutes before it was too late to evacuate Cile),** Dick Eastland told Glenn Juenke to go home because his shift was ending at 2:00 a.m. It was beyond reckless to send one of the few available able-bodied men home 30 minutes after receiving a flash flood warning. Fortunately, Mr. Juenke did not leave. His decision—in the face of the grossly negligent instruction by Dick Eastland—saved lives. After moving the equipment, Edward drove back to the office where Dick and Juenke were still located.

## D. The Eastlands Ignored Three More Warnings From 2:00 to 2:26 a.m.

247. By this time, at least 45 minutes had passed since the NWS told the Eastlands to move to higher ground immediately. The warnings kept coming. The Eastlands kept ignoring them.



Copy from re:SearchTX

248. **<u>At or around 2:20 a.m.</u>**, counselors from Bug House cabin gave the Eastlands another warning when they alerted Camp leadership that their cabin was taking on water. They drove back over to Bug House in Dick Eastland's Tahoe and observed water rushing off the steep hill into the Bug House cabin like a waterfall. The counselors were instructed to put towels down, get belongings off the floor and stay put. Dick and Edward returned to the Main Office.

249. **<u>At or around 2:21 a.m., (still more than 30 minutes before it was too late to evacuate Cile),</u>** Edward Eastland sent his wife a text message stating he could not return home because Bubble Gum Creek was overflowing. Bubble Gum Creek is small—not much wider than a post card. By this time, it was raging.



250. Why Edward was concerned about his own safe return home and not evacuating his campers is beyond comprehension. But, again, once he witnessed this normally dry creek turn into a raging river, he knew the entire camp was in danger. By then, escape to the Cypress Lake campus was shut off. However, the Eastlands still could have safely moved every camper and counselor to the alternate muster sites: the Cricket Corner/Sky High trail, the Equipment Shed, Rec Hall, or the Commissary.



Copy from re:SearchTX

251. **At approximately 2:25 a.m.**, Edward Eastland received another warning. This time, he received a call on his radio from the Camp's gatehouse guard, Ms. Blackwell, who was at the entrance of Camp Mystic and Highway 39. She reported water coming into the gatehouse. Edward told her to get out of the gatehouse and to go up the hill towards Senior Hill. The gatekeeper was frantic—she could not open the gatehouse door. Suddenly, her communications ceased. She was swept away and survived by clinging to a tree for hours. Still, even then, the Eastlands warned no one.

## E. Like the Man in the Parable, the Eastlands rejected these Final Warnings to Avoid Catastrophic Loss of Life

252. The NWS gave the Eastlands explicit, clear instructions: MOVE TO HIGHER GROUND IMMEDIATELY. The only things they moved were canoes. Then they received more warnings, one after the other. Still, the Eastlands did nothing. There was plenty of time between 1:14 a.m. and 1:45 a.m. to move Cile and everyone else to the Cypress Lake campus before Bubble Gum and Edmunson Creeks flooded. It would have taken them less than 5 minutes to walk there, or 1 minute to drive there. And after Bubble Gum Creek began to flood out of its banks after 2:00 a.m., there was still plenty of time for Cile to walk the 20 paces to the Commissary or take any of the other routes to safety. The Eastlands deprived her of the chance.

253. The Eastlands publicly defend their actions by claiming that, as the storm was raging, Dick Eastland was "monitoring" the weather on his phone from 12:42 a.m. to 2:26 a.m. Phone data provided by the Eastlands show Mr. Eastland checked the weather 14 times during that period. Nine of the fourteen times, he used a weather monitoring device called AcuRite. This is an at home weather monitoring device one can buy on Amazon. It is essentially a digital rain gauge for a home weather station limited to its precise location; it is not a device capable of measuring river and stream data over a 700–800-acre ranch. Nor does it measure stream and river levels or predict



Copy from re:SearchTX

flooding. It provides no data about what is happening upstream or in the many flood sources that feed into the Camp Mystic chokepoint. As Mr. Eastland knew from his prior experience on the Upper Guadalupe River Authority Board, that data is what mattered most and he knew he didn't have it. So, he had to heed the warnings God gave him via TDEM, the NWS and his own eyes.

254. At most, all the Eastlands did to prepare for the flood was move property and monitor a digital rain gauge.

## XI.
## AS THE WATER ROSE, THE EASTLANDS DOUBLED DOWN: THEIR ONLY PLAN WAS TO SHELTER IN PLACE.

255. By 2:26 a.m. on July 4, 2025, the Eastlands had wasted all the precious minutes they had been given to prepare for a flash flood and move Cile to higher ground. Cile was still in her cabin. The Eastlands never told Cile that there was a flash flood warning or that she was in danger.

256. As is discussed above, the Eastlands knew that Texas law required Camp Mystic to do more than merely order their campers to shelter in place during a flood. Camp Mystic also had to have an evacuation plan, train every camper and counselor how to execute that plan, and give every staff member and counselor specific assignments for handling a flood emergency. But Camp Mystic did none of those things.

257. Quite the contrary, the only information Camp Mystic provided Cile and her counselors was the seven-sentence shelter in place mandate.

258. With hundreds of children's lives dependent on a real evacuation plan, that paragraph was the sum of the Eastlands' preparation.

259. The Eastlands knew Cile would obey these instructions and do exactly as she was told. Camp Mystic's culture was built on obedience to a rigid hierarchy. Campers were taught that leadership, belonging, and advancement in their particular "tribe" depended on following



Copy from re:SearchTX

instructions—without question—from those above them. Cile had just found out which "tribe" she would join for life.




At the top of that hierarchy were the Eastlands, followed by the "Big Three," counselors, and older campers. At the bottom were the youngest, most vulnerable children: the eight-year-olds housed in Bubble Inn and Twins I & II, three cabins located in the low-lying "Flats" section of the camp.

260. Compliance was not optional. It was reinforced through a point system that rewarded obedience and penalized deviation—often affecting an entire "tribe." These children were trained, incentivized, and conditioned to follow rules.

261. Because of their age—especially in moments of fear—these campers were natural rule-followers. The Eastlands knew this. They knew that Cile and her cabinmates would trust and obey emergency instructions issued by "the office," particularly when those instructions were written, categorical, and absolute:

> **Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.**

These instructions were false and fatally flawed: the cabins were not safe; the instructions violated every concept of reasonableness for a camp.

262. When the Eastlands promised they would issue emergency instructions over loudspeakers, they knew these children would wait for them. When the Eastlands told them their cabins were



Copy from re:SearchTX

"high" and "safe," they knew these girls would believe it, even as the water rose and kept rising to the ceiling. And when the Eastlands ordered the youngest campers in the Flats to remain inside their cabins unless told otherwise, they knew that command would be obeyed.

263. In a flood, this forced obedience to a reckless rule became lethal. This mandatory instruction was a death sentence. Cile did exactly what she had been ordered to do. She stayed in her cabin. She waited for instructions from "the office" or her counselors to receive instructions from "the office." With each passing minute, her escape routes narrowed. Had she been warned, been given a plan, been told the truth, before any kind of fighting chance, she would have made it. She was plucky—she would have had ample time to reach higher ground.

## XII.
## THE TERROR AND CHAOS AT CAMP MYSTIC: CILE'S FINAL HOUR OF LIFE ON JULY 4, 2025.

264. The Eastlands' negligent and grossly negligent failure to plan, prepare, warn, or evacuate—combined with their mandatory shelter in place order—left Camp Mystic's campers and counselors in complete terror.

### A. The Eastlands' Desperate Attempt at an Improvised Evacuation

265. **At approximately 3:00 a.m.**, Dick Eastland, Edward and Glenn Juenke began to evacuate. They drove back to the cabin and observed the water right at the Bug House porch. They had no plan. So, they improvised. They decided to evacuate only the cabins closest to the river, by vehicle, one cabin at a time: Bug House, then Look Inn, then Hangout, then Tumble Inn, and then Jumble House.



Copy from re:SearchTX




266. Why only three adults were available to evacuate the entire camp remains a mystery. At minimum, staff from the Commissary—just 20 paces away from Twins II—were available and not stranded. The distance from Twins II to the Commissary, which had a safe second floor, is only twenty paces.

267. But, with no plan, more precious minutes were racing by. They instructed the Bug House campers and counselors to get in their vehicles, two trucks and Dick's Tahoe. They drove them around to the Main Office and told them to run into Rec Hall.

268. Rec Hall was located perilously close to the river's edge. It made no sense why the Eastlands would pick a spot closest to the river as an evacuation spot. When the evacuation began, Dick, Edward, and Glenn told the campers they are staying in Rec Hall because "their stuff is getting wet." They did not tell them they may be in mortal danger.

269. Even though Rec Hall was not the safest choice for a muster site, it somehow held during the flood. Cile could have run there in 30 seconds or less. The distance from Bug House to Rec



Copy from re:SearchTX

Hall is approximately 1,000 feet. The distance from the Twins I door to Rec Hall is 315 feet, about the length of a football field. However, despite the beginning of an evacuation and the clear and present dangers posed to the entire camp, Camp Mystic made no announcement over the loudspeakers.

270. By this time, many of the girls in Twins I and II were no longer sleeping. Thunder was booming and lightning was cracking across the sky. Counselors were moving around the cabin, peering outside the cabin door, not knowing what was happening or what to do.

271. A clear evacuation route for all cabins remained open and passable.

272. Yet in that hour, even as water was clearly rising, Dick and Edward ordered the remaining cabins to stay put and wait for instructions. The counselors were not trained what to do. One counselor remembered turning to her Camp Mystic manual for guidance. The manual confirms the instructions given: stay put, do not leave the cabin, wait for instructions. The manual does not say that the "high ground" the cabins are supposedly built on is, in fact, in a known floodplain. Nor did the manual identify an evacuation route or safe muster site.

273. Cile and the other campers in Twins II could see the lights of Dick, Edward, and Glenn's vehicles as they passed back and forth between other cabins and Rec Hall. Flashes of lightning revealed creeping levels of water and canoes floating over the soccer field.

274. Some counselors were taking turns getting up and telling the frightened campers to go back to sleep every twenty minutes. After the Bug House evacuation began, the campers and counselors in Twins II could hear the voices of other campers yelling and shrieking as they walked *past their cabin* on the way to Rec Hall. The Twins II counselors came into the Twins I cabin and told the Twins I counselors they are going to be evacuated and to stay put because someone was coming.



Copy from re:SearchTX

So, the Twins I counselors told their campers to stay put and go on the porch to look and see what was happening. Water was rising over the first step of their porch.

275. The campers and counselors of Nut Hut, Chatter Box, Wiggle Inn, Giggle Box, Twins I, Twins II, and Bubble Inn began to panic. There was no coordinated movement. No communication. No loudspeaker announcement. No cabin-to-cabin direction. As one counselor later put it: "Every single cabin on the Flats had a different experience and none was really alike and every single one was horrible."

276. After evacuating Hangout, Glenn Juenke decided it was too dangerous to continue driving in the rising water. At some point in their "evacuation hour," the ad-hoc chaotic evacuation plan disintegrated. Counselors began to realize help was not coming. They realized the entire campus was left to fend for itself. Counselors—sixteen- to eighteen-year-old girls themselves who had received no training whatsoever—were left to make snap decisions. On counselor remembered: "Everybody thought flooding was a possibility, but we never got training." The counselors of several of the older cabins engaged in heroics, leading their campers out up their cabins and scrambling up the cliffside abutting their cabins.



*Photograph of muddy handprints outside cabin along route to Sky High trail.*



Copy from re:SearchTX

277. In "Nut Hut," the counselors tried to leave the cabin to find help. Clinging to the sides of cabins, the current was too strong and the counselors turned back. They ultimately broke the cabin's screen with a rock, evacuated themselves and their campers through a window, and scrambled up the steep hill behind their cabin connected to the Cricket Corner/Sky High trail. In the darkness, the only way to know where they were going was to watch for lightning. When it struck, the counselors could see the "Camp Mystic" sign at the top of the Sky High trail. Because the campers and counselors had never been through an evacuation drill, had no safe evacuation location, and no evacuation route, the counselor was leading them "blind" in the chaos. She had never hiked to the top of this hill. Yet, she was able to get all sixteen of her campers to safety.

278. In "Chatter Box," counselors decided to evacuate on their own. Counselors used rocks to break windows, pass campers through the window one by one, and another counselor helped them scramble up the same steep hill.

279. In "Giggle Box," a counselor defied orders to stay and decided on her own it was not safe to wait. She told her girls to put on their shoes and rain jackets. Screens were hastily ripped from the windows. The counselors, working together, handed campers out the window one-by-one and made multiple trips through waist-high water and up the steep hill to evacuate all sixteen campers.

280. The Twins counselors were still left in the dark about what to do. They were stuck in the cabin, obeying Edward Eastland's mandate to "stay until you possibly cannot." They waited for the "office" to tell them what to do as the waters rose. They turned the cabin lights on and went outside to the porch with flashlights. One counselor began flashing SOS with her flashlight while the other counselors yelled for help.

281. At approximately **3:30 a.m.,** Edward Eastland drove back from Rec Hall after evacuating Jumble House. He saw Dick Eastland parked outside of Bubble Inn. Dick directed Edward to



Copy from re:SearchTX

take the Bubble Inn and Twins cabins. The water was rising but not yet to the porch. Over walkie-talkies, Dick agreed to take Bubble Inn; Edward agreed to take the Twins cabins.

282. Edward backed his truck up to Giggle Box and walked to Twins from the Giggle Box porch. The counselors anxiously waited on the Twins' porch. They saw Edward walking toward them and began pleading to him for instruction.

283. At approximately **3:35 a.m**., Edward climbed up onto the Twins' shared porch, where the water reached his ankles.



*Photograph of Twins I and II combined porch.*

284. By the time Edward finally arrived to help the Twins' cabins, he decided the campers needed to remain in the cabins and wait for the waters to recede. Although the Eastlands had rejected every single warning, now he decided to pray that the water will stop.

285. The counselors pleaded with him to evacuate. "The water will start going down," he said. Of course, Edward was wrong. That command reinforced the terribly conceived shelter in place



Copy from re:SearchTX

order. It could not have come at a worse time. The water pinned the Twins I door closed. Edward tried to open it but could not.

286. Edward then left Twins I and went to Twins II. Water was running over his legs but walking from door to door was still feasible. The Twins II counselors and campers were able to open their door.

287. At some point in the intervening minutes, Dick called Edward on the walkie talkie, stuck, struggling, and needing help. Edward told him he could not move either.

288. The Twins I and II campers were all still alive in their respective cabins. Edward and the counselors tried to keep the water out, but it started coming in through a window. Edward told the Twins II campers to get on the top bunks. He yelled the instruction through the slats to the Twins I campers as well.

289. At **3:57 a.m.**, Kerr County 911 received the first call to emergency services from Camp Mystic, a report that campers were stranded on a hill seeking evacuation. This is not a call from the Eastlands but from terrified counselors on Senior Hill. At this point, no Camp Mystic official had ever called any first responder to report a problem or ask for help. The first call from the Eastlands would not come until 7:22 a.m.—more than 6 hours after the Flash Flood Warning.

290. The water kept coming. The girls' trunks were floating. The girls huddled on two top bunks by the windows, terrified and desperate.

291. The water in Twins I rose faster than in Twins II. A Twins I counselor screamed that girls were being swept out the Twins I door onto the shared porch.

292. Edward was at the Twins II doorframe, holding the doorframe, facing out toward the river. Twins I campers floated down the porch toward the Twins II door. Girls started fleeing through the Twins I door on the shared porch, rather than drown.



Copy from re:SearchTX

293. Edward caught two Twins I campers and held on to them and the doorframe.

294. At or by **4:09 a.m**., Edward was swept away from the Twins II doorframe and downstream with two Twins I campers clinging to him. The water was churning and violent. It was a vortex of currents from the 4 raging bodies of water and the sheets of water coming down the hill, all of which converged on the flats. Edward tried to swim down the soccer field and to the cabins and trees to the right. His path was similar to many of those that survived from the Twins cabins. He was led to a row of different trees aligning the road he had earlier been using to evacuate campers. He held on to these trees, one to the next, until he ultimately arrived at a tree about 200 yards downstream at the archery range near Bug House (the "Bug House Tree"). Although he was swept away early, Edward would be the last to arrive at the Bug House Tree.

**B. <u>Cile's Final Moments</u>**

295. Cile and the other Twins II campers were still in their cabin.

296. The waters continued to rise. The ceilings were flat, not vaulted, so the girls were quickly running out of room and air. They were terrified. Some were silent, so shocked they could not speak. Most were crying hysterically, wanting to go home, wanting to be with their parents. Some were screaming "help" so often that those who survived were hoarse the next day.

297. The counselors realized that if they stayed in the cabin, everyone would drown.

298. Eventually, the water rose high enough to float and tip the bunks, spilling the girls into the water inside the cabin. The girls could not stand. The water was less than two feet from the ceiling. The girls swam toward their counselors.

299. Once the water rose to the counselor's shoulder height, she decided she could not stay any longer and broke out the side windows with a camper's trunk. The water continued to rise to above the top of the Twins II front door.



Copy from re:SearchTX



300. The counselors prepared to guide the campers downriver out of the second Twins II window on top of inflatable mattresses they had been using in their bunks. They told the girls to be brave and to hold on to anything they can get their hands on, including clotheslines. They put girls on mattresses and pushed them underwater to get them through the window. Some girls were sucked out of the window by the current.

301. One of the three counselors in Twins II was swept out of the window, grabbed the roof of Twins II, and tried to hold on and help with the window evacuation. She and another Twins II camper were swept away together after losing their grip on the roof. Another counselor was sucked out and grabbed onto a clothesline pole outside the window.

302. The water was so high before they were able to get out that some girls could barely breathe. The water in Twins ultimately rose to just six inches below the ceiling. For some of the girls, the current carried them to the cabins and a stand of trees lining the road and soccer field. Some girls were flung from tree to tree, holding on as long as they could, until they reached the Bug House Tree where most of the survivors would be found. Upon arriving at the tree, the girls performed a kind of "pull up" to climb into the branches. Some campers reported being approximately thirty feet high in the tree but still touching water.



Copy from re:SearchTX

303. Cile was on a mattress with two or three other Twins II campers. At one point, Cile fell off of the mattress.

304. On information and belief, Cile did not go from tree to tree but took a more direct path to the Bug House Tree. She made it to the tree where the majority of the survivors were found. She was so close to survival. She almost made it.

305. But Cile was swept away.

306. She was eight years old.

307. At **11:28 a.m.**, the Eastlands sent their first official post-flood email to Camp Mystic's parents: "If you have not been personally contacted then your daughter is accounted for."

308. Despite the steadfast commitment of dozens of workers and volunteers, Cile has not been found.

309. Cile, and all the young girls in Twins I, Twins II and Bubble Inn, were waiting for instructions and help that never came. And when someone finally came—Edward Eastland—he doubled down: he told the entire cabin to stay there until the water rose so high they could not stay. That order, like all of the Eastlands' other failures, sealed her fate.

## XIII.
## POST-FLOOD: THE EASTLANDS CHASE ACCOUNTS INSTEAD OF ACCOUNTABILITY.

310. After the flood, it was business as usual for the Eastlands. They wasted no time reopening. They need the cash from tuition to sustain their lifestyles, and they will stoop to just about any level to get it.

### A. The Eastlands Prioritize Reopening Over Reflection and Responsibility

311. On September 22, 2025, the Eastlands launched a public relations campaign to entice parents into believing Camp Mystic is safe and faultless. The Eastlands sent letters via email to



Copy from re:SearchTX

Camp Mystic families announcing plans to reopen the Cypress Lake campus and build a memorial at the Guadalupe River campus. These letters promised a memorial for the lives lost without seeking approval from the Stewards or other families and without mentioning Cile's name or that she was still unrecovered. The Eastlands' first letter went to the Heaven's 27 parents. The Eastlands promised it was a private, personal communication about a memorial. A few hours later, the Eastlands' true purpose became clear: they sent a letter to all parents to solicit public support for reopening, so they do not go bankrupt.

312. The Stewards responded the next day:

> To promote reopening less than three months after the tragedy—while one camper remains missing—is unthinkable. Our families remain trapped in the deepest throes of grief, yet your communications treat our never-ending nightmare as little more than a brief pause before resuming business as usual.

313. The Eastlands did not listen. Even after this email, the Eastlands admitted in the November 15th *New York Times* article, "Swept Away," that no plan existed for how to evacuate campers, the chaotic July 4th attempt to evacuate was improvised, and the camp was planning to create a plan—in the future.

314. On October 14, 2025, Tweety Eastland mailed another letter—this time directly to minor children who survived July 4th, *without first obtaining permission from their parents*. The letter encouraged these traumatized children to remember they are "Mystic Girls." At other moments, the Eastlands have stated that attending Camp Mystic would honor those lost, that those who drowned would want them to return, and that re-opening would bring healing. The parents of those children disagree.

315. On December 2, 2025, the Eastlands sent yet another letter soliciting parents to return their children to Camp Mystic. The letter claimed that returning to camp is part of a child's "healing journey"—despite the Eastlands having no training in trauma psychology.



Copy from re:SearchTX

**B. The "New" Safety Measures Only Reinforce its Failures**

316. The Eastlands' December letter announced "new" safety measures for Cypress Lake—measures that prove exactly what was missing at the Guadalupe River facility on July 4, 2025:

- Flood warning river monitors — Not present on July 4th
- Elevated muster station — Not present on July 4th
- Far-reaching outdoor PA system and cabin speakers — Not working on July 4th
- Hand-held two-way radios with NOAA weather alerts — Not present on July 4th
- Redundant internet backed by satellite — Not present on July 4th
- Higher-capacity backup generators — Not present on July 4th
- Cabins on high ground above floodplain — Not true on July 4th

317. That the Eastlands "saw the light" about safety five months after they killed 27 children doesn't change the outcome. These policies and procedures were within the scope of what any reasonably prudent camp owner should have implemented decades ago—especially one located in the middle of Flash Flood Alley.

318. Thankfully, other camps will be safer in the future thanks to the Texas Legislature, which passed the HEAVEN'S 27 SAFETY ACT during the Second Special Legislative Session of 2025. These new laws will help ensure that all summer camps throughout Texas take the necessary steps to keep children safe while under their care.

**C. The Eastlands Have No Business Watching Over Children Ever Again**

319. In the aftermath of the July 4th tragedy, the Eastlands have claimed that the Cypress Lake camp is "completely independent from the Guadalupe River camp." This claim is patently false and deliberately misleading.

320. Both camps share the same operating license from The State of Texas.

321. Beyond the ownership being the same, the location is the same as well. The two camps share the same land, same culture, same ranch hands, same equipment, same philosophy, same



Copy from re:SearchTX

tribes and most importantly the same leadership. The two camps' offices are separated by a single gravel road that spans the length of a few football fields. Regardless of the slightly different name, the supervision, control and governance remain under the same reckless family.

322. The Eastlands—as an entire family—have engaged in a letter writing, social media and press campaign to entice parents to send their children back. All of the Eastlands—from both camps—signed these letters. The same family owns and operates both camps. All of them made decisions that killed 27 children. All of them signed these letters. All of them benefit financially from the money paid by the parents they seek to entice back to Camp Mystic. And none of them should ever be put in charge of other people's children ever again. At any location.

323. There is simply no context in which a business owner could cause the loss of so many children's lives and ever be allowed to operate their business again. That three months later, they aggressively push for re-opening without investigating, reflecting or accounting for their myriad failures, is evidence of the continued hubris and complacency that insults the legacies of those lost and confirms the Eastlands' inadequacies as shepherds of children.

324. Moreover, the Eastlands are attempting to pull the wool over impressionable eyes, attempting to distinguish Camp Mystic as two different entities, Cypress Creek and Guadalupe, as if it makes a difference. The only reason the Cypress Creek campus did not also suffer massive losses was not a difference in training, planning or monitoring. Just sheer luck of elevation. The idea that the two campuses are two separate operations is fiction and fantasy.

325. As with any mass casualty event involving children, the entire Camp Mystic management and leadership structure must be examined. The Captain bears the final burden to see the ship safely to port, or metaphorically, sink with it. The Eastlands are not leaders. The Eastlands are



Copy from re:SearchTX

not protectors. Camp Mystic must be nothing but a memory and a memorial to those lost in the wake of the Eastlands' negligence.

## D. The Eastlands Have Spoliated Evidence

326. In their eagerness to reopen, the Eastlands also have intentionally altered material evidence at the disaster scene. The Eastlands' communications that they are "continuing to evaluate plans to rebuild Camp Mystic Guadalupe River" is patently false. They have already decided to rebuild. They are actively working on the property every day. Regardless of this and countless other litigation proceedings, the active and ongoing search of Cile, the Joint House and Senate Investigative Committee and the potential criminal investigations, the Eastlands have treated the camp site with no reverence. They have scrubbed entire offices, cleaned out cabins, and significantly altered evidence.

327. The Main Office has been completely remodeled. All existing camp communication systems, radios, and announcement equipment are gone. Fresh paint and walls show no signs of storm damage. The watermark lines from the flood at Rec Hall have disappeared, seemingly cleaned or painted over. The Commissary, a potential escape route for Cile less than 20 paces from her cabin, has a new exterior staircase. Several cabins have entirely new framing. Other than the watermark lines in Cile's cabin, it has been cleaned, no mattresses, bunks, or bed frames remain.



Copy from re:SearchTX











Copy from re:SearchTX




328. Make no mistake: the entire camp site is an evidence scene, and Defendants have failed to preserve it. Plaintiffs intend to seek injunctive relief to prevent further spoliation.

## XIV.
## CAUSES OF ACTION

329. Plaintiffs assert the following causes of action against all Defendants, jointly and severally, based on their ownership, operation, management, and control of Camp Mystic and related entities.

### A. Negligence

330. All prior material fact allegations are incorporated.

331. Defendants owed a duty of reasonable care to protect Cile Steward and all campers and staff at Camp Mystic. Defendants owed a duty to provide a safe environment, to implement and follow adequate safety and evacuation procedures, to monitor and respond to known flood risks, and to warn of known dangers. Defendants breached every one of these duties.

332. Defendants committed negligent acts and omissions, including but not limited to the following:

a. failure to implement and maintain adequate emergency and evacuation plans;
b. failure to ensure camp facilities were constructed in safe locations;
c. failure to enforce policies and procedures related to camper safety;



Copy from re:SearchTX

d. failure to take proper preventative measures to mitigate the known flood risks;
e. failure to adequately staff the Camp with properly trained oversight, management, and counselors;
f. failure to assess, monitor, and respond to flood risks, despite repeated prior flooding and official warnings;
g. failure to timely evacuate campers and staff when flooding was foreseeable or imminent;
h. failure to train employees and/or counselors in emergency action plans;
i. failure to provide lifesaving equipment and maintain safe facilities;
j. failure to warn campers, staff, and parents of the dangerous condition of the camp being located in or near a known flood zone.

333. Defendants' negligence proximately caused the injuries and death of Cile Steward, and Plaintiffs seek survival and wrongful death damages.

**B. <u>Negligence *Per Se*</u>**

334. All prior material fact allegations are incorporated.

335. Defendants violated applicable statutes and regulations designed to protect against the type of harm suffered by Cile Steward.

336. Chapter 265 of the TEXAS ADMINISTRATIVE CODE is titled "Texas Youth Camps Safety and Health." Within that chapter, section 265.15(k) expressly requires a written "plan of procedures to be implemented in case of disaster" including "evacuation of each occupied building and the facility."

337. TEXAS ADMINISTRATIVE CODE § 265.15(k) expressly requires every youth camp to maintain a written disaster plan. The Code also requires that even if a camp has a written policy that includes sheltering in place, a camp "shall" also have procedures for evacuation of each occupied building and the facility as a whole. This requirement reflects a basic and universally accepted safety principle: when children are housed in foreseeable danger zones, evacuation planning is not optional. The Eastlands had no flood emergency plan. And they had no evacuation plan.



Copy from re:SearchTX

338. This section was drafted with the safety of children attending camps in mind—it was drafted precisely to avoid the type of needless deaths that occurred at Camp Mystic. But Defendants ignored this obligation. By avoiding a regulatory requirement specifically designed to protect camp attendees from natural disasters, Defendants defied reasonable care, common sense, and Texas law.

339. Additionally, section 265.13(a) states that a camp's "buildings, structures, and grounds shall not present a fire, health, or safety hazard." 25 TEX. ADMIN. CODE § 265.13. In violation of this requirement, Camp Mystic's cabins presented a safety hazard by being built within a known floodplain without adequate protections in place.

340. Section 265.12(d) also requires written personnel policies and practices for both campers and staff. 25 TEX. ADMIN. CODE § 265.12(d). Camp Mystic failed to maintain these mandatory written policies.

341. Lastly, section 141.011 of the TEXAS HEALTH AND SAFETY CODE states that a youth camp operator "shall provide each camper with safe and healthful conditions, facilities, and equipment that are free from recognized hazards that cause or may tend to cause death, serious illness, or bodily harm." TEX. HEALTH & SAFETY CODE § 141.011. Camp Mystic breached this statutory duty by exposing campers to a known, life-threatening flood hazard without adequate protections.

342. Cile Steward, as a youth camp attendee, belonged to the class of persons these statutes and regulations were designed to protect, and her death is precisely the type of harm these rules were designed to prevent.

343. Defendants' violation of these rules proximately caused the injuries and death of Cile Steward.



Copy from re:SearchTX

344. All of the foregoing statutes or regulations were in effect at the time of the July 4, 2025 flood.

**C. <u>Gross Negligence</u>**

345. All prior material fact allegations are incorporated.

346. Defendants' acts and omissions, viewed objectively from their standpoint, involved an extreme degree of risk considering the probability and magnitude of potential harm to campers and staff, including Cile Steward. Defendants' acts and omissions constituted "Gross Negligence" as defined in the TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.001(11).

347. Defendants had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Cile Steward and others. Specifically, Defendants knew that the campers' cabins were in the flood plains and knew of severe flood warnings, but even with the lives of young children at stake, Defendants proceeded with conscious indifference to their safety.

348. Cile Steward is presumed to be deceased as a direct and proximate result of Defendants' grossly negligent conduct.

349. Plaintiffs seek exemplary damages for Defendants' gross negligence.

**D. <u>Premises Liability</u>**

350. All prior material fact allegations are incorporated.

351. Under Texas law, a property owner or occupier owes a duty to invitees, such as Cile Steward, to exercise reasonable care to protect them from conditions that create an unreasonable risk of harm that the owner/occupier knew or should have known about through reasonable inspection.



Copy from re:SearchTX

352. Defendants owned, occupied, possessed, managed, and/or controlled the area where Cile Steward sustained injuries and ultimately died.

353. The condition of the area, including the location of cabins in a known floodplain and lack of adequate safety infrastructure, posed an unreasonable risk of harm. Defendants had actual knowledge or reasonably should have known of the unreasonably dangerous condition.

354. Defendants breached their duty by failing to warn or make the condition reasonably safe, proximately causing the death of Cile Steward.

**E. <u>Intentional Infliction of Emotional Distress</u>**

355. All prior material fact allegations are incorporated.

356. Defendants are liable for intentional infliction of emotional distress because they acted intentionally or recklessly, their conduct was extreme and outrageous, and their conduct caused Will and CiCi Steward severe emotional distress.

357. Defendants prioritized reopening Camp Mystic and preserving their profits over the dignity of the deceased children and the emotional well-being of their families. Despite pending recovery efforts, active lawsuits, and ongoing governmental investigations, Defendants launched a coordinated public-relations campaign designed to rehabilitate Camp Mystic's image and solicit future campers.

358. Defendants, in letters signed by Tweety Eastland herself, repeatedly communicated with the Steward parents and the public in ways that were misleading, self-serving, and designed to rehabilitate Camp Mystic's image.

359. Tweety Eastland personally authored, approved, and sent multiple letters and communications to the Steward parents, child survivors, and the broader Camp Mystic community.



Copy from re:SearchTX

She used these communications to announce reopening plans and a proposed memorial. In doing so, she invoked Cile Steward's memory without consent to promote a return to Camp Mystic.

360. When the Steward parents objected and asked Defendants to halt reopening efforts, Defendants ignored them and escalated their conduct, including contacting traumatized child survivors and later asserting that returning to Camp Mystic could be part of a child's "healing journey," despite Defendants' lack of any trauma-related training or expertise.

361. Defendants knew or should have known that this conduct, directed at parents whose child had died and remained missing, would cause severe emotional distress, but proceeded with reckless disregard for the Steward parents' well-being.

362. Defendants' conduct directly and proximately caused the Steward parents severe emotional distress beyond that ordinarily associated with the loss of a child.

**F. <u>Respondeat Superior, Agency, and Ratification</u>**

363. All prior material fact allegations are incorporated.

364. All agents, servants, and/or employees of Defendants were acting within the course and scope of their employment and in furtherance of the Defendants' business. Accordingly, Defendants are liable for their acts and omissions under the doctrine of *respondeat superior*.

365. Further, Defendants ratified the negligent acts and/or omissions of other Defendants and their agents. Accordingly, Defendants are liable for these acts or omissions. Namely, Defendants approved unsafe Camp facility locations, approved dangerous camp procedures, and accepted the benefits from campers paying to use these unsafe facilities. By failing to repudiate such negligent conduct, Defendants are jointly and severally liable for their tortious conduct resulting in Cile Steward's injuries and damages.



Copy from re:SearchTX

**G. Joint Enterprise**

366. All prior material fact allegations are incorporated.

367. At all relevant times, Defendants operated a Joint Enterprise such that each individual party thereto should be held responsible for the negligent acts of the other.

368. Defendants operated under (i) an express or implied agreement; (ii) to carry out a common purpose; (iii) a community pecuniary interest in that common purpose; and (iv) an equal right to direct and control the enterprise. Defendants collectively shared control and pecuniary benefits from the enterprise. As members of the joint enterprise, Defendants committed numerous torts against Cile Steward. Thus, as members of the tortious joint enterprise, Defendants are jointly and severally liable to Plaintiffs for the death and damages sustained therefrom.

**H. Veil Piercing and Alter Ego**

369. All prior material fact allegations are incorporated.

370. The Eastlands have abused the corporate privilege and should not be able to avail themselves of the benefit therefrom.

371. At all relevant times, Defendants Dick and Tweety Eastland exercised total dominion and control over the Defendant entities in a manner indistinguishable from their own personal affairs and are using the corporate fictions as a means of evading a legal obligation. Dick and Tweety Eastland were known to be the owners, president, managers, and directors of the Camp Mystic entities, and the ones actually in control over the facilities and operations of the Camp Mystic entities.

372. Dick and Tweety Eastland created a web of corporate entities to separate ownership of assets from the Camp's operations, intentionally operating entities that were under-capitalized and under-insured. This structure was designed to shield assets, limit liability, and maximize personal



Copy from re:SearchTX

profits, thereby perpetuating a fraud for their personal benefit. Allowing the Eastlands to maintain the legal fiction of separate entities would promote injustice and allow them to evade accountability.

373. Ultimately, Dick and Tweety Eastland are the "alter ego" of the Entity Defendants, as the entities were organized and operated as mere tools for the Eastlands' personal benefit. The various Defendant Entities, including Camp Mystic, LLC, Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC, should be disregarded and their corporate forms deemed not separate. Because these entities are mere shams, organized and operated by the Eastlands in their individual capacities to perpetrate fraud upon Plaintiffs, they should be disregarded.

374. Alternatively, Camp Mystic Family Partnership, Ltd. used its subsidiaries, including Camp Mystic, LLC and Natural Fountains Properties, Inc., to perpetrate an actual fraud for the primary benefit of the Eastlands individually, and not for any legitimate corporate purpose.

## XV. DAMAGES

### A. Wrongful Death

375. All prior material fact allegations are incorporated.

376. Plaintiffs, as wrongful death beneficiaries, seek to recover the following damages resulting from the death of Cile Steward:

a. Mental anguish sustained in the past and future;
b. Pecuniary loss sustained in the past and future;
c. Loss of companionship and society sustained in the past and future;
d. Loss of household services sustained in the past and future;
e. Any other damages available to wrongful death beneficiaries

### B. Survival Action

377. All material factual allegations are incorporated.



Copy from re:SearchTX

378. Plaintiffs seek to recover the following elements of survival damages:

a. Physical pain and mental anguish sustained by Cile Steward before death;
b. Funeral and burial expenses;

**C. <u>Exemplary Damages</u>**

379. Plaintiffs incorporate and re-allege the above paragraphs and all subsequent paragraphs as if stated fully here.

380. Because of Defendants' gross negligence, they should have exemplary damages under Chapter 41 of TEXAS CIVIL PRACTICE AND REMEDIES CODE assessed against them in an amount deemed appropriate by the jury.

381. Additionally, because Defendants' acts and/or omissions—for which the Entity Defendants are vicariously liable—constitute an intentional and/or knowing violation of TEXAS PENAL CODE § 22.04(a), Plaintiffs are entitled to recover exemplary damages without limitation as provided for under TEXAS CIVIL PRACTICE AND REMEDIES CODE § 41.008(c)(7).

## XVI.
## INJUNCTIVE RELIEF AND PRESERVATION OF EVIDENCE SOUGHT

382. Plaintiffs incorporate all prior material fact allegations herein. Plaintiffs seek all injunctive relief to which they may be justly entitled.

383. More specifically, as set forth above, Defendants have already altered, destroyed, and removed material physical evidence at the Camp Mystic disaster scene. Plaintiffs therefore seek injunctive relief to prevent further spoliation of evidence at Camp Mystic.

384. Plaintiffs hereby demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom. This demand includes but is not limited to preserving and maintaining all parts of the site of the incident, the campsite, signs, statements, photographs, video footage, audio,



Copy from re:SearchTX

surveillance, security footage, information, business records, incident reports, equipment (including weather monitoring equipment), invoices, checks, correspondence, facsimile, email, voice-mail, text messages and any evidence whatsoever involving or relating to the incident in question. Failure to preserve and maintain such evidence will constitute spoliation of evidence, and Plaintiffs will seek appropriate relief from the Court for any such spoliation.

## XVII.
## NOTICE OF SELF-AUTHENTICATION

385. Pursuant to Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs give notice of intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## XVIII.
## RESERVATION OF RIGHTS

386. Plaintiffs reserve the right to prove the amount of damages at trial. Plaintiffs reserve the right to amend their petition to add additional counts and/or parties upon further discovery and as this investigation continues.

## XIX.
## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

387. Plaintiffs request pre- and post-judgment interest as may be permitted by law.

## XX.
## REQUEST FOR JURY TRIAL

388. Plaintiffs, in accordance with Rule 216 of the TEXAS RULES OF CIVIL PROCEDURE, request a trial by jury. Plaintiffs have tendered the required jury fee.



Copy from re:SearchTX

## XXI.
## CONDITIONS PRECEDENT

389. Pursuant to Rule 54 of the TEXAS RULES OF CIVIL PROCEDURE, all conditions precedent to Plaintiffs' right to recover herein and to Defendants' liability have been performed or have occurred.

## XXII.
## CLAIM FOR RELIEF

390. Plaintiffs are seeking monetary relief in excess of $1,000,000.00 in actual and punitive damages.

## XXIII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear and answer, and after trial or final hearing, the Court enter judgment for Plaintiffs for:

a. Full actual damages as set forth above;
b. Exemplary damages as allowed by law;
c. Pre-judgment and post-judgment interest at the maximum rates allowed by law;
d. Costs of court;
e. Injunctive relief to preserve physical evidence and to prohibit operation or reopening of Camp Mystic pending resolution of this action;
f. Such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.



Copy from re:SearchTX

Respectfully submitted,

By: */s/ Brad Beckworth*

Bradley E. Beckworth
State Bar No. 24001710
Christina Yarnell
State Bar No. 24071973
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
Telecopier: (512) 328-5335
bbeckworth@nixlaw.com
cyarnell@nixlaw.com

*and*

Blair Townsend, *pro hac forthcoming*
THE TOWNSEND LAW FIRM, LLC
50 SW Pine Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 715-1896
Telecopier: (503) 907-6904
blair@thetownsendlawfirm.com

***Attorneys for Plaintiffs***



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Donna Fernandez-Abshere on behalf of Bradley Beckworth
Bar No. 24001710
dfabshere@nixlaw.com
Envelope ID: 110874834
Filing Code Description: Petition
Filing Description: PLAINTIFF'S ORIGINAL PETITION
Status as of 2/5/2026 11:11 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Donna Fernandez-Abshere | | dfabshere@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Christina Yarnell | | cyarnell@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Christina Yarnell | | cyarnell@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Christina Yarnell | | cyarnell@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Bradley Beckworth | | bbeckworth@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Bradley Beckworth | | bbeckworth@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |
| Bradley Beckworth | | bbeckworth@nixlaw.com | 2/4/2026 7:27:07 PM | NOT SENT |

Copy from re:SearchTX

2/6/2026 5:21 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-26-000758
Nancy Rodriguez

CAUSE NO. D-1-GN-26-000758

| | | |
|---|---|---|
| WILL and CiCi STEWARD, Individually and as Representatives and Heirs of the Estate of CILE STEWARD, a Deceased Minor<br><br>Plaintiffs,<br><br>v.<br><br>CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc. MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased, WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC. EDWARD S. EASTLAND, MARY E. EASTLAND and WILLIAM NEELY BONNER, III<br><br>Defendants. | § | IN THE DISTRICT COURT OF<br><br>TRAVIS COUNTY, TEXAS<br><br>200th JUDICIAL DISTRICT |

**PLAINTIFFS' APPLICATION FOR TEMPORARY**
**<u>RESTRAINING ORDER AND TEMPORARY INJUNCTION</u>**

Plaintiffs Will and CiCi Steward, Individually and as Representatives and Heirs of the Estate of Cecilia "Cile" Steward, a Deceased Minor, (collectively "Plaintiffs") move for a temporary restraining order and temporary injunction to prevent Defendants CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased; WILLETTA A. EASTLAND, Individually and as Director and Vice President of



Copy from re:SearchTX

CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC.; EDWARD S. EASTLAND; MARY E. EASTLAND; and WILLIAM NEELY BONNER, III (collectively, "Defendants") from further altering or destroying the Camp Mystic site and the physical evidence central to this case.

**INTRODUCTION**

Cile Steward was tragically killed on July 4, 2025, as a result of Defendants' negligence and gross negligence. Plaintiffs filed suit on February 4, 2026. This application for injunctive relief seeks to preserve the status quo and protect material evidence bearing on how and why Cile Steward lost her life while entrusted to Defendants' care. While grieving Plaintiffs search for answers in the courtroom and search crews continue to search for Cile Steward's body, Defendants press forward with remodeling the Camp Mystic site in search of next year's campers. It now falls to this Court to protect the public, Plaintiffs' search for answers, and the evidence at the Camp Mystic site.



*Photograph of Cile drawing Kiowa, her tribal assignment, on June 29, 2025.*



Copy from re:SearchTX



Under Texas law, Defendants' duty to preserve the Camp Mystic site arose once there was a "substantial chance" litigation would be filed involving material evidence in their control. *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 722 (Tex. 2003). Given the sheer magnitude of the July 4, 2025 Camp Mystic tragedy, that duty attached immediately. Yet, despite knowing that litigation and subsequent investigations were inevitable, Defendants hastily proceeded with material alterations and construction at the ***very site*** from which this preventable tragedy arose.

By altering the site, Defendants threaten to "undermine the truth-seeking function" of this Court and "stymie the search for the truth." *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 16–17 (Tex. 2014). But this Court has the authority to prevent that result. Texas trial courts are empowered to issue injunctions to preserve the status quo and safeguard the Court's ability to effectuate a meaningful judgment. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(2); *GL Logistics Co., LLC v. Flores*, No. 04-21-00125-CV, 2021 WL 3862232, at *5 (Tex. App.—San Antonio Aug. 31, 2021, no pet.). By enjoining Defendants from further altering the Camp Mystic site, the Court will preserve the central evidence in this case, protect Plaintiffs' right to a fair adjudication, and ensure that any eventual judgment is based on a complete and unaltered record.



Copy from re:SearchTX

Accordingly, because the permanent erasure of this evidence constitutes imminent and irreparable harm for which no legal remedy can compensate, Plaintiffs seek an order enjoining Defendants from altering, destroying, or modifying the Camp Mystic site pending trial on the merits.

In support of this Application for Temporary Restraining Order and Temporary Injunction, Plaintiffs respectfully show the Court as follows:

## FACTS

1. Attached hereto as "Exhibit 1" and incorporated herein by reference is a true and correct copy of the affidavit of Will Steward in support of this Application for Temporary Injunctive Relief. Also attached hereto as "Exhibit 2" and incorporated herein by reference is a true and correct copy of Plaintiffs' Original Petition, filed on February 4, 2026.

2. Plaintiffs' Petition asserts a cause of action for negligence, gross negligence, and premises liability, based on Defendants' ownership, operation, and control of the Camp Mystic property and facilities that resulted in the wrongful death of Cile Steward. Ex. 2 ¶¶ 329–354.

3. As alleged in Plaintiffs' Petition, Camp Mystic is located in an area with a long-documented history of severe flash flooding along the Guadalupe River. Ex. 2 ¶¶ 147–182. Plaintiffs' pleadings allege that Defendants were aware of this history, that several cabins housing young campers were located in flood-prone areas, and that Defendants failed to take reasonable measures to protect campers or timely evacuate them as flooding conditions developed. The photos below depict the location of the Camp Mystic cabins and the deadly flood chokepoint in which they were situated.



Copy from re:SearchTX









Copy from re:SearchTX

4. Since the flooding, Defendants have maintained exclusive control over the Camp Mystic property. Physical conditions at the site, including cabins, terrain, posted disaster plans, and access routes, constitute critical physical evidence relevant to Plaintiffs' claims. After the July 4th flood, the Camp Mystic site contained extensive physical evidence documenting the flood's effects and Camp Mystic's culpability. The photographs below provide a representative snapshot of site conditions and posted instructions that warrant preservation. These photographs illustrate only a minute portion of the physical evidence that Plaintiffs seek to preserve.






5. Alteration or removal of the physical evidence at the Camp Mystic site would greatly impair Plaintiffs' ability to develop and present their case and would adversely affect the ability



Copy from re:SearchTX

of the Court to grant meaningful relief. Moreover, alteration of this evidence would deny the grieving families the answers and justice that they deserve.

6. Aside from the patent relevance of the Camp Mystic site, Plaintiffs' petition includes a demand that Defendants preserve and maintain evidence pertaining to this lawsuit. Ex. 2 ¶¶ 382–384. But Plaintiffs' explicit request for preservation merely reiterates the duty to preserve evidence that automatically arises when a party knows or reasonably should know that there is a substantial chance that a claim will be filed and that evidence in its possession or control will be material and relevant to that claim. *See Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 20 (Tex. 2014). In this instance, there can be no doubt that Defendants were on notice that litigation was certain after multiple minor children died while in their care. The Camp Mystic cabins, grounds, and surrounding facilities are central, material evidence to those claims.

7. Moreover, the State of Texas is still investigating the Camp Mystic tragedy. The Joint Senate and House General Investigating Committees on the July 2025 Flooding Events—established by the 89th Legislature to conduct a comprehensive review of the Camp Mystic tragedy—have yet to hold final hearings or issue a conclusive report. *See* Ex. 3 (Senate and House Resolutions creating the joint committees tasked with investigating the Camp Mystic tragedy). Simultaneously, the state's camp licensing portal has recently opened for the annual renewal and revocation cycle. In response, a multitude of families have filed or intend to file formal statements with the licensing authorities, calling for an exhaustive investigation into the camp's safety protocols and moving the state to either revoke or refuse to renew Camp Mystic's operating license.

8. Despite the presence of pending investigations and litigation directly related to the condition of the Camp Mystic cabins and site, Defendants have taken actions to alter the Camp



Copy from re:SearchTX

Mystic site in an attempt to re-open the same camp that resulted in the death of multiple young girls less than one year ago.

9. Defendants have stated in written and oral communications that they are "continu[ing] to evaluate plans to rebuild Camp Mystic Guadalupe River." *See* Ex. 4 (September 22, 2025 Letter from Camp Mystic). Those plans are being ***actively executed*** as of the date of this filing.

10. As of the date of this application, construction activity is occurring on the Camp Mystic property. The Main Office building at Camp Mystic has been remodeled since the flood event. All radios, announcement systems, and other camp communication equipment previously located in the Main Office have been removed. The interior of the Main Office has been repainted, and interior walls have been replaced. High-water marks that were previously visible in the Rec Hall building are no longer present. The Commissary building now has a newly constructed exterior staircase that was not present in the same configuration prior to the flood.

11. Several cabins on the Camp Mystic property contain new framing materials and structural components. In the cabin where Cile was housed, the mattresses, bunk beds, and bed frames have been removed, and the interior has been cleaned. The physical condition, layout, and interior features of multiple buildings at Camp Mystic differ from their condition immediately following the flood. The photographs below demonstrate the extent of the Defendants' spoliation. Defendants are using heavy machinery to reshape the topography and have stripped cabins to the studs, thereby erasing the physical evidence of the Camp Mystic tragedy.



Copy from re:SearchTX








Copy from re:SearchTX





12. Defendants themselves have admitted that they are "rebuilding cabins and trails" and are working to "finalize plans" going forward. *See* Ex. 4. These statements combined with the physical alterations described above reflect a coordinated effort to prepare the Camp Mystic property for future use while this litigation remains pending.

13. Defendants' efforts to reopen the Camp Mystic site while this litigation is pending demonstrate: (1) a disregard for the ongoing litigation relating to the Camp Mystic site, and (2) a lack of remorse and refusal to accept responsibility for the tragedy that occurred on Defendants' watch.

## **LEGAL STANDARD**

14. The purpose of a temporary restraining order is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co*., 84 S.W.3d 198, 204 (Tex. 2002). Preserving the status quo of litigation necessarily includes preserving evidence relevant to pending litigation as "the loss or destruction of evidence may seriously impair a party's ability to present its case." *See Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003). A party's failure to preserve discoverable evidence can "undermine the truth-seeking function of the



Copy from re:SearchTX

judicial system and the adjudicatory process." *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 16–17 (Tex. 2014).

15. Accordingly, a trial court may issue an injunction to "prevent the future alteration, disposition, or destruction of physical evidence" relevant to the litigation. *See GL Logistics Co., LLC v. Flores*, No. 04-21-00125-CV, 2021 WL 3862232, at *5 (Tex. App.—San Antonio Aug. 31, 2021, no pet.).

16. Moreover, trial courts are statutorily empowered to grant temporary injunctive relief where Defendants are performing and continuing to perform acts related to the subject of pending litigation that would render a judgment in this litigation ineffectual. *See* TEX. CIV. PRAC. & REM. CODE § 65.011(2). Injunctive relief is likewise authorized where the plaintiff is entitled to the relief demanded in its live pleading and such relief requires restraining the defendant from prejudicial acts. *Id.* § 65.011(1). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru*, 84 S.W.3d at 204.

17. To obtain a temporary injunction, an applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id*. Destruction or alteration of physical evidence can constitute imminent and irreparable harm because even a spoliation instruction addresses only the consequences of evidence loss and cannot prevent or undo the loss of evidence itself. *See GL Logistics*, 2021 WL 3862232, at *5.

**ARGUMENT**

18. Plaintiffs re-allege and incorporate by reference paragraphs 1–17 above, as if fully set forth herein.



Copy from re:SearchTX

**I. To preserve the Status Quo of this litigation, Defendants should be enjoined from altering the physical evidence at the Camp Mystic Site.**

19. Plaintiffs seek to preserve the status quo of this litigation and the truth-seeking function of the judicial system by preventing the Defendants' efforts to alter physical evidence at the Camp Mystic site that is central to this case. Unless Defendants are immediately enjoined and restrained, Defendants will continue to alter or destroy physical evidence from the Camp Mystic Site in question and thereby deprive the Plaintiffs of the answers they seek and the evidence necessary to present their case.

20. The requested temporary injunction will maintain the status quo between now and trial by prohibiting Defendants from altering, disposing of, or destroying physical evidence as it existed at the time this dispute arose, thereby preserving the last, actual, peaceable condition of the evidence before the threatened conduct occurred. *See Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.*, 281 S.W.3d 215, 222 (Tex. App.—Fort Worth 2009, pet. denied) ("Status quo is defined as the last, actual, peaceable, noncontested status which preceded the pending controversy.")

**A. Plaintiffs have satisfied all elements necessary for injunctive relief.**

21. To obtain temporary injunctive relief, Plaintiffs must show (1) a cause of action against the defendants, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim for which there is no adequate remedy at law. *Butnaru*, 84 S.W.3d at 204. As set forth below, Plaintiffs have satisfied each of these requirements.

**i. Plaintiffs have pleaded multiple viable causes of action against the Defendants.**

22. Plaintiffs have satisfied the requirement of pleading viable causes of action against Defendants. Plaintiffs' petition alleges negligence, gross negligence, and premises liability claims



Copy from re:SearchTX

against Defendants arising from the wrongful death of Cile Steward. Those claims readily meet this element. Ex. 2 ¶¶ 329–354.

**ii. Plaintiffs have demonstrated a probable right to relief against the Defendants.**

23. At the preliminary injunction stage, a probable right to the relief sought is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Tanguy v. Laux*, 259 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2008, no pet.). To demonstrate a probable right to the relief sought, "the applicant is not required to prove, at this stage, that it will prevail on final trial; instead, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial." *Shor v. Pelican Oil & Gas Mgmt., LLC*, 405 S.W.3d 737, 749 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

24. Here, Plaintiffs have demonstrated a probable right to relief. It is beyond dispute that twenty-seven young girls entrusted to Defendants' care lost their lives while under that care. The facts in this case will demonstrate that Defendants owed clear duties to these young girls and breached those duties by maintaining unsafe conditions at the Camp Mystic site. Those breaches proximately and tragically caused Cile Steward's death.

25. More specifically, the evidence will show that Defendants operated Camp Mystic with a disregard for a century of flood history and numerous urgent flood warnings. The evidence will further show that Defendants violated Texas law by failing to maintain a written evacuation plan or provide documented training to campers and staff. *See* TEX. ADMIN. CODE § 265.15(k). Rather than complying with these life-saving requirements, Defendants relied on a fatally flawed "shelter in place" mandate that left children trapped in their cabins as floodwaters rose to the ceilings. These facts are more than sufficient at this preliminary stage. Thus, Plaintiffs have demonstrated



Copy from re:SearchTX

a probable right to relief, entitling them to preservation of the status quo while the merits are resolved.

**iii. In the absence of an injunction, Plaintiffs will suffer imminent and irreparable injury as a result of the Defendants alteration of physical evidence.**

26. Unless this Court grants Plaintiffs' application and temporarily restrains Defendants from the acts described above, Plaintiffs will suffer probable, imminent, and irreparable injury.

27. ***The threatened harm is imminent and ongoing***. The harm to Plaintiffs is imminent and probable because Defendants are *presently altering* or disturbing physical conditions and evidence at the Camp Mystic site that are critical to Plaintiffs' claims. Once altered or destroyed, that evidence cannot be recreated, and the loss will occur before the Court can adjudicate the merits of this case.

28. Plaintiffs' evidentiary concerns are neither conjectural nor speculative. As discussed above, Defendants have ***already undertaken alterations*** to the Camp Mystic site. Moreover, Defendants have demonstrated an intent to continue to alter the Camp Mystic site, further prejudicing the Plaintiffs' ability to prosecute their case.

29. ***The harm is irreparable.*** An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru*, 84 S.W.3d at 204. Plaintiffs will suffer irreparable injury because the alteration or destruction of physical evidence at the Camp Mystic site would impair the truth-seeking function of the judicial process and prevent Plaintiffs from fully developing and presenting their claims. *See Brookshire Bros.*, 438 S.W.3d at 16–17. The physical condition of the Camp Mystic site bears directly on issues of duty, breach, and causation, and its loss would permanently and irreparably prejudice Plaintiffs' case.



Copy from re:SearchTX

30. Absent preservation of the physical evidence, Plaintiffs will lose not only the ability to prove their claims, but also the opportunity to obtain answers and accountability regarding the circumstances surrounding Cile's death.

31. Because the site was altered before a full inspection, Plaintiffs have been deprived of the opportunity to conduct a complete inspection. Furthermore, photographs are an inadequate substitute for physical evidence. A physical inspection is necessary to measure and map potential evacuation routes, evaluate flood clearances, and assess the opportunities for evacuation that existed if the Defendants acted reasonably. These analyses depend on accurate measurements of distances, elevations, spatial relationships, and site conditions that cannot be reliably reconstructed from photographs alone. If the site is altered further, Plaintiffs' ability to perform these critical forensic evaluations will be further diminished.

32. Importantly, this application seeks the preservation of evidence *now*, not the imposition of post-hoc remedies after evidence has already been lost. As the court explained in G*L Logistics*, a spoliation instruction or discovery sanction "addresses the harm that arises ***after*** evidence has already been lost, altered, or destroyed" and therefore does not prevent the imminent impairment of a party's ability to prosecute its claims. 2021 WL 3862232, at *5 (Tex. App.—San Antonio Aug. 31, 2021, no pet.) (emphasis added).

33. Thus, "the future potential remedy of spoliation sanctions [is] not an adequate or complete remedy in this situation where equitable relief prohibiting the alteration, disposition, or destruction of evidence [is] more prompt, practical, and efficient." *Id.* (citing *Butnaru,* 84 S.W.3d at 210).

34. ***Plaintiffs have no adequate remedy at law.*** There is no adequate remedy at law because once physical evidence at the Camp Mystic site is altered or destroyed, no monetary award, discovery sanction, or jury instruction can restore the evidence, eliminate the resulting prejudice,



Copy from re:SearchTX

or place Plaintiffs in the position they were in before the loss. Only injunctive relief can preserve the status quo and ensure a fair adjudication on the merits.

35. Put simply, physical evidence lost today cannot be restored tomorrow, no matter the instruction or sanction imposed later.

**B. The balance of equities weighs heavily in favor of granting an injunction.**

36. Because an injunction is an equitable remedy, the Court must weigh the respective conveniences and hardships of the parties and balance the equities. *See Graham Mortg. Corp. v. Hall*, 307 S.W.3d 472, 477–478 (Tex. App.—Dallas 2010, no pet.). Here, the balance of equities is overwhelmingly in favor of an injunction.

37. The ***public interest*** strongly supports temporary injunctive relief. This case implicates public safety, public accountability, and the integrity of the judicial process. Each of these considerations weighs heavily in favor of preserving the status quo pending adjudication on the merits.

38. Enjoining Defendants from further altering the Camp Mystic site will not harm the public; it will protect it. Temporarily restraining further alteration prevents the premature reopening of a facility where multiple lives were lost and ensures that any future use occurs only after the underlying facts bearing on safety and accountability are fully and fairly examined.

39. The Joint Senate and House General Investigating Committees on the July 2025 Flooding Events continue to review the facts and circumstances of this tragedy. Because the Committees have yet to hold final hearings or issue a conclusive report, the Camp Mystic site remains a live scene of intense public and legislative scrutiny. Furthermore, with the state's licensing portal now open for renewal and revocation, the public—including the families of the victims—has a vested interest in ensuring that the physical record of the camp's safety failures is preserved. The public's



Copy from re:SearchTX

right to a transparent accounting of this disaster cannot be reconciled with the Defendants' ongoing efforts to alter the evidence the state is currently investigating.

40. Conversely, denying injunctive relief would harm the public interest by allowing continued alteration of a site central to determining how and why the incident occurred. The public has a strong interest in transparent fact-finding and accountability where serious injuries and deaths are alleged, particularly in settings involving children. That interest is irreparably undermined if critical evidence is altered before it can be examined.

41. The ***private equities*** likewise favor injunctive relief. Absent an injunction, Plaintiffs face the permanent loss of physical evidence central to their claims, resulting in irreparable prejudice that no later remedy can cure. Continued alteration of the Camp Mystic site threatens evidence bearing directly on duty, breach, and causation.

42. By contrast, the burden on Defendants from granting injunctive relief is limited and temporary. The requested injunction does not require Defendants to dismantle structures, undo completed work, or forgo lawful use of their property indefinitely. It merely requires Defendants to refrain from further alteration of existing conditions pending resolution of this case.

43. In short, the equities do not favor allowing irreversible harm to Plaintiffs and the public in order to avoid a temporary and modest restraint on Defendants' conduct. Because denial of injunctive relief would permanently prejudice Plaintiffs and undermine the public interest, while granting relief would impose only minimal hardship on Defendants, the balance of equities weighs decisively in favor of an injunction.



Copy from re:SearchTX

## REQUEST FOR HEARING

44. Plaintiffs request that the Court set this Application for Temporary Restraining Order and Temporary Injunction for immediate hearing, and after hearing the Application, issue a Temporary Restraining Order and Temporary Injunction against Defendants enjoining Defendants from the acts described above.

## BOND

45. Plaintiffs are willing and able to post a bond in a reasonable amount to be set by this Court.

## PRAYER FOR RELIEF

46. For the foregoing reasons, Plaintiffs respectfully pray that the Court:

A. Set a hearing on this application for a temporary injunction and after the hearing issue a temporary injunction enjoining Defendants, during the pendency of this action, from directly or indirectly: altering, demolishing, repairing, remodeling, reconstructing, or removing any structure or physical feature at the Camp Mystic site, and from cleaning, discarding, relocating, or otherwise modifying any physical evidence located there. Defendants should also be enjoined from altering the layout, access routes, or ground conditions of the property. Additionally, Defendants should be enjoined from utilizing the Camp Mystic site for any commercial purpose, including but not limited to camp operations. Plaintiffs respectfully request that these restrictions remain in effect pending further order of the Court.

B. Plaintiffs further request that the Court issue a Temporary Restraining Order enjoining Defendants from the acts described above to protect Plaintiffs from the irreparable harm described above and to maintain the status quo in the interim before the application for temporary injunction may be heard.

C. Order that Plaintiffs recover from Defendants the reasonable costs Plaintiffs incurred in obtaining the Temporary Restraining Order and Temporary Injunction.

D. Award such other and further relief to which Plaintiffs may be entitled in law or equity.



Copy from re:SearchTX

Respectfully submitted,

By: ______________________________
Bradley E. Beckworth
State Bar No. 24001710
Christina Yarnell
State Bar No. 24071973
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
Telecopier: (512) 328-5335
bbeckworth@nixlaw.com
cyarnell@nixlaw.com

*and*

Blair Townsend, *pro hac forthcoming*
THE TOWNSEND LAW FIRM, LLC
50 SW Pine Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 715-1896
Telecopier: (503) 907-6904
blair@thetownsendlawfirm.com

***Attorneys for Plaintiffs***

**CERTIFICATE OF CONFERENCE**

I certify that on February 4, 2026, I conferred with counsel for Defendants regarding the merits of this Application. Defendants oppose the relief requested.

By: ______________________________
Brad Beckworth



Copy from re:SearchTX

# EXHIBIT 1

Copy from re:SearchTX

**CAUSE NO. D-1-GN-26-000758**

| | | |
|---|---|---|
| **WILL and CiCi STEWARD, Individually and as Representatives and Heirs of the Estate of CILE STEWARD, a Deceased Minor**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc. MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased, WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC. EDWARD S. EASTLAND, MARY E. EASTLAND and WILLIAM NEELY BONNER, III**<br><br>**Defendants.** | § | **IN THE DISTRICT COURT OF**<br><br>**TRAVIS COUNTY, TEXAS**<br><br>**200th JUDICIAL DISTRICT** |

**AFFIDAVIT OF WILL STEWARD**

**STATE OF TEXAS** §
§
**COUNTY OF TRAVIS** §

BEFORE ME, the undersigned authority, personally appeared Will Steward, who being by me duly sworn, stated as follows:

"My name is Will Steward. I am over 18 years of age, of sound mind, and capable of making this affidavit. I have personal knowledge of the facts stated herein and they are true and correct.

Copy from re:SearchTX

I am one of the Plaintiffs in this case and the father of Cecilia 'Cile' Steward. On or about September 11, 2025, I personally observed the alterations and construction on the Camp Mystic property described in the Application. I have also reviewed photographs and videos of the site and am aware of the Defendants' ongoing construction activity.

I further state that the facts contained in paragraphs 8 through 11 of Plaintiffs' Application for Temporary Restraining Order and Temporary Injunction are true and correct.

I further state that the photographs appearing in the Application immediately following Paragraph 11 are true and correct depictions of the conditions at Camp Mystic."

Further, Affiant sayeth not.

[signature]
Will Steward

**SWORN UNDER OATH**, before me, the undersigned notary, on this the 5th day of February, 2026, by Will Steward.

ABIGAYLE MARYLAND ASPERHEIM
Notary Public, State of Texas
Comm. Expires 12-23-2028
Notary ID 135210778

[signature]
Notary Public, In and for the
State of Texas

Copy from re:SearchTX

# EXHIBIT 2

Copy from re:SearchTX

2/4/2026 7:27 PM
Velva L. Price
District Clerk
Travis County
D-1-GN-26-000758
Ruben Tamez

D-1-GN-26-000758

CAUSE NO. ____________________

| | | |
|---|---|---|
| WILL and CiCi STEWARD, Individually and as Representatives and Heirs of the Estate of CILE STEWARD, a Deceased Minor | § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc. MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased, WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC. EDWARD S. EASTLAND, MARY E. EASTLAND and WILLIAM NEELY BONNER, III | § | 200TH, DISTRICT COURT |
| Defendants. | § | _____th JUDICIAL DISTRICT |

**PLAINTIFFS' ORIGINAL PETITION**

COMES NOW, Will Steward and CiCi Steward, Individually and as Representatives and Heirs of the Estate of Cecilia ("Cile") Steward, a Deceased Minor (collectively referred to as "Plaintiffs"), and files their Plaintiffs' Original Petition complaining of Camp Mystic, LLC, Natural Fountains Properties, Inc. d/b/a Camp Mystic, Inc., Mystic Camps Family Partnership, Ltd., Mystic Camps Management, LLC (collectively referred to as "Camp Mystic Defendants" or "Camp"), George Albritton ("Britt") Eastland, as Representative of the Estate of Richard G. Eastland, Deceased, Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc., Edward S.

Copy from re:SearchTX

Eastland, Mary E. Eastland (collectively referred to as "Eastlands"), and William Neely Bonner, III, ("Bonner"), (collectively referred to as "Defendants"), and respectfully would show unto the Court the following:

Copy from re:SearchTX

# TABLE OF CONTENTS

I. INTRODUCTION: CILE STEWARD'S DEATH WAS DUE TO AN ACT OF MAN, NOT AN ACT OF GOD. ....1

A. Promises Made and Broken: The Eastlands Create an Illusion that Camp Mystic was a Safe Haven ....2
B. The Eastlands Prioritized Profits and Property over People ....5
C. Warnings Received and Ignored: A Flood that Came with Timestamps ....11
D. Cile's Last Day ....12
E. Shelter in Place: Obedience is Cile's Death Sentence ....16
F. Cile's Death ....19
G. There Were Heroes at Camp Mystic. But None were Named Eastland. ....23
H. Post-recovery ....24
I. The Eastlands Refuse to Take Accountability ....25
J. Back to Business: Post-Flood Pressure Campaign to Reopen ....27
K. The Eastlands Should Never Be Responsible for Children Again ....28
L. Acknowledgement of the State of Texas ....29

II. DISCOVERY CONTROL PLAN ....30

III. PARTIES ....30

IV. JURISDICTION AND VENUE ....33

V. THE EASTLANDS BLAME THE FLOOD ON AN ACT OF GOD: BUT THEY RECEIVED A CENTURY OF WARNINGS THAT A CATASTROPHIC FLOOD WAS COMING. INSTEAD OF LISTENING, THEY BUILT CABINS DIRECTLY IN THEIR PATH. ....37

A. The Eastlands Chose to Keep Camp Mystic Located in the Most Dangerous Flood Zone in the United States ....37
B. Camp Mystic's Location in "Flash Flood Alley" Made It a Chokepoint Particularly Vulnerable to Flooding with No Means of Escape ....38
C. The Eastlands Received a Century of Flood Warnings as Old as the Camp Itself ....40
1. *The Eastlands Were Warned by the 1932 Flood* ....40
2. *The Eastlands Were Warned by the 1951 Flood* ....42
3. *The Eastlands Were Warned by the 1978 Flood* ....42



Copy from re:SearchTX

4. *The Eastlands Were Warned by the 1984, 1987 and 1988 Floods* ....44
5. *The Eastlands Were Warned by Their Own Flood Experiences* ....45
6. *The Upper Guadalupe River Authority Told Dick Eastland a Flood Was Coming* ....47

D. Like the Man in the Parable, the Eastlands Refused These Warnings ....49

VI. THE EASTLANDS WERE SENT WARNINGS IN THE FORM OF REGULATIONS, STANDARDS, AND GUIDELINES: THE EASTLANDS REFUSED AND CHOSE COMPLACENCY OVER PREVENTION. ....50

A. The State of Texas told the Eastlands: YOU MUST HAVE A PLAN ....50
B. The American Camp Association told the Eastlands: YOU MUST HAVE A PLAN ....51
C. Numerous State and Federal Authorities told the Eastlands: YOU MUST HAVE A PLAN ....52
1. *OSHA* ....52
2. *The Federal Government* ....52
3. *The Texas Land Office* ....53
D. The Eastlands Refused to Follow Any Safety Standards Except Their Own ....53
E. Britt Eastland Even Opposed the Camp Safety Transparency Bill ....53
F. Like the Man in the Parable, the Eastlands Refused Help From these Resources ....54

VII. THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS FROM THE TEXAS DEPARTMENT OF EMERGENCY MANAGEMENT: THE EASTLANDS IGNORED THEM, CONCEALED THEM FROM CAMPERS AND COUNSELORS, AND CARRIED ON WITH BUSINESS AS USUAL. ....54

A. The Eastlands Were Specifically Warned on July 2, 2025: TDEM Activates Emergency Response ....55
B. The Eastlands Were Given an Intensified Warning on July 3, 2025: TDEM Escalates to Level II Response ....55
C. The Eastlands Were Given Simple, Easy to Understand, Instructions About How to Receive Emergency Warnings ....56
D. Despite These Clear Warnings, the Eastlands Concealed them from Cile and her Counselors ....57



Copy from re:SearchTX

E. Like the Man in the Parable, the Eastlands Refused These Warnings ....... 60

VIII. THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS THAT THEY NEEDED TO EVACUATE. THE EASTLANDS DEFIANTLY DID NOTHING. ....... 61

A. The Cypress Lake Campus Was the Safest Muster Site ....... 61
B. The Commissary Was an Alternative Muster Site for Cile as Options Narrowed ....... 62
C. The Cricket Corner/Sky High Trail Was a Safe Alternate Muster Site ....... 63
D. The Equipment Shed Was a Safe Alternate Muster Site ....... 64
E. The Recreation "Rec" Hall Was Another Alternate Muster Site ....... 64
F. Like the Man in the Parable, the Eastlands Refused Rescue ....... 65

IX. A TALE OF TWO CAMPS: UNLIKE CAMP MYSTIC, CAMP MO-RANCH LISTENED TO THE WARNINGS, TOOK ACTION BEFORE THE FLOOD, FOLLOWED SAFETY GUIDELINES, AND SAVED EVERY LIFE. ....... 65

X. THE EASTLANDS CONTINUED TO RECEIVE WARNINGS AND THEY KEPT IGNORING THEM: 11:36 a.m. JULY 3RD – 2:26 a.m. JULY 4TH. ....... 65

A. The Eastlands Wasted Over 12 Hours of Precious Time From TDEM's Notice Until Midnight on July 3rd ....... 67
B. The Eastlands Wasted Another Hour From Midnight Until 1:14 a.m. ....... 69
C. The Eastlands Received a Flash Flood Warning at 1:14 a.m. ....... 69
D. The Eastlands Ignored Three More Warnings From 2:00 to 2:26 a.m. ....... 70
E. Like the Man in the Parable, the Eastlands Rejected these Final Warnings to Avoid Catastrophic Loss of Life ....... 72

XI. AS THE WATER ROSE, THE EASTLANDS DOUBLED DOWN: THEIR ONLY PLAN WAS TO SHELTER IN PLACE. ....... 73

XII. THE TERROR AND CHAOS AT CAMP MYSTIC: CILE'S FINAL HOUR OF LIFE ON JULY 4, 2025. ....... 75

A. The Eastlands' Desperate Attempt at an Improvised Evacuation ....... 75
B. Cile's Final Moments ....... 82




Copy from re:SearchTX

XIII. POST-FLOOD: THE EASTLANDS CHASE ACCOUNTS INSTEAD OF ACCOUNTABILITY. ....84

A. The Eastlands Prioritize Reopening Over Reflection and Responsibility ....84
B. The "New" Safety Measures Only Reinforce its Failures ....86
C. The Eastlands Have No Business Watching Over Children Ever Again ....86
D. The Eastlands Have Spoliated Evidence ....86

XIV. CAUSES OF ACTION ....90

A. Negligence ....90
B. Negligence *Per Se* ....91
C. Gross Negligence ....93
D. Premises Liability ....93
E. Intentional Infliction of Emotional Distress ....94
F. Respondeat Superior, Agency, and Ratification ....95
G. Joint Enterprise ....96
H. Veil Piercing and Alter Ego ....96

XV. DAMAGES ....97

A. Wrongful Death ....97
B. Survival Action ....97
C. Exemplary Damages ....98

XVI. INJUNCTIVE RELIEF AND PRESERVATION OF EVIDENCE SOUGHT ....98

XVII. NOTICE OF SELF-AUTHENTICATION ....99

XVIII. RESERVATION OF RIGHTS ....99

XIX. PRE-JUDGMENT AND POST-JUDGMENT INTEREST ....99

XX. REQUEST FOR JURY TRIAL ....99

XXI. CONDITIONS PRECEDENT ....100

XXII. CLAIM FOR RELIEF ....100

XXIII. PRAYER ....100



Copy from re:SearchTX

**I.**

**INTRODUCTION: CILE STEWARD'S DEATH WAS DUE TO AN ACT OF MAN, NOT AN ACT OF GOD**

1. There is no greater transfer of trust than that which occurs when a parent entrusts her child to the care of another. On June 29, 2025, Will and CiCi Steward dropped their eight-year-old daughter Cile off for her first time at sleepaway camp, an entire month at Camp Mystic, where Cile's mother, aunt, grandmother, and countless cousins had attended as campers and counselors. This year was Cile's turn. Tragically, the Eastlands and Camp Mystic Defendants violated their trust in every conceivable way.

2. Cile's parents did not know that when they kissed Cile goodbye, it would be the last time they would ever hold her. The last thing Cile said to her mother, misty-eyed, seeing her firstborn off to camp for the first time, was "Mom, don't worry, I'm going to be okay." Cile is not worried about her safety. She doesn't know she needs to be. No child expects the adults in charge to abandon them.



3. CiCi was not worried about Cile's safety either. The Eastland family had run Camp Mystic for nearly a century. It was a family dynasty: Dick and Tweety Eastland at the top, their sons,



Copy from re:SearchTX

Edward, Britt, and Richard, running the rest. The family made millions of dollars every summer. CiCi worried about social dynamics, mean girls, homesickness. Never in her wildest dreams did she consider that the Eastland family would cut corners on safety.

4. The Eastlands promised to protect, safeguard, and prioritize Cile's safety and well-being in exchange for her parents' enrollment, trust, and money. When a business houses, safeguards, and cares for other people's children, it steps into the parents' shoes. The Eastland family would violate that borrowed trust and its heightened duties in every conceivable way.

5. On July 4, 2025, Cile would be one of twenty-seven campers and counselors needlessly killed as a direct result of the Eastlands' conduct, inaction, and decisions.

## A. <u>Promises Made and Broken: The Eastlands Create an Illusion that Camp Mystic was a Safe Haven</u>

6. The Eastlands marketed Camp Mystic as a Christian sanctuary for young girls, "heaven on earth," a place where faith, tradition, and safety converged under the watchful eyes of the Eastland family. Their communications to families consistently invoked scripture, closing with blessings such as "Until we see you again, may 'the Lord watch over you.'" Psalm 121:5. They cultivated an atmosphere of absolute trust, authority, and obedience rooted in tradition. Generations of campers and their families believed the Eastlands could do no wrong.

7. The Eastlands also invoked the camp as a legacy-builder and a bridge to future social standing — a place where the girls lucky enough to attend would meet their future college roommates and sorority sisters. Between the Eastlands' marketing and the power dynamic they created within the camp, Camp Mystic commanded an almost cult-like following.

8. The camp's culture reinforced this hierarchy at every level. Each camper was assigned a tribe, Kiowa or Tonkawa, through which they competed, connected, and learned deference to the rules and to those in authority. The camp's entire philosophy taught young girls that they could



Copy from re:SearchTX

earn their own leadership positions by following directions from a clear chain of command. At the top of that chain, for every camper, counselor, and staff member, was the Eastland family.



*Photograph of Cile drawing Kiowa, her tribal assignment, on June 29, 2025.*

9. Cile's assigned cabin was Twins II, one of three cabins housing the youngest and most vulnerable campers: Twins I, Twins II, and Bubble Inn. All three were located in an area of Camp Mystic's Guadalupe River campus known as "the Flats." Twins I and Twins II shared a single building, divided by a common wall, with a shared front porch. Each had two counselors — teenagers and former campers themselves. The cabins' location was centralized, within easy walking distance of common camp buildings: the Recreation Hall, the Commissary, the Main Office, and the Dining Hall ("Harrison Hall"). Cabins for older campers were located on higher ground in an area called "Senior Hill."



Copy from re:SearchTX




10. While every counselor and camper was expected to obey the Eastlands' rules and directives, none were more obedient, more reliant, and more deferential than the youngest campers in their first year at camp.

11. Joy and growth cannot exist without safety. CiCi and Will Steward entrusted Cile's life to the Eastland family under explicit promises and assurances that her safety and well-being were the Eastlands' paramount priority.

12. On and before July 4, 2025, common-sense safety measures were absent. Protocols and plans that should have been in place were ignored. Cile was killed not because of an unavoidable act of nature, but because of preventable failures and broken promises.

13. Behind the veneer of Christian tradition and rustic charm, the Eastlands operated Camp Mystic as something very different from its outward image. Their promises of protection were hollow. Their invocations of faith masked a reckless disregard for the lives of the children entrusted to their care. Camp Mystic is a for-profit enterprise, and for decades the Eastlands treated it as one,



Copy from re:SearchTX

rejecting industry safety standards, fighting legislation designed to protect campers, avoiding regulatory oversight, and refusing to join the American Camp Association. They constructed a deliberately layered corporate structure designed to shield their personal assets from accountability. They even sued one another, spending more than $6 million in a bitter family lawsuit accusing Dick Eastland of fraud and corruption. While they told parents their focus was on the campers, their focus was equally or greater on the money.

**B. <u>The Eastlands Prioritized Profits and Property over People</u>**

14. Camp Mystic sits in the middle of *the* deadliest flood zone in the United States, a region known as "Flash Flood Alley." The National Weather Service has issued more than 100 flash flood warnings for the area surrounding Camp Mystic over the last 30 years. The entire camp lies within the 500-year floodplain, surrounded by high cliffs, a river, and three creeks that act as a funnel for rainwater falling upstream. Access to the camp is over a narrow land bridge crossing all three creeks. Anytime the Guadalupe, Cypress Creek, Edmundson Creek, or Bubble Gum Creek floods, which happens often, the entire camp is cut off from ingress, egress, evacuation, and rescue. The camp's topography makes it a deadly chokepoint. When Camp Mystic floods, as it has many times in its 99-year history, campers get stranded because there is no way out. The location alone makes it no place for children to sleep overnight.






Copy from re:SearchTX

15. The Eastlands did not deny Camp Mystic's history of flooding. They celebrated it. The Eastlands heralded the Great Flood of 1932 as part of the camp's folklore. Every year, including 2025, campers participated in trivia contests about Camp Mystic's history and traditions. One of the history questions they are asked is: "What was the year of the great flood? 1932."


When was Camp Mystic established? 1926
What kind of trees are behind Harrison Hall? Pecan
When was Harrison Hall dedicated? May 26, 1990
Byrd in By... House? B-Y-R-D
...of tree is found in the river? Cypress
What is the name of the river Mystic is on and how do you spell it? Capital G
What is the name of a frog in Cypress Creek? Orpheus
What cabin on Senior Hill was once a log cabin? Look Out
Where were Sunday Vespers held before Chapel Hill was dedicated? On the
10. What is the elevation of Camp Mystic? 2200 feet
What was the original name of Camp Mystic? Camp Stewart for Girls
2. What years did the U.S. Air Force use Mystic as a rehabilitation center?
How did Mystic get its name? Mrs. Former, a nurse at Mystic in 1926, notice
magical and MYSTIC the camp looked...thus the name.
14. What was the original name of Senior Hill? Indian Hill
15. What was the year of the great flood? 1932
16. What was the original length of one term at Mystic? 8 weeks
17. When was Rec Hall built? 1928
18. What year did Ag and Pop Stacy buy Mystic? 1939
19. How many acres of land are owned by Mystic? 750 acres
20. What is the name of the Mystic newspaper? Mystic Murmurs
21. When was Chapel Hill dedicated? 1959

*One of Cile's few possessions that survived the July 4th Flood.*

16. Both floods of July 2, 1932, and July 4, 2025, share strong and foreboding similarities. Both originated on the Guadalupe River and directly impacted Camp Mystic. Both occurred in the first week of July. Both were caused by intense, concentrated rainfall that triggered flash flooding. In both, campers had to be evacuated. In both, Camp Mystic cabins and structures were swept away. And the gauge data is remarkably close: on July 2, 1932, the river at Hunt peaked at 36.60 feet; on July 4, 2025, it peaked at 37.52 feet — ***a difference of less than one foot***. The 2025 flood was essentially a repeat of what the river had already shown it could do 93 years earlier.

17. The critical difference between the two: the 1932 flood occurred during the daytime. A local newspaper noted at the time that it would have been far worse had it happened at night. Although the Eastland family now calls the 2025 flood unprecedented, the river had already



Copy from re:SearchTX

reached nearly this same height, at this same location, in the same month — within the lifetime of the camp itself. The 1932 flood was not just a historical event. It was an explicit warning to take precautions and make plans. That warning went unheeded.

18. Nor was it the only warning. Subsequent floods reminded the Eastland family of the river's dangers again and again: floods that forced evacuations to higher ground, floods that left counselors and campers stranded without food for days. In 1987, a flood killed 10 campers and counselors at a neighboring camp downriver. One flood even forced the evacuation of Tweety Eastland by Army helicopter so she could give birth to one of her children. Flooding was so commonplace that in the camp's 99-year history, campers on Senior Hill were routinely cut off from the rest of camp.

19. Yet despite this history — despite every flood, every evacuation, every warning — the Eastlands kept cabins in a known floodplain and at a chokepoint for floodwater. Worse, the Eastlands consistently opposed or sought to remove any designation of those cabins as being located in a floodplain. They did not merely fail to protect the children in their care. They actively resisted the regulations and guidance designed to do so.

20. The floods themselves were warnings. But the Eastlands also received direct, specific knowledge of the imminence of a major flood and the urgent need to safeguard the camp. Dick Eastland sat on the board of the Upper Guadalupe River Authority, the very agency charged with protecting the river corridor. The UGRA told him that the county lacked necessary warning systems and infrastructure. It told him that a catastrophic flood, outside the standard 100- or 500-year definitions, was likely within the next three years. Dick Eastland did not learn this secondhand. He was in the room.



Copy from re:SearchTX

21. Camp Mystic did nothing. The Eastlands never adopted an appropriate emergency evacuation plan. They never installed warning infrastructure. They never purchased walkie-talkies for counselors (just themselves), battery-powered radios, or a back-up generator. A basic communication bundle for every cabin would have cost roughly $100. They would not spend the money.

22. But they did spend money on themselves. The Eastlands built and improved large personal residences on the camp property — every one of which had a second story.

23. Any business that houses children overnight bears a heightened duty to implement safety measures against foreseeable disasters. This is not just common sense. It is the law.

24. The State of Texas, OSHA, FEMA and authorities like the American Camp Association ("ACA") (which the Eastlands refused to join) all require and urgently recommend that any facility exposed to flood risk ***must*** maintain and follow a flood emergency and evacuation plan.

25. The principle is basic and universally accepted: when children are housed in foreseeable danger zones, evacuation planning is not optional. The Eastlands were bound by this principle through regulation, through industry standards, and through the most fundamental obligations of decency and care.

26. On July 4, 2025, under Texas Administrative Code § 265.15(k), the Eastlands were required to have:

a. Maintained a written emergency plan for evacuation in the event of a flood, with detailed procedures to follow;
b. Reviewed that plan and specifically assigned staff members and counselors to defined roles and protocols in the event of a flood;
c. Designated emergency shelters (also called "muster sites") providing a reasonable degree of safety;
d. Established clear chains of command with specific assignments for each staff member and counselor;
e. Posted the emergency plan in each cabin; and



Copy from re:SearchTX

f. Trained and instructed every camper, counselor, and staff member on the emergency plan and evacuation procedures.

27. The Eastlands knew a major flood was not a possibility but an inevitability. Why they did not regard the flooding hazards at their camp with greater care, particularly for children sleeping in the very zone of danger, remains unclear. But they did not.

28. The Eastlands did not merely ignore these requirements. They defied them. The single most important piece of safety equipment the Eastlands should have had was an emergency response and evacuation plan. Not only is such a plan required, it's also free.

29. The Eastlands did post plans in its cabins and in its counselor training manuals but to call what they posted an "evacuation plan," as required by law, is generous.




*"Emergency Instructions" posted on bulletin board in Twins II, photographed July 7, 2025.*



Copy from re:SearchTX

30. These "Emergency Instructions," posted on the bulletin board next to the Twins II door on July 4th, miraculously survived the flood even as half of the Twins II campers did not. At some point after July 7, 2025, these instructions will suspiciously disappear from the bulletin board of Twins II and other cabins at the camp.

31. The entirety of Camp Mystic's guidance to campers and counselors on what to do in the event of a flood is found in Section II of these instructions:

> II. **Floods**
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

32. These instructions were also the embodiment of the Eastlands' promises to parents to keep their children safe. And the very foundation of those promises was false.

33. The Eastlands promised Cile and her parents that Twins II was safe and built on high ground.

34. The Eastlands promised Cile and her parents that, in the event of an emergency, Cile would be given instructions over the loudspeaker and that if the electricity was off, a walkie-talkie would be used.

35. The Eastlands promised Cile and her parents that, to keep Cile safe, she must "NEVER" wander from her cabin and must stay in her cabin unless told otherwise by the office, i.e., the Eastland family.

36. The Eastlands never trained counselors, campers, or staff on what to do in the event of a flood: not how to prepare, not where to go, not how to reach the safety of higher ground.

37. CiCi, Will and Cile knew none of this. They believed, and relied upon, the Eastlands' promises to keep Cile safe.



Copy from re:SearchTX

38. The Stewards relied on every one of these promises. Every one was false. The cabins were not on high ground. The loudspeakers were never used. No one provided Cile or her counselors with walkie-talkies. What the Eastlands called an emergency plan was, at best, an order to shelter in place at all costs.

39. Rather than keep Cile safe, the Eastlands' conduct on July 2, 3, and 4 sealed her fate the moment the water began to rise. The National Weather Service and the State of Texas put the Eastlands on notice of the threat of deadly flooding beginning on July 2, 2025. Those notices were updated regularly as the threat escalated.

**C. <u>Warnings Received and Ignored: A Flood that Came with Timestamps</u>**

40. The July 4, 2025 flood did not come out of nowhere. It came with timestamps. The Eastlands received multiple warnings and had multiple opportunities to prepare. Weather forecasters repeatedly told them the storm would stall over the camp Thursday night into early Friday morning.

41. Cile had no way to know about the growing threat. The Eastlands had deprived her, and her counselors, of any ability to receive information from the outside world. Camp Mystic was marketed as a phone-free camp, an idyllic retreat where children could experience nature free from the distractions of modern technology.

42. Camp Mystic's "Final Instructions 2025 Guadalupe River" included strict policies and procedures prohibiting campers and counselors from having phones or any electronic communication devices in their cabins. The Eastlands marketed this policy as a benefit. What they did not tell parents was that it would leave their children completely dependent on camp leadership to warn them of imminent danger — warnings the Eastlands would never give.



Copy from re:SearchTX

43. As the threat intensified, the Eastlands told no counselor or camper what was happening. The cabins had no weather radios and no communication devices of any kind. When Cile went to sleep on the night of July 3rd, she felt safe and protected. She had no idea of the storm building outside her cabin walls.

44. Cile did not need the Eastlands to monitor a rain gauge. She needed them to have a flood emergency plan. An evacuation plan. A designated muster site. Most of all, she needed the Eastlands to heed the active flash flood warning and tell her and her counselors, ***clearly and urgently***, that her life was in immediate danger and that she needed to move to higher ground without delay.

45. The Eastlands did none of these things. Not one.

**D. <u>Cile's Last Day</u>**

46. Cile's final full day of life began like any idyllic childhood day at camp: banana bread for breakfast, morning arts and crafts, tidying up her cabin with new friends, pesto pasta for lunch.

47. When she wakes up on the morning of July 3rd, she does not know that government agencies are already escalating their emergency flood response plan, urging Texans to prioritize flood preparedness and warning of imminent danger.

48. During the daily rest period, Cile sits down and writes a letter home, carefully decorating the envelope with her art and her love.





Copy from re:SearchTX

49. These daily letters, placed in the mail, are the only way she can communicate with her parents. Cile sent her last letter home out on July 3rd but it was not postmarked until July 5th.




50. For a few blissful hours that afternoon, the sun breaks through. Cile plays *Steal the Bacon* with her friends, cheering enthusiastically even when they lose. She is happy and making friends. And she is led to believe she is safe.



51. Cile does not know that just hours earlier. the National Weather Service had issued a Flood Watch for Kerr County, or that by the afternoon the Texas State Emergency Operations Center had escalated to Level II, activating additional emergency resources in anticipation of severe



Copy from re:SearchTX

rainfall and flash flooding. She has no way to know. She is eight years old. She is fully dependent on the Eastlands to warn her and protect her from danger.

52. That evening, she eats fajitas and Jell-O cake for dinner. At approximately the same time, the National Water Center issued an intensified warning to the Eastlands of *"considerable"* flooding risks in areas including Camp Mystic. Still the Eastlands tell her nothing; and they did nothing to prepare.

53. At around 7:30 p.m., Cile and the other campers, dressed in white, walk uphill to Chapel Hill for Ags Vespers, a cherished Camp Mystic tradition meant for reflection, worship, and peace, overlooking the Guadalupe River. During the candlelight service, at 8:12 p.m., the Flood Watch is extended in another warning to the Eastlands of the camp's considerable flooding risks. Still, they do nothing to prepare. At 8:30 p.m., Cile watches "Counselor Stunts" at Rec Hall, complete with a surprise appearance of an animal from the stables. She is happy. She feels safe.

54. By 10:00 p.m., Cile returns to her Twins II cabin and climbs into her top bunk, excited for her first Fourth of July with her new friends at camp. "Taps" plays over the loudspeaker mounted just 49 feet from the door of Twins II, signaling bedtime. It would have been so easy for the Eastlands to use that loudspeaker, the one they had promised would deliver emergency instructions, to warn campers and counselors to be on alert. It also would have been just as easy for the Eastlands to move the girls to the massive Jones Hall building at Camp Mystic's Cypress Lake campus, over 60 feet higher in elevation and less than 1,900 feet away. But still, the Eastlands say and do nothing to warn or protect the campers.

55. At 10 p.m. and again at 2 a.m., the Eastlands move their canoes to higher ground. They do not move the campers. Property is protected. Children are not.



Copy from re:SearchTX

56. At 1:14 a.m., while Cile sleeps, the NWS issues a ***Flash Flood Warning***, for Kerr County with a "***Considerable***" threat tag, the second-highest alert possible. The NWS uses the "Considerable" tag only rarely, "when indications of flash flooding capable of unusual severity or impact are imminent or ongoing and urgent action is needed to protect lives and property."




57. The 1:14 a.m. warning is explicit: **LIFE THREATENING CONDITIONS EXIST. MOVE IMMEDIATELY TO HIGHER GROUND.** Dick Eastland receives this warning on his phone. Dick Eastland ignores it. The only affirmative action he takes for at least the next hour is to order his team to move the *rest* of Camp Mystic's canoes to higher ground. Every safe evacuation route is still open and available.

58. A safe two-story shelter stands 20 paces from Cile's bunk. But rather than evacuate her to safety, the Eastlands leave Cile asleep in her top bunk, exposed to a multitude of hazards she knows nothing about. Three hours will pass before she is swept away by the raging river.

59. Over the next hour, the routes of escape from Camp Mystic will be cut off one by one as the river and the three creeks begin to rise higher and higher. By 2:15 a.m., the Eastlands know that even little Bubble Gum Creek is impassable. However, even as late as 3:00 a.m., a clear evacuation route for all cabins remains open and passable.



Copy from re:SearchTX



"Swept Away," *New York Times*, November 15, 2025 (3:00 a.m. graphic).

**E. <u>Shelter in Place: Obedience is Cile's Death Sentence</u>**

60. Despite the clear, urgent warning, and visual confirmation of normally dry creeks and rivers rising with their own eyes, the Eastlands continue to do nothing. Even when counselors from Bug House, the cabin closest to the river, run to tell them they are taking on water, the Eastlands order them to return to their cabin and tell them to stay put. At least one counselor turns to her Camp Mystic manual for guidance. The manual confirms the instructions given: stay put, do not leave the cabin, wait for further instructions. The manual does not say that the "high ground" the cabins are supposedly built on is, in fact, in a known floodplain. Nor does the manual identify *any* evacuation route.

61. These instructions are no different than the ones posted in the cabins. It is particularly horrific to know that, by following the rules the Eastlands gave them, so many girls would lose their lives.



Copy from re:SearchTX

62. At approximately 3:00 a.m., Dick Eastland decides he needs to evacuate some of the cabins closest to the river. But Camp Mystic has no evacuation plan. And no one has been trained what to do if they ever do have to evacuate. So, Dick and Edward Eastland and the night watchman, Glenn Juenke, improvise a plan in the midst of the chaos of a deadly flash flood. They decide to evacuate, one at a time, the five cabins closest to the river in order: Bug House, Look Inn, Hangout, Tumble Inn, and Jumble House. It is chaos.

63. The Eastlands have admitted there was no plan and they were improvising. You don't improvise with children's lives.

64. No one tells the rest of the camp what is happening. No announcement over the loudspeakers. No communication by walkie talkie. Nothing.

65. Cile and the other campers in Twins II can see the lights of Dick, Edward, and Glenn's vehicles as they pass back and forth between other cabins and Rec Hall. Flashes of lightning reveal creeping levels of water. Some counselors remind themselves of their orientation training and the reassurances given that the cabins are built on safe, high ground and that a dangerous flood will "never happen." The campers and counselors in Twins II hear the voices of other campers yelling and shrieking as they walk *past their cabin* on the way to Rec Hall. For the first time, they hear from someone in charge—Edward Eastland. He yells out to the counselors and orders them to stay put in their cabins until the water gets "so high they couldn't stay any longer." Edward leaves them there. They are the youngest campers. They follow their orders just like the Eastlands taught them to do.

66. That order was a death sentence. It defied every policy and guideline every federal and state agency provides for flood emergencies.



Copy from re:SearchTX

67. When evacuations finally began, the youngest and most vulnerable girls were left for last. There was time. There were routes. There were safe places to go. But there was no plan and no leadership. Every evacuation route was available when they started evacuating. Every evacuation route was still available at 3 a.m. and afterward.

68. Eventually, around 3:30 a.m., Edward comes back. The counselors, desperate for a rescue plan, are told they cannot leave. He tells them the water is too high and will soon recede. The two cabins are able to communicate with each other through slats in the wall; the counselors try to calm everyone and reassure them by telling them to get on the highest bunk bed.



69. The water continues to rise, inch by inch, filling the concrete box. The girls flee to the top bunks, but they are running out of room to breathe. Edward yells to a Twins II counselor, asking for a screwdriver, hoping to remove an air conditioning vent in the Twins II's low ceiling. There is no screwdriver.

70. The girls are screaming. They can hear the screaming of their friend in Twins I and Bubble Inn. Edward begins audibly praying, yelling out the Twins II door: "Lord Jesus, please stop the rain." But the water keeps coming. The girls' trunks are floating as the girls huddle on two top bunks by the windows, terrified and desperate. The water in Twins I rises faster than in Twins II. A Twins I counselor screams that girls are being swept out of the cabin. By this time, Edward is



Copy from re:SearchTX

at the Twins II doorframe, bracing the doorframe, facing out toward the river. Twins I campers float down the porch toward the Twins II door. Chaos reigns. Girls start fleeing, rather than drown, through the doors and windows on the shared porch.

71. At or by 4:09 a.m., Edward is swept away from the Twins II doorframe and downstream with two Twins I campers clinging to him. Ultimately, he arrives at a tree about 200 yards downstream at the archery range near Bug House (the "Bug House Tree").

**F. <u>Cile's Death</u>**

72. Cile and the other Twins II campers are still in their cabin. The water continues to rise. The Twins II ceilings are flat, not vaulted, so the girls quickly run out of room and air. The girls are terrified. Some are silent, so shocked they cannot speak. Most are crying hysterically, wanting to go home, wanting to be with their parents. Some are screaming "help" so many times that those who survive will be hoarse the next day. The counselors realize that if they stay in the cabin, everyone will drown. Eventually, the water rises so high it floats and tips the bunks, spilling the girls into the churning water inside the cabin. The girls cannot stand.

73. Once the water rises to the counselor's shoulder height, one counselor decides to try to break out the side windows with a camper's trunk. The water continues to rise to above the top of the Twins II front door.





Copy from re:SearchTX

74. The counselors prepare to guide the campers downriver out of the second Twins II window on top of mattresses. They tell the girls to be brave and hold on to anything they can get their hands on, including clotheslines. They put girls on mattresses and push them underwater to get them through the window. Some girls are sucked out of the window by the current. The water is churning and violent. For some of the girls, the current carries them to the cabins and a stand of trees lining the road and soccer field. Some girls are flung from tree to tree, holding on as long as they can, until they reach the Bug House Tree where most of the survivors will be found. Some campers report later being approximately thirty feet high in the tree but still touching water.

75. Cile's cabinmate and best friend is swept away. Incredibly she survives after being found in trees miles down-river. Six months later, she is asked to write a paragraph in school about a time she persevered. This is what she writes about the morning of July 4, 2025:




76. Cile also does all she can to persevere. Cile is on a mattress with two or three other Twins II campers. At one point, Cile falls off the mattress. Cile is one of the only girls in her cabin who,



Copy from re:SearchTX

when they took the swim test, made it to the next level. She is a strong swimmer. On information and belief, Cile does not go from tree to tree but takes a more direct path to the Bug House Tree. She makes it to the tree, where the majority of the survivors are found. She is so close to survival.

77. She calls for help. She grabs for branches. But she keeps grabbing leaves.

78. The current is too strong. She almost makes it. She is unable to secure her grip on the tree.

79. Cile is swept away.

80. Because of the Eastland family, Cile was left with an impossible choice: drown in her cabin or fight violent floodwaters in the dark in a blind effort of escape and survival. My baby was a fighter. She was a strong swimmer and a great climber.

81. Cile did not die because there was nowhere to go. She died because she was told not to go.

82. She did not die because there wasn't time. She died because time was wasted.

83. Cile did not die because there was no time to save her. She died because the Eastland family did not have a plan and ran out of time.

84. At 9:01 a.m., CiCi receives the call from Camp Mystic that Cile is "unaccounted for."

85. As of February 4, 2026, Cile still has not been found. Recovery efforts are ongoing.

86. Cile's death was a tragedy, not only because it was tragic, violent and horrifying for her but because it was also completely avoidable. Camp Mystic was the only camp on the Guadalupe River where children died. Other camps received the same warnings. They evacuated. Every child lived.

87. Cile's death has deprived her parents of their firstborn daughter. It has deprived her younger sister not merely of companionship, but also of the singular bond, guidance, and emotional security that exists uniquely between sisters. Cile's life, though tragically brief, left an



Copy from re:SearchTX

unmistakable and enduring impact on all who knew her. Her absence leaves a permanent void in the lives of her parents, sister, and all who loved her.



88. Cile was a vibrant, intelligent, and deeply loved child and older sister. She possessed a rare combination of joy, curiosity, independence, humor, pluck, athleticism, and creativity that drew others to her. A natural leader, Cile was known for her confident and spirited presence that brightened every room she entered. Beneath that commanding exterior lived a sweet, sensitive, and generous soul whose warmth, vulnerabilities, and already evident maternal instincts endeared her to all who knew her.

89. As an older sister, Cile was a teacher, protector, best friend, and playmate to her younger sister. The two shared an exceptionally close and inseparable bond, moving through childhood hand in hand as partners in growth, play, and mischief. Cile modeled for her sister the intrinsic value and freedom to develop her own unique style and personality. When she left home to go to



Copy from re:SearchTX

Camp Mystic, she was sad to leave her mom, dad, sister and dog. But Cile was so excited to go and experience camp with her friends. And make new ones.

**G. <u>There Were Heroes at Camp Mystic. But None were Named Eastland</u>.**

90. While there were many heroes at Camp Mystic on July 4, 2025, ***none of them were named Eastland***. The true heroines were the young counselors of the camp, teenagers themselves, too young to have been burdened with the responsibilities and trauma of that morning. They were left to make split-second, life-or-death decisions in an emergency for which the Eastlands had never warned them, never trained them, and never given them an evacuation plan. They received no communication by radio, walkie-talkie, or loudspeaker. They had no idea the camp had been under a flood watch for two days. They did not know they had been under a flash flood warning for two hours. They relied on their courage, their strength, their perseverance, and their sheer will to survive and saved hundreds of children.

91. The counselors with Cile in her final moments were braver than the adults who put them in that impossible situation. They did everything they could to save Cile and every girl in Twins I, Twins II, and Bubble Inn. Those that survived in Twins I and Twins II did so because of their counselor's heroic efforts. Cile's counselors gave her a fighting chance when the people in charge did not.

92. Without the Camp Mystic counselors, the loss of life on July 4th would have far exceeded twenty-seven.

93. Camp Mystic was not safe for Cile. It will never be safe for any child as long as the Eastlands are associated with it. They can never be allowed to operate a camp again.



Copy from re:SearchTX

**H. Post-recovery**

94. In the days and weeks following July 4th, twenty-six Camp Mystic campers who perished were recovered in valiant and ambitious efforts still underway by the State of Texas and its Emergency Operations Center ("EOC"). Cile is the only camper missing somewhere in the destruction field of the flood, over seven months later. The State and EOC are still conducting their recovery efforts. These efforts can only be characterized as inspiring and heroic and so incredibly "Texan." The boots on the ground efforts of Texas and its leaders in finding Cile stands in dark contrast to the Eastlands' tone-deaf, self-serving and self-sanitizing response to the deaths of twenty-seven children on their watch.



95. The fact that Cile has not yet been recovered and returned to her parents and family is an ongoing and devastating deprivation, distinct and in addition to, the wrongful loss of her life.



Copy from re:SearchTX

## I. The Eastlands Refuse to Take Accountability

96. The Eastlands now blame God for what happened. They claim this tragedy occurred because of an unprecedented flood. The truth is that this flood was precedented. The Eastlands dismiss the warnings embedded in Camp Mystic's own history by insisting the July 4 flood was a 1,000-year event, that the last time a flood like this occurred, Noah had to build an ark. That is not true. But even if it were, both Noah and the Eastlands were warned a flood was coming. The difference is that Noah prepared. The Eastlands did not.

97. Rather than accept responsibility for their complete defiance of every rule, guideline, and warning, the Eastlands have waged a public relations campaign designed to sanitize the reality and convince the public and regulators that what happened to Cile on July 4, 2025, was an unavoidable act of God. It was not. Gilbert White, the geographer known as the "father of floodplain management," wrote that "floods are acts of God, but flood losses are largely acts of man." White's observation proved true at Camp Mystic. The tragedy was not caused by an act of God. It was caused by the Eastlands.

98. There is an old spiritual parable about a devout man caught in a flood. As the waters rise, a neighbor comes by offering help. "No," the man says, "God will protect me." The waters continue to rise and a boat arrives, offering rescue. "No," the man insists, "God will save me." The waters rise higher still, and the man climbs to his roof. A helicopter hovers overhead and drops a ladder. The man refuses: "God will not bring me harm." The man drowns. Upon meeting God in Heaven, he asks, "Why didn't you save me?" God replies: "I tried. I gave you time. I sent you a neighbor, a boat, and a helicopter."

99. Like the devout man, the Eastlands refused every form of help that was offered. Now, after a catastrophic and preventable loss of life, they ask: "How could we have known?" The answer is



Copy from re:SearchTX

obvious. Camp Mystic and the Eastland family received warning after warning, scientific, historic, and regulatory, that they must act to protect the children in their care from foreseeable floods. They chose to ignore every one. They moved the horses. They moved the canoes. They did not move the children.

100. It is not clear why the Eastlands concealed the warnings and did nothing to protect Cile. Perhaps greed. Perhaps complacency or sheer arrogance. Whatever their reasons, the Eastlands' conduct leading up to and during July 2 through 4, 2025, caused Cile's death.

101. The Eastlands now make three claims in their defense. Each is false.

102. First, they claim they did nothing wrong because nobody told them there would be a catastrophic flood at Camp Mystic's specific address. That is false. The National Weather Service issued a flash flood warning for the area that included Camp Mystic. The warning did not need to name the camp by street address to be understood.

103. Second, they claim nobody told them there was a life-threatening situation or instructed them to evacuate until after 3:30 a.m. That is also false. The NWS's 1:14 a.m. warning said, in all capital letters, that there was "LIFE THREATENING FLASH FLOODING" and directed recipients to move to higher ground immediately.

104. Third, they claim they should be congratulated for safely evacuating 166 campers. In reality, the Eastlands evacuated only a few cabins. Everyone else was on their own. More than 30 girls fled uphill to Sky High by themselves. The rest defied the Eastlands' orders and self-evacuated. Nearly half of the young women at Camp Mystic on July 4 either perished or escaped without any help from the Eastlands. The only acceptable evacuation number was 100%.



Copy from re:SearchTX

**J. Back to Business: Post-Flood Pressure Campaign to Reopen**

105. Less than three months after the flood, while families are still burying their daughters, it was back to business as usual for the Eastlands. While the Stewards and the State of Texas searched for Cile, Tweety Eastland focused on accepting awards on behalf of Dick.




106. Less than 60 days after 27 children died, the Eastlands began recruiting again. While families planned funerals, the Eastlands solicited deposits for summer 2026. While parents consoled children who had survived, authorities investigated what went wrong, and the State of Texas scoured the river for Cile, whom the Eastlands would not acknowledge as still missing, the Eastlands were seeking deposits. It was a time for reflection and accountability. The Eastlands chose commerce.

107. The Eastlands sent handwritten letters addressed specifically to the children, bypassing their parents, imploring them to return. They followed with email after email pressuring families to send their daughters back. In doing so, they invoked the memories of the dead campers and counselors as a *marketing tool*, telling families that a return would bring healing, that the deceased campers would have wanted them to come back, that the legacy of Camp Mystic lives on even while twenty-seven of its campers do not.



Copy from re:SearchTX

108. The Eastlands are tone deaf to the horrifying realities of what transpired at their camp. The Eastlands' only focus is on reopening Camp Mystic—immediately. They are aggressively soliciting deposits from parents who do not know of the dangers that still exist, both in the camp and the family that runs it. The stark reality is that the Eastlands will do and say anything to keep their cash flow from camper tuition to stay in business, fund their lifestyles and avoid bankruptcy.

109. The Eastlands invoke God while simultaneously blaming Him for their complete failure to prepare for or protect Cile from the flood they were warned was coming in every way imaginable.

**K. The Eastlands Should Never Be Responsible for Children Again**

110. This case is about what happens when parents trust the wrong people with their children, people who choose profit over safety, secrecy over transparency, and self-preservation over the lives of the girls entrusted to their care. The Eastlands knowingly operated a camp for children in a location with a known history of deadly floods. Rather than spend money on moving cabins to higher ground, fortifying infrastructure, or even modernizing emergency plans and systems, the Eastlands kept that money to sustain their lifestyles, building large personal residences on the campus while refusing to update the cabins where children slept.

111. As the Eastlands promote the illusion that they did nothing wrong and that newly implemented safety measures will prevent future tragedy, nothing about them has changed. They rushed to reopen. They pressured families with a relentless campaign of letters insisting that daughters need to return so they can heal. But the image of Camp Mystic as "heaven on earth" is, and should be, forever shattered. It was only a matter of time before a flood swept someone away. And if the Eastlands are permitted to continue, it is only a matter of time before it happens again.



Copy from re:SearchTX

112. Any parent considering sending their child to Camp Mystic — and any authority charged with deciding whether anyone associated with the Eastlands should ever be allowed to operate a camp again — should read this Petition. Then they should ask two questions:

a. Should the Eastlands be allowed to operate a camp for children at a location with a known history of deadly floods — including one that swept cabins downriver and another that killed 27 children?

b. Should the Eastlands be allowed to have supervisory authority over the health, safety, or well-being of any child, at any location, when their negligence killed 27 children?

113. The obvious answer to both questions is: No, never.

114. Every parent the Eastlands try to convince to send their daughter back will hear the same things the Stewards were told: your daughter will be safe; we are the Eastlands; we've been doing this for decades; trust us. Those parents should remember one thing: the Eastlands have already shown exactly how they supervise and protect children. But when someone shows you who they are, believe them.

115. A place where 27 children died because adults ignored warnings is not a camp. It's a crime scene.

116. Camp Mystic was not safe for Cile. It will never be safe for any child as long as the Eastlands are associated with it. They can never be allowed to operate a camp again.

**L. <u>Acknowledgement of the State of Texas</u>**

117. Other camps will be safer in the future thanks to the Texas Legislature, which passed the Heaven's 27 Safety Act during the Second Special Legislative Session of 2025. The Act is codified in Chapter 141 of the Texas Health & Safety Code. Governor Abbott signed the Act into law on September 5, 2025. Governor Abbott, Lieutenant Governor Patrick, and the Legislature should be



Copy from re:SearchTX

commended for their leadership. These new laws will help ensure that summer camps throughout Texas take the necessary steps to keep children safe.

118. The State of Texas, the Governor, the Lieutenant Governor, and the dedicated teams at the Texas Division of Emergency Management have committed to continuing the search for Cile. They believe in the importance of their mission. They are searching the grounds and searching the water. They are taking steps to protect future generations, engaging in cleanup and research efforts for future flooding events. Their tireless commitment stands as a testament to the best of what Texas represents.

## II.
## DISCOVERY CONTROL PLAN

119. Plaintiffs intend discovery be conducted under Level 3 of Rule 190.4 of the TEXAS RULES OF CIVIL PROCEDURE.

## III.
## PARTIES

120. Plaintiff Cecilia "Cile" Steward, was an eight-year-old minor child residing in Travis County, Texas. Cile was at Camp Mystic on July 3-4, 2025. Cile is the last remaining Camp Mystic camper that has not been found. Cile is presumed to be deceased. At the time of Cile's presumed death, she was only 8 years old. No administration of the estate is pending, and none is necessary.

121. Cile Steward is represented by and through her biological father, Will Steward. Will Steward is a plaintiff in his own capacity and is the Representative and heir of the Estate of Cecilia Steward. Will Steward is a resident of Travis County, Texas.

122. Plaintiff Catherine "CiCi" Williams Steward is a resident of Texas and the biological mother of Cile Steward. CiCi is a plaintiff in her individual capacity.



Copy from re:SearchTX

123. The Defendants are composed of Camp Mystic, LLC; Natural Fountains Properties, Inc. d/b/a Camp Mystic Inc.; Mystic Camps Family Partnership, LTD.; Mystic Camps Management, LLC; Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc.; George Albritton ("Britt) Eastland, as Representative of the Estate of Richard G. Eastland, Deceased; Edward S. Eastland; Mary E. Eastland; and William Neely Bonner, III, (collectively, "Defendants").

124. Defendant Camp Mystic, LLC is a Texas limited liability company with its principal place of business located at 2689 Highway 39, Hunt, Kerr County, Texas 78024. Defendant can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

125. Defendant Natural Fountains Properties, Inc. d/b/a Camp Mystic Inc. is a Texas corporation with its principal place of business located at 2689 Highway 39, Hunt, Kerr County, Texas 78024. Defendant may be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

126. Defendant Mystic Camps Family Partnership, Ltd. is a limited partnership whose registered office is located at 2404 Scenic Drive, Austin, Travis County, Texas 78703—the same address as the personal homestead address of Defendant Tweety Eastland. Mystic Camps Family Partnership, Ltd., can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.



Copy from re:SearchTX

127. Defendant Mystic Camps Management, LLC, is a domestic limited liability company whose registered office is located at 2404 Scenic Drive, Austin, Travis County, Texas 78703. Defendant can be served with process by serving the Texas Secretary of State located at 1019 Brazos Street, Austin, Texas 78701. Pursuant to the TEXAS BUSINESS ORGANIZATIONS CODE § 5.201, Defendant is required to but has failed to maintain a registered agent in Texas.

128. Defendant Willetta A. ("Tweety") Eastland, Individually and as Director and Vice President of Camp Mystic, LLC and Secretary of Natural Fountains Properties, Inc., is an individual residing in Travis County, Texas. Defendant may be served with process at 2404 Scenic Drive, Austin, Texas 78703, or wherever she may be found. She has served as an owner and Executive Director of Camp Mystic since 1974.

129. Defendant George Albritton ("Britt") Eastland, as Representative of the Estate of Richard ("Dick") G. Eastland, Deceased, is an individual residing in Kerr County, Texas. Defendant may be served with process at 401 West Main Street, Kerrville, Texas 78028, or wherever he may be found.

130. Defendant Edward S. Eastland is an individual residing in Kerr County, Texas. Defendant may be served at 1105 Louis Street, Kerrville, Texas 78028, or wherever he may be found. At all times material to this lawsuit, he was, and still is, a Director of Camp Mystic.

131. Defendant Mary E. Eastland is an individual residing in Kerr County, Texas. Defendant may be served at 1105 Louis Street, Kerrville, Texas 78028, or wherever she may be found. At all times material to this lawsuit, she was, and still is, a Director of Camp Mystic.

132. Defendant William Neely Bonner III ("Neel Bonner") is an individual residing in Harris County, Texas. Defendant may be served with process at 4147 Lanark Lane, Houston, Texas



Copy from re:SearchTX

77057, or wherever he may be found. At all times material to this lawsuit, he was, and still is the President of Defendant, Natural Fountains Properties, Inc.

133. In the event any parties are misnamed or not included herein, Plaintiffs contend this was the result of a misidentification, misnomer, and/or such parties are or were alter egos of parties named herein. Alternatively, Plaintiffs contend any such "corporate veils" should be pierced to hold such parties properly accountable in the interest of justice.

134. Pursuant to Rule 28 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs are suing any partnership, unincorporated association, private corporation, or individual whose name contains the words, or who does business under the name of the Defendants.

## IV.
## JURISDICTION AND VENUE

135. This Court has subject matter jurisdiction because the amount in controversy exceeds the minimum jurisdictional limits of this Court.

136. Pursuant to the forum-defendant rule, this case cannot be removed because all Defendants are citizens of Texas with residence and/or their principal places of business in Texas. *See* 28 U.S.C. § 1441(b)(2), § 1332(c).

137. This Court may exercise personal jurisdiction over Defendants because they are citizens of the State of Texas and/or conduct a substantial and continuous amount of business in Texas, and because all acts, omissions, and conduct giving rise to Plaintiffs' claims occurred wholly within the State of Texas. Defendants' wrongful conduct was directed at Texas residents, performed in Texas, and caused injury in Texas.

138. Venue is proper in Travis County, Texas, under TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002(a)(2) because one or more Defendants reside in this county, and/or the principal office of a defendant that is not a natural person is located in this county. Specifically, Defendant Tweety



Copy from re:SearchTX

Eastland is a natural person that resided in Travis County at the time this cause of action accrued. According to property records, the property listed as her homestead is located in Travis County.

139. Tweety Eastland is a properly joined Defendant. Plaintiffs have pleaded valid causes of action against Tweety Eastland for negligence, negligence *per se*, gross negligence, premises liability, and intentional infliction of emotional distress based on her own acts and omissions.

140. At all relevant times, Tweety Eastland acted as an owner, operator, and Executive Director of Camp Mystic, exercising control over camp operations, safety decisions, communications, and post-flood conduct.

141. Tweety Eastland personally authored, signed, and disseminated post-flood communications to grieving parents, child survivors, and the broader Camp Mystic community. Those communications form the factual basis of Plaintiffs' intentional infliction of emotional distress claims and were undertaken in her individual capacity and within the scope of her managerial authority.

142. Furthermore, venue is proper in Travis County because Defendants Mystic Camps Family Partnership Ltd. and Mystic Camps Management, LLC are not natural persons and have their principal offices in Travis County. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3).

143. Mystic Camps Management, LLC's public filings confirm that its principal office is at 2404 Scenic Drive, Austin, Travis County, Texas. Dick and Tweety Eastland are the company's only members and both list that same Travis County address.



Copy from re:SearchTX

**Mystic Camp Management, LLC's Public filings:**

05-102 (Rev.9-15/33)

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ **Tcode** 13196 Franchise

■ Taxpayer number: 3 2 0 8 1 5 2 9 0 3 7

■ Report year: 2 0 2 4

*You have certain rights under Chapter 552 and 559, Government Code, to review, request and correct information we have on file about you. Contact us at 1-800-252-1381.*

Taxpayer name: MYSTIC CAMPS MANAGEMENT, LLC

○ Blacken circle if the mailing address has changed.

Mailing address: 2404 SCENIC DR

Secretary of State (SOS) file number or Comptroller file number: 0804275960

City: AUSTIN | State: TX | ZIP code plus 4: 78703

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2404 SCENIC DR, AUSTIN, TX, 78703

Principal place of business: 2404 SCENIC DR, AUSTIN, TX, 78703

1000000000015

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| RICHARD G EASTLAND | MEMBER | ○ YES | |
| **Mailing address** | **City** | **State** | **ZIP Code** |
| 2404 SCENIC DRIVE | AUSTIN | TX | 78703 |
| **Name** | **Title** | **Director** | **Term expiration (m m d d y y)** |
| WILLETTA A EASTLAND | MEMBER | ○ YES | |
| **Mailing address** | **City** | **State** | **ZIP Code** |
| 2404 SCENIC DRIVE | AUSTIN | TX | 78703 |
| **Name** | **Title** | **Director** | **Term expiration (m m d d y y)** |
| | | ○ YES | |
| **Mailing address** | **City** | **State** | **ZIP Code** |
| | | | |

144. Mystic Camps Family Partnership, Ltd.'s public filings also confirm that it maintains its principal office and principal place of business at 2404 Scenic Drive, Austin, Travis County, Texas. Mystic Camps Management, LLC is the partnership's general partner and maintains that same Travis County address. Mystic Camps Family Partnership wholly owns Camp Mystic, LLC and Natural Fountains Properties, Inc.



Copy from re:SearchTX

**Mystic Camps Family Partnership LTD's public filings:**

05-102
(Rev.9-15/33)

**Texas Franchise Tax Public Information Report**

*To be filed by Corporations, Limited Liability Companies (LLC), Limited Partnerships (LP), Professional Associations (PA) and Financial Institutions*

■ Tcode 13196 Franchise

| ■ Taxpayer number | ■ Report year | |
|---|---|---|
| 3 2 0 8 1 5 6 8 6 2 1 | 2 0 2 4 | *You have certain rights under Chapter 552 and 55 Government Code, to review, request and correct informatio we have on file about you. Contact us at 1-800-252-138* |

| Taxpayer name | | | ○ Blacken circle if the mailing address has changed. |
|---|---|---|---|
| MYSTIC CAMPS FAMILY PARTNERSHIP LTD | | | |
| Mailing address: 2404 SCENIC DRIVE | | | Secretary of State (SOS) file number or Comptroller file number |
| City: AUSTIN | State: TX | ZIP code plus 4: 78703 | 0804281844 |

○ Blacken circle if there are currently no changes from previous year; if no information is displayed, complete the applicable information in Sections A, B and C.

Principal office: 2404 SCENIC DRIVE, AUSTIN, TX, 78703

Principal place of business: 2404 SCENIC DRIVE, AUSTIN, TX, 78703

*You must report officer, director, member, general partner and manager information as of the date you complete this report.*

1000000000015

*Please sign below!* **This report must be signed to satisfy franchise tax requirements.**

**SECTION A** Name, title and mailing address of each officer, director, member, general partner or manager.

| Name | Title | Director | Term expiration (m m d d y y) |
|---|---|---|---|
| MYSTIC CAMPS MANAGEMENT LL | GENERAL PARTNER | ○ YES | |
| Mailing address: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
| Name | Title | Director ○ YES | Term expiration |
| Mailing address | City | State | ZIP Code |
| Name | Title | Director ○ YES | Term expiration |
| Mailing address | City | State | ZIP Code |

**SECTION B** Enter information for each corporation, LLC, LP, PA or financial institution, if any, in which this entity owns an interest of 10 percent or more

| Name of owned (subsidiary) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| CAMP MYSTIC, LLC | TX | 0804296074 | 100.000 |
| NATURAL FOUNTAINS PROPERTIES, INC | TX | 0013315900 | 100.000 |

**SECTION C** Enter information for each corporation, LLC, LP, PA or financial institution, if any, that owns an interest of 10 percent or more in this entity.

| Name of owned (parent) corporation, LLC, LP, PA or financial institution | State of formation | Texas SOS file number, if any | Percentage of ownership |
|---|---|---|---|
| | | | |

Registered agent and registered office currently on file *(see instructions if you need to make changes)*
Agent: RICHARD G. EASTLAND
*You must make a filing with the Secretary of State to change registered agent, registered office or general partner information.*

| Office: 2404 SCENIC DRIVE | City: AUSTIN | State: TX | ZIP Code: 78703 |
|---|---|---|---|

The information on this form is required by Section 171.203 of the Tax Code for each corporation, LLC, LP, PA or financial institution that files a Texas Franchise Tax Report. Use additional sheets for Sections A, B and C, if necessary. The information will be available for public inspection.

I declare that the information in this document and any attachments is true and correct to the best of my knowledge and belief, as of the date below, and that a copy of this report has been mailed to each person named in this report who is an officer, director, member, general partner or manager and who is not currently employed by this or a related corporation, LLC, LP, PA or financial institution.

| sign here | Title | Date | Area code and phone number |
|---|---|---|---|
| RICHARD G EASTLAND | PARTNER | 09/01/2024 | ( 830 ) 238 - 4660 |

145. Alternatively, venue is also proper in Travis County under TEXAS CIVIL PRACTICE & REMEDIES CODE § 15.002(a)(1) because a substantial part of the events giving rise to Plaintiffs' claim for intentional infliction of emotional distress occurred in Travis County. At all relevant times, Plaintiffs Will and CiCi Steward resided in Travis County. Defendants, through letters signed by Tweety Eastland, intentionally directed post-flood communications to Plaintiffs at their



Copy from re:SearchTX

Travis County residence. Those communications were received, read, and caused severe mental anguish to Plaintiffs in Travis County, and they constitute the acts forming the basis of Plaintiffs' intentional infliction of emotional distress claim.

146. Because proper venue is established against at least one Defendant, and because all of Plaintiffs' claims arise out of the same series of transactions or occurrences, venue is proper for all Defendants in this action. *See* TEX. CIV. PRAC. & REM. CODE § 15.005.

## V.
## THE EASTLANDS BLAME THE FLOOD ON AN ACT OF GOD: BUT THEY RECEIVED A CENTURY OF WARNINGS THAT A CATASTROPHIC FLOOD WAS COMING. INSTEAD OF LISTENING, THEY BUILT CABINS DIRECTLY IN THEIR PATH.

### A. The Eastlands Chose to Keep Camp Mystic Located in the Most Dangerous Flood Zone in the United States

147. The Eastlands bought Camp Mystic over 100 years ago. It is located in Kerr County, Texas. According to the *Texas Tribune*, "Kerr County … is one of the most flash flood-prone areas in the nation." Camp Mystic's location and topography places it in a deadly zone within Flash Flood Alley. Flash Flood Alley is known to be the deadliest flood zone in the United States.




148. Over the past century, the Guadalupe River basin has experienced more than 42 major floods, many of them deadly. The area's geography, topography and geological features make it



Copy from re:SearchTX

a hot zone for flooding. Its geography attracts storms from the Gulf of Mexico. Sometimes those storms stall over Flash Flood Alley and sometimes they combine with other storms. Due to the elevation, those storms often increase in intensity. The steep slopes and thin, rocky soil cause rain to run off very quickly. In areas where a river is fed by small creeks and streams, those creeks and streams can fill rapidly, adding to the flood potential of area rivers.

149. According to data from the National Oceanic and Atmospheric Administration ("NOAA"), the "minor" flood stage for the Guadalupe River at Hunt is 10 feet. A flood stage of 12 feet is considered a "moderate" flood. Major flooding occurs at a stage of 22 feet. Past historical events show that severe damage occurs at low-lying levels at each of these stages. Defendants were well-aware from prior events that the Guadalupe River had crested at "major flood" heights near Hunt at least five times since 1932 and at "moderate flood" levels at least nine more times.

## B. Camp Mystic's Location in "Flash Flood Alley" Made It a Chokepoint Particularly Vulnerable to Flooding with No Means of Escape

150. Camp Mystic sits at the convergence of at least four bodies of water that flood. Just below Camp Mystic's entrance. The Guadalupe River flows into a steep and narrow section with Highway 39 on one side and a high cliff on the other. When a flash flood occurs, the camp is positioned in such a way that water can rise rapidly from at least four different water sources that converge on the property. Campers and counselors can become quickly trapped with no way out.

151. The road to and from Camp Mystic runs along Highway 39. Less than a quarter mile below Camp Mystic, Highway 39 crosses a low-lying culvert over the river. When the Guadalupe floods above and below this crossing, there is no route onto Highway 39. Camp Mystic has a guard building and gate just above this crossing off Highway 39. The river washed the guard building and the guard herself down the river earlier in the morning on July 4th. When the river floods over



Copy from re:SearchTX

the low-lying crossing and up to the Camp Mystic gate, as it did on July 4th, there is no way to escape along Highway 39.




152. Once inside the gate, there are only two ways in or out. The first route is over the main driveway called "Camp Mystic Way."




153. This route crosses over a single, two-lane land bridge. However, this land bridge crosses Cypress Creek, Edmunson Creek, and Bubble Gum Creek.



Copy from re:SearchTX



If either of these creeks flood above or below the land bridge—which they often do—there is no way in or out. And, even if they do not flood, evacuation may still not be possible (other than by air or boat) past the gate along Highway 39.

154. The dangers associated with flooding are exacerbated by the remote nature of the property. The Eastlands acknowledged the campgrounds are located in a "delayed response area"—meaning that the facility was located miles from medical care and first responders. The Eastlands knew that in the event of an emergency of any type they would likely be left to fend for themselves for at least some time.

## C. <u>The Eastlands Received a Century of Flood Warnings as Old as the Camp Itself</u>

155. Camp Mystic opened in 1926—almost 100 years ago. The Eastlands knew Camp Mystic's location was prone to catastrophic flooding. Prior to July 4, 2025, they did not deny it. They romanticized it.

### 1. *The Eastlands Were Warned by the 1932 Flood*

156. The Great Flood of 1932 is a staple of the Camp's folklore. On July 2, a flash flood caused catastrophic damage to the Camp. Cabins were flooded. Three cabins were swept down the river. More than 14 inches of rain fell above Hunt, Texas between July 1 and 2, 1932. The rain caused the river to reach a height of over 36 feet at Hunt. The damage to the town of Hunt was devastating.



Copy from re:SearchTX

According to reports chronicled in Jonathan Burnett's "Flash Floods in Texas:"

> [The town of Hunt] was swept off the map so far as all the buildings are concerned. The post office, filling station and general store were all washed away. The only building left standing was the school. Twenty houses were lost, and more than three hundred people were left homeless. As one account summed up the situation in Hunt, 'Nothing is left there.'

157. Summer camps along both forks of the Guadalupe River were filled with campers "during the peak of the camping season." The flash flooding inundated several camps on both forks. Stewart, Waldemar, and Rio Vista all flooded. The owner of Camp Stewart had to seek refuge in an oak tree. An airplane flew over the camps to drop supplies to stranded campers and survey the scene. One pilot observed that some of the buildings looked like they had been "flattened as though they had been stepped on by a giant foot."

158. The raging waters did not spare Camp Mystic. The flash flood damaged several cabins. Three of the cabins located near the river were swept away. The dining hall also flooded.

159. One Camp Mystic counselor ("Miss Plunkett") described the flooding in an interview with the *Austin American-Statesman* a few days later. She remembered that the flood waters "persistently arose over cabins and came lapping up against the mess hall." They evacuated out of the back door of the mess hall. She went on to say that "from the way we did it, we didn't even realize that we might have all drowned if we had gone out the front door and walked face-into a sheet of water."

160. Fortunately, no one drowned at Camp Mystic on July 2, 1932—something authorities attributed to the fact that the flooding occurred during broad daylight. Despite the horrifying parallels of the 1932 flood, the Eastlands still claim publicly that the July 4th flood was unprecedented. That is just not true. History provided an unmistakable warning of the flooding to come at Camp Mystic.



Copy from re:SearchTX

### 2. *The Eastlands Were Warned by the 1951 Flood*

161. Camp Mystic flooded again on May 15, 1951. That day, flooding severely damaged the highway along the Guadalupe River. News reports stated that the water at Camp Mystic reached a height of 10-12 feet.

### 3. *The Eastlands Were Warned by the 1978 Flood*

162. History repeated itself—as it often does—in 1978. From August 1-2, 1978, flash flooding again hit Camp Mystic. Much like what happened in July 2025, remnants of the tropical storm stalled over the Hill Country. In an eerily familiar report, experts described what happened next: "These new cells grew rapidly in size and intensity and moved very slowly through Bandera, Kerr, Gillespie and Kendall counties, producing torrential rain in the early morning hours of Wednesday, August 2." "How a largely forgotten 1978 storm foreshadowed Texas' deadly July 4th flood," *San Antonio Express News*, July 12, 2025. Torrential rains fell over the Hill Country, killing 33 people across Texas. The flash flood destroyed over 400 homes in Comfort, located just a few miles from Camp Mystic. The floods destroyed numerous buildings at the Hermann Sons Youth Summer Camp, leaving 7 feet of mud in some cabins. Over 150 campers, ages 9-13, had to be evacuated.

163. This photo from the *New York Times* shows the severity of the flooding that occurred in Kerrville, Texas, on August 2, 1978:





Copy from re:SearchTX

164. This photograph from the *San Antonio Express News* shows a bridge that washed out on Highway 27:



165. The floods also damaged Camp Mystic. The flood waters ultimately reached the second step from the top of the Dining Hall stairs. Erin Paisan, a camper at Camp Mystic in 1978, recounted her story of the flood in a recent *New York Times* podcast. She was sleeping in Bug House—*the same cabin that Defendants evacuated first on July 4, 2025*.

166. Paisan said she woke up during the night and saw the river had risen into a large cypress tree by her cabin. She remembered that the water rose all the way up to the top. Even though she was only 13 years old, it was she who woke up her counselor and said, "we've got to get out of here." Her entire cabin evacuated to a cabin at a higher elevation.

167. The campers were stranded without food for days. She remembered parts of Camp Mystic looked like "the Pacific Ocean" and she saw cars floating down the river:

> The water was starting to recede a little bit, but it was still raging. And I remember watching with horror as a counselor, they were trying to get food over to us, like peanut butter sandwiches or something from the dining hall, and they got on a horse. And I remember watching them try to get across. And I was like, please, God, please, please don't let anything happen to these people. Like, everyone was



Copy from re:SearchTX

> just waiting. Just couldn't believe they were trying to get to us because it was still really dangerous.[1]

168. Paisan also recalled that Camp Mystic never gave her any warning about the flood or training about what to do in a flood. Thankfully, at 13 years old, she had enough awareness and maturity to alert her counselor and call for an evacuation. Forty-seven years later, campers and counselors would again have to fend for themselves.

#### 4. *The Eastlands Were Warned by the 1984, 1987 and 1988 Floods*

169. Edward S. Eastland came into this world during a flood. His mother, Defendant Tweety, had to be airlifted to the hospital to give birth to Edward. Floodwaters prevented her from going to the hospital by car. The Court of Appeals decision in the Eastlands fight over Camp Mystic even cites testimony from Stacy Eastland about the property: "it floods."

170. The 1987 flash flood on the South Fork of the Guadalupe River was strikingly similar to what happened at Camp Mystic on July 4, 2025. On July 16 and 17, 1987, over 11 inches of rain fell less than 10 miles west of Hunt. The massive rains caused a flood wave that traveled along the Guadalupe River from Ingram to Kerrville and down to Comfort. The river rose 29 feet. It crested at 31.50 feet. The Guadalupe River reached its second highest crest (now third) at both Kerrville and Hunt. According to the NWS, the Guadalupe River was estimated to be over two-thirds of a mile outside its banks at Comfort.

171. The Pot O' Gold Ranch was a summer camp located only 30 miles east of Camp Mystic. The camp was in session on July 16, 1987 and was supposed to end on the afternoon of July 17th. Despite flood warnings, camp officials tried to evacuate the campers after the river had already started to flood. The camp loaded campers on buses and vans. When they reached a low water

---

[1] Erin Paisan, *A Love Letter to Camp Mystic*, *The Daily*, *N.Y. Times* (July 8, 2025).



Copy from re:SearchTX

crossing, the lead bus decided to try to take a different route. The last bus in the group stalled in the rising water.

172. Rescuers attempted to rescue the campers who were trapped but a wave of water swept many of them away. Forty-three campers and adults were swept down the river. Ten campers drowned.

173. The 1987 tragedy was yet another example of how history repeats itself in Flash Flood Alley near Hunt, Texas. In fact, a warning that was issued at 2:45 a.m. on July 17th said the following about the flooding near Camp Mystic:

> The highest ever reported stage at Hunt was 36.6' in July 1932 but this is a very dangerous flood. Camp Mystic officials say they have polled camps in the area and all campers are accounted for.

174. Another flash flood hit near Camp Mystic a year later on July 11, 1988. The floods killed two people in Kerr County. The water also washed out a bridge near the camp. Buses carrying over 150 campers on their way to Camp Mystic could not get into the camp. Camp Mystic had to divert its bus to an auditorium in Kerrville and wait until the flood waters receded.

175. These are just a few of the severe floods that hit Camp Mystic and the Hunt area in the 97 years prior to July 4, 2025. Many more floods stranded campers on Senior Hill over the years.

**5. *The Eastlands Were Warned by Their Own Flood Experiences***

176. On May 10, 2012, Camp Mystic posted on its own Facebook page photographic evidence of Cypress Lake and Bubble Gum Creek flooding the main areas of the Flats. The Camp's album titled, "Flood of May 10, 2012," shows photos of rushing waters blocking the land bridge at the entrance to camp as well as the passage over Bubble Gum Creek to the Camp's main office. The parking lot is also photographed being submerged as well as a photo of Defendant Edward Eastland himself smiling with rapids behind him.



Copy from re:SearchTX







There is no way to count all the times that part of the property flooded like this—or worse.

177. On or about December 17, 2025, Richard Eastland Jr., son of Dick and Tweety Eastland and head chef at Camp Mystic, reached out to Camp Mystic alumni with a Facebook post on a private page called "Byrd Chatter." According to Eastland, he believed his father and a now-deceased former foreman had information about these prior floods that he did not possess. Eastland asked Camp Mystic's loyalists to provide him with information about the 1978 and 1987 floods at Camp Mystic to try to prove that those floods were not as bad as the July 4, 2025 flood. Eastland admitted that both floods impacted Camp Mystic and destroyed at least one building. He



Copy from re:SearchTX

also admitted that he knew the guard gate had flooded to the roof line and the flood water reached the second highest step during the 1978 flood and that both the Bug House and Look Inn cabins were evacuated in 1987.

178. One alum responded that the 1978 flood reached the bottom of her cabin's windows and flooded several counselors' cars. Another camper remembered a priority during the 1978 flood was to evacuate the "kitchen help" because the bottom of the dining hall was flooding. Another alum remembered that the 1987 flood washed away a car and "got close to the cabins."

179. Richard Eastland Jr.'s attempt to try to defend his family's actions by comparing 2025 to prior flood events is absurd but also telling: the Eastlands knew Camp Mystic floods. Often.

**6. *The Upper Guadalupe River Authority Told Dick Eastland a Flood Was Coming***

180. Dick Eastland served on the Upper Guadalupe River Authority Board ("UGRA Board"), which is charged with maintaining the health of the Guadalupe River watershed. As a Board Member, Dick Eastland had unique access to information about flood hazards. Defendants knew a catastrophic flood was imminent due to the information they obtained from the Kerr County Hazard Mitigation Plan ("the Plan"). The Plan's sole purpose was to "systematically identify hazards that can affect the County." The Plan determined that:

> [b]ased on the frequency of previous flood events, every jurisdiction ***can expect to experience some type of flooding that may or may not meet the definition of a 100-year or 500-year event on a more regular basis***. The local planning team determined it is likely that Kerr County and the participating jurisdictions ***will experience a flood event in the next year, meaning an event is probable in the next three years***. (*emphasis added*)

Horrifyingly, the Plan also predicted that "future worst-case events in Kerr County and the participating jurisdictions may meet or exceed previous worst-case 10" flood depths." The Plan recommended installing and expanding warning systems and sirens.



Copy from re:SearchTX

181. In a 2018 email, Dick Eastland acknowledged that every minute is "precious" in a flood event and referenced the importance of getting an advanced warning of even 30 minutes.

Gmail Dick Eastland [redacted]

**Old Kerr County Flood system map**
4 messages

**Dick Eastland** [redacted] Thu, Aug 23, 2018 at 11:22 AM
To: [redacted]
Cc: [redacted]

Dear Matt,

Enjoyed visiting with you yesterday. I hope you got my text but the quality of the map picture was poor. Attached is a better copy of the old Flood System while on the UGRA board in the late 1980s and early 90s. So glad GBRA took over this system and the real time rain gages are fantastic. The only limitations are the river level sensors upstream. During major flood events that info can be crucial to buy precious time before if hits downstream. Back in the old days there was a level sensor at location #9 (South Fork Ranch) but it was removed years ago. To me that is the most critical as it will buy us about 30 minutes during an event. Location #13 at West Perkins would be good as well. We have been here for some critical big floods including 1978, 1984, 2000 and many others.

I am also attaching an old 1988 UGRA report we had commissioned years ago for your info.

Hope this info is useful. Thanks, Dick [redacted]

The UGRA Plan also called for back-up generators. Dick Eastland knew that if there was a power outage, Camp Mystic would need its own power source. Despite this knowledge, the Eastlands had no backup generators in place before July 4, 2025.

182. Further, the Plan outlined that roughly 6% of Kerr County is in a 100-year floodplain and 93% of it is in a 500-year floodplain. The Plan further stated a flood was ***probable*** in the near future. All cabins in "the Flats" were in the 500-year floodplain. In May 2025—less than 45 days before the July 4th flood—Dick Eastland reviewed and voted to approve the Kerr County Hazard Mitigation Plan and was therefore well aware of the vulnerability to which his property was exposed. Despite the UGRA's warnings and recommendations, Camp Mystic had no infrastructure or procedures in place to deal with a flood. The Eastlands never invested in a sophisticated weather tracking or evacuation plan. Nor did they invest in safety equipment, training or even the creation of an evacuation plan.



Copy from re:SearchTX

**D. <u>Like the Man in the Parable, the Eastlands Refused These Warnings</u>**

183. The Eastlands knew another catastrophic flood was possible. And they knew Camp Mystic was exposed without any warning systems in place. A reasonable camp operator, knowing this history, would have relocated sleeping facilities out of flood-prone areas, implemented heightened protective measures and heightened flood-warning systems and backup power, created evacuation plans, and paid attention to warnings. The Eastlands did none of these things.

184. Instead, after the 1988 flood the Eastlands authored a letter to a local newspaper acknowledging both the danger of flash flooding and their duty "to take great measures" to keep children safe during flooding. Tragically, they never followed through.

185. The Eastlands own over 700 acres that house Camp Mystic. The Guadalupe River campus occupies a very small part of that acreage. The entire facility sits on the lowest part—all in the 500-year floodplain. The Eastlands had over 93 years since the Great Flood to move their cabins from this lowest lying area. The cabins are simple, spartan structures. The Eastlands could have built new cabins on the massive bluff overlooking "the Flats," which sits well over 50 feet above the lowest cabins. But, rather than spend the money to move those cabins, they chose to spend their money on themselves: purchasing massive houses all over Texas (including on Lake Austin) and building new ones on their property; prolonging their bitter legal fight; spending millions more building new structures across the creek on the Cypress Lake campus so they could handle more campers each year and make more money; and even fighting back against efforts to declare the cabins as being located in the 100-year floodplain.

186. They chose to spend their money on everything but camper safety.



Copy from re:SearchTX

## VI.
## THE EASTLANDS WERE SENT WARNINGS IN THE FORM OF REGULATIONS, STANDARDS, AND GUIDELINES: THE EASTLANDS REFUSED AND CHOSE COMPLACENCY OVER PREVENTION.

187. The number one priority for any business facing a potential flood is to plan ahead. Planning ahead means having an emergency evacuation plan, training your staff how to execute that plan, spending the funds necessary to ensure that you have the infrastructure in place needed to actually execute that plan, and when an emergency occurs. Federal, State, and private groups all have specific procedures and guidelines available for business owners (and camps) to use to prepare for and execute during a flood event. Indeed, FEMA, the ACA, and Texas' own legislature all tried to improve Camp Mystic's safety measures. At every opportunity, however, the Eastlands chose to rebel against these and other outside influences to regulate the camp. The Eastlands have a generations long culture of fighting oversight and regulation. This willful arrogance directly caused the death of Cile Steward.

### A. The State of Texas told the Eastlands: YOU MUST HAVE A PLAN

188. The rules for summer camps in effect as of July 4, 2025, required Camp Mystic to have a specific emergency evacuation plan. TEXAS ADMINISTRATIVE CODE § 265.15(k) expressly requires every youth camp to maintain a written disaster plan. That plan must also include specific procedures for evacuation of each occupied building and the facility. The Code also expressly requires training for *every camper* regarding *how to evacuate*. The camp must also provide the plan to every counselor and staff member. Critically, the camp must also give specific written instructions to each staff member and counselor telling them what their specific duties are during an emergency evacuation. Further, the camp must keep written records documenting the training.



Copy from re:SearchTX

189. The Eastlands rejected these rules in every conceivable way. The only thing Camp Mystic had in place for flood emergencies was this seven-sentence paragraph posted in the cabins and provided in the counselors' orientation notebooks:

> 11. **Floods**
> In case of flood, all campers on Senior Hill must stay in their cabins. They will be given instructions through the loud speaker. If the electricity is off, a walkie-talkie will be used. Food and other supplies will be delivered to Senior Hill by boat or truck. Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.

190. These instructions did not have any evacuation plan. Campers and counselors confirmed they never received any training whatsoever about how to evacuate. No staff member or counselor received any specific instructions about what to do in an evacuation. There is no written documentation of any training because there was no training. The Eastlands admit that since they had no plan they had to improvise during the chaos of the flood.

**B. <u>The American Camp Association told the Eastlands: YOU MUST HAVE A PLAN</u>**

191. The ACA is the leading organization that establishes safety standards for youth camps. ACA accreditation signifies that a camp has voluntarily submitted to rigorous safety inspections and committed to following industry best practices. ACA Standard OM.8 calls for camps to develop site-specific emergency procedures to respond to natural disasters typical of the area. For years, the ACA has sounded the alarm: floods are not a matter of if, but when, and camps must have emergency plans in place before disaster strikes "to prevent an emergency from turning into a crisis."

192. The Eastlands refused to join the ACA or adopt what should have been deafening recommendations to prepare and plan for an inevitable massive flood. The fees for accreditation by the ACA were less than $1,000. The Eastlands refused to spend this small sum of money (a fraction of a single camper's tuition) to make Camp Mystic safe. They also rejected the primary rule for emergency preparedness because they refused to have an evacuation plan.



Copy from re:SearchTX

## C. Numerous State and Federal Authorities told the Eastlands: YOU MUST HAVE A PLAN

193. In addition to Texas' mandatory requirements and the ACA's rules, the Eastlands also ignored free, publicly available guidelines from the NWS, United States Government, OSHA and the State of Texas, all of which also provide that any camp, employer or head of household should have a flood preparation or flash flood evacuation plan, an evacuation route and evacuate *before* a flood starts. For example:

### 1. *OSHA*

194. OSHA provides that employers should have a plan for "Flood Preparedness and Response."[2] OSHA's primary recommendation for flood planning is to have an e*vacuation plan in place* in advance to help avoid confusion and prevent injuries. Such a plan should include conditions that activate it, a chain of command, emergency functions and who will perform them, specific evacuation procedures, including routes and exits, procedures for accounting for people, equipment, and reviewing the plan with staff.

### 2. *The Federal Government*

195. Ready.Gov, the United States government's emergency preparedness program, states that "Floods are the most common disaster in the United States" and "flash floods can come with no warning." One of its top three recommended steps *is to determine an evacuation route in advance*, an echo of its most obvious and warning: "Failing to evacuate flooded areas or entering flood waters can lead to injury or death." Like Ready.Gov, Texas' Ready.Gov confirms that "when the threat of flooding is high, evacuate early. Don't wait until it's already flooded." One of Ready.Gov's other most important instructions is to pay attention to NWS and NOAA weather

2 https://www.osha.gov/flood/preparedness.



Copy from re:SearchTX

alerts. This means that a camp operator must have reliable communication infrastructure and battery powered NOAA weather radios to ensure they receive all emergency alerts in real time.

### 3. *The Texas Land Office*

196. The Texas Land Office ("TLO") lists having a "Family Evacuation Plan" in its "Top 5" things Texans should do to prepare for a flood, even if "outside a high-risk area." The TLO provides several instructions for developing an evacuation plan. One of the primary steps is to have a *muster site and a planned evacuation route*.

## D. The Eastlands Refused to Follow Any Safety Standards Except Their Own

197. According to all of these authorities, the single most important piece of safety equipment the Eastlands should have had was an emergency response and evacuation plan. Such a plan is free. But the Eastlands' hubris would not allow them to spend the time to develop one. The Eastlands' refusal to follow these guidelines was not an oversight—it was a deliberate choice worsened by their decades of defiance to avoid accountability.

## E. Britt Eastland Even Opposed the Camp Safety Transparency Bill

198. The Eastlands' rejection of oversight was on full display during the 2019 Texas legislative session. In 2019, Camp Mystic—alongside the Boy Scouts of America—testified against the Camp Safety Transparency Bill, which was intended to make camps safer in several ways, including providing additional safeguards against sexual predators. The bill ultimately passed, but not before Britt Eastland tried to defeat it. At a hearing for the proposed bill aimed at enhancing youth camp safety by mandating better sexual abuse reporting, Britt Eastland testified ***against*** the bill stating, "[Y]outh camps in Texas are safer than they have ever been in history with the regulations that are already in place." The fact that any Eastland would oppose such a bill that was ultimately passed is further proof of the efforts they will go to avoid oversight and regulation.



Copy from re:SearchTX

199. Contrary to Mr. Eastland's testimony, on July 4, 2025, Camp Mystic was anything but safe. The Camp was exposed in multiple ways due to the owners' poor judgment and lack of planning. Despite guidance from state and federal agencies, and guidance from private groups like the ACA, the Eastlands did not harden or upgrade Camp Mystic's campus. They had no plan whatsoever.

**F. Like the Man in the Parable, the Eastlands Refused Help From these Resources**

200. Like the man in the parable, the Eastlands were offered rescue. Like the man in the parable, they refused. With hundreds of lives relying on Camp Mystic to have an evacuation plan, and all these resources freely available to them, the Eastlands produced only a seven-sentence emergency paragraph in the 93 years since the Great Flood. They rejected industry standards. They testified against safety regulations. And when the flood came, they were forced to improvise after it was too late because they had refused all attempts to modernize the camp's infrastructure and safety plans.

## VII.
## THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS FROM THE TEXAS DEPARTMENT OF EMERGENCY MANAGEMENT: THE EASTLANDS IGNORED THEM, CONCEALED THEM FROM CAMPERS AND COUNSELORS AND CARRIED ON WITH BUSINESS AS USUAL.

201. When you operate a camp located in the middle of Flash Flood Alley, and you've been warned of the dangers by multiple floods, including one where cabins have been swept down river, you better listen when officials warn you that a flood is coming in 48 hours. The Eastlands received very specific warnings on July 2nd and 3rd. The Eastlands were told to prepare. Again, they chose not to listen.



Copy from re:SearchTX

**A. The Eastlands Were Specifically Warned on July 2, 2025: TDEM Activates Emergency Response**

202. Two days before the flood, on July 2, 2025, the TDEM issued a statewide warning announcing it had activated its emergency response resources. The warning specifically addressed flash flooding:

> The Texas Division of Emergency Management (TDEM) today announced that the agency activated state emergency response resources in anticipation of increased threats of flooding in parts of West and Central Texas heading into the holiday weekend.

Critically, TDEM instructed people in affected areas to "proactively prepare for potential hazards."

203. The Eastlands received this notice. Camp Mystic was located in the impacted area. The Eastlands did nothing. They did not prepare. They did not warn campers or counselors. They did not create an evacuation plan.

**B. The Eastlands Were Given an Intensified Warning on July 3, 2025: TDEM Escalates to Level II Response**

204. Less than 24 hours later, on July 3, 2025, TDEM escalated its state of readiness to Level II. The announcement stated:

> The Texas Division of Emergency Management (TDEM) has increased the readiness level of the Texas State Emergency Operations Center (SOC) to Level II (Escalated Response) and activated additional state emergency response resources as portions of West and Central Texas prepare for continued heavy rainfall and flash flooding threats heading into the holiday weekend.

205. TDEM announced that multiple state agencies were activated, including the Texas Department of Transportation, Texas Department of Public Safety, Texas Parks and Wildlife Department, Texas National Guard, and swift boat rescue teams and helicopters equipped with hoist systems. This escalated warning was issued *more than 12 hours* before Camp Mystic flooded. TDEM expressly warned that "flash flooding will continue to threaten West Texas, Central Texas, and the Hill Country over the next couple of days." TDEM also told the Eastlands



Copy from re:SearchTX

that they should "monitor local weather forecasts from trusted sources and avoid flooded roadways." TDEM even reminded them to go to public resources like TexasReady.Gov to help prepare.

**C. <u>The Eastlands Were Given Simple, Easy to Understand Instructions About How to Receive Emergency Warnings</u>**

206. When you operate a camp located in Flood Alley that you know is prone to flooding, and you receive multiple advanced warnings from TDEM, you must understand how flood watches and warnings work. The Eastlands received easy to understand instructions about how to ensure they received—and understood—these warnings. The NWS created clear, non-technical graphics to help people easily understand NWS' warnings.

207. Here is how the NWS explains Flash Flood Warnings:




The NWS told the Eastlands that a Flash Flood WARNING, like the one received at 1:14 a.m., does not mean a flood *may* happen. It means it *is happening* or will happen soon. The NWS graphic also made it perfectly clear what you must do when you receive a Flash Flood Warning: "MOVE TO HIGHER GROUND."

208. The NWS made flash flood warnings themselves even easier to understand in 2019. The NWS created Impact-Based Warnings located in mandatory "tags" that accompany Flash Flood



Copy from re:SearchTX

WARNINGS. The NWS created these "tags" because there was a perception that the NWS "over warns" during a storm. Flash flood WARNINGS now have one of three "threat tags:"

- Base – used most of the time, when flash flood impact is possible;
- **Considerable – Used rarely, when indications of flash flooding capable of unusual severity or impact are imminent or ongoing and urgent action is needed to protect lives and property;** or
- Catastrophic – Used exceedingly rarely, when a flash flood threat to life and catastrophic damage is occurring or is imminent, and floodwaters have risen or will rise to levels rarely if ever seen.

Only warnings that have a "considerable" or "catastrophic" tag will trigger wireless emergency alerts. The NWS also pushes its warnings to mobile phone devices and social media platforms, such as "X."

## D. Despite These Clear Warnings, the Eastlands Concealed them from Cile and her Counselors

209. When the Eastlands received these warnings, one of the first things they should have done was to alert their staff and every counselor about the very real possibility of a flash flood. Had they done that, everyone would have been aware of the threat. However, the Eastlands did just the opposite: they deprived every camper and counselor of any knowledge of these warnings.

210. Counselors and campers were strictly prohibited from having phones or electronic communication devices in their cabins. While marketed as a charming feature, this policy carried profound safety consequences.

211. Camp Mystic was located miles from medical care and first responders. The Eastlands knew that in any serious emergency, outside assistance would be delayed, and that campers and staff would be dependent on Camp Mystic leadership for timely warnings and instructions. Rather than prepare for the heightened risks created by this isolation, the Eastlands treated remoteness as part of the camp's appeal—without disclosing to parents that it would leave their children entirely reliant on camp leadership to warn them of imminent danger.



Copy from re:SearchTX

212. And those warnings never came.

213. By depriving campers and counselors of any independent means of receiving emergency alerts, Camp Mystic assumed an affirmative duty to maintain reliable, camp-wide communication systems. The Eastlands knew such systems were unreliable at best. Camp Mystic is located in an area with minimal to nonexistent cellular coverage. Internet access is limited and entirely unavailable during a power outage.

214. Nevertheless, while campers and counselors were kept deliberately in the dark, the Eastlands themselves began receiving information about severe and dangerous weather conditions as early as July 2. They did not share this information. When Cile and her cabinmates went to sleep on the night of July 3, they believed they were safe. They had no idea that the outside world was warning the Eastlands about the deadly conditions approaching Camp Mystic.

215. The Eastlands also assured parents that Camp Mystic would use its public address system and loudspeakers to warn campers in the event of an emergency. Speaker towers were installed throughout the camp, including one located just 49 paces from the door of Twins II.





Copy from re:SearchTX

216. A camp that chooses to rely on loudspeakers for emergency communication must ensure those systems function during foreseeable emergencies. Power outages during severe storms are not unexpected—they are inevitable.

217. Effective and redundant communication systems were essential to camper safety. Camp Mystic needed the ability to (1) receive flood and flash-flood warnings, (2) communicate those warnings and instructions to staff and campers, and (3) call for emergency assistance.

218. At a minimum, all of the agencies discussed above recommend the use of battery powered NOAA weather radios. It would have been cheap and simple for the Eastlands to put a camper safety communication bundle in each cabin, office and shelter. A typical bundle would include a battery powered weather radio, three walkie talkies and a flashlight.




Such a bundle cost less than $100, which means the Eastlands could have outfitted every cabin for less than $3,000.



Copy from re:SearchTX

219. At a minimum, the Eastlands should have had the following communications systems and redundancies in place on July 3, 2025—but they did not:

| **Communications Systems Needed on July 3-4, 2025** | | **Communications Systems Actually in place on July 3-4, 2025** |
|---|---|---|
| Reliable Mobile Phone Service | | None |
| Reliable Internet and Wi-FiIFI Service | | None |
| Starlink Internet Service | | None |
| Battery Powered Weather Radios and Walkie Talkies in every cabin | | None |
| Working Public Address System, Speakers and Sirens | | None |
| Backup Power Generator to Ensure Internet and Public Address System, Speakers and Sirens worked during a power outage | | None |

The Eastlands could have installed these systems for less than $28,000. The total cost is less than the total cost of tuition for four campers for a single session.

**E. <u>Like the Man in the Parable, the Eastlands Refused These Warnings</u>**

220. Like the man in the parable, the Eastlands were offered rescue in the form of all these warnings. Like the man in the parable, they ignored them. Despite claiming that its mission is the religious education and protection of young girls, Camp Mystic prioritized profit over safety. Its public image rests on the illusion of a simpler, safer, bygone era—a place hidden from modern technology and modern dangers. In reality, the Eastlands collected millions in camp fees each summer while failing to invest even minimally in systems that could have warned, protected, and saved the children entrusted to their care. As Dick Eastland admitted in 2018, even 30 minutes in an emergency are precious. The Eastlands received warnings at least 2,160 minutes in advance of the flood. They just chose not to listen.



Copy from re:SearchTX

## VIII.
## THE EASTLANDS WERE SENT EARLY ADVANCED WARNINGS THAT THEY NEEDED TO EVACUATE. THE EASTLANDS DEFIANTLY DID NOTHING.

221. Long before the duty to disclose the TDEM and NWS notices, watches and warnings, the Eastlands should have vetted, established, trained and routinely reevaluated campers, counselor and staff with an evacuation plan, complete with identification of muster sites, safe evacuation routes to higher ground, the delegation of responsibilities in the event of an emergency, and plans for backup generators, communication modules, and emergency aid. Camp Mystic had multiple safe evacuation locations available had the Eastlands evacuated campers in a timely manner. Every guideline for flood preparedness includes an emergency evacuation route and muster site (a single safe gathering spot). The reasonable muster location was the Cypress Lake campus. It was a short, easy walk, has a significantly higher elevation, and has large, permanent buildings that could have sheltered the entire Guadalupe River camp. Once access to Cypress Lake was cut off, there were still multiple routes to safety located a short walk from the Flats. The Eastlands should have had a decision tree that outlined where to relocate or evacuate campers based on the nature and extent of the threat of a flood. Had the Eastlands prepared for the forecasted flood, or taken the time to have an evacuation plan, they would have evacuated the campers to different safe locations depending on the proximity of their cabins to other locations long before 3:30 a.m. on July 4th.

### A. The Cypress Lake Campus Was the Safest Muster Site

222. The Cypress Lake campus adjoins the Guadalupe River campus and sits at a significantly higher elevation. The distance between offices is less than 1,900 feet in a straight line and less than half a mile by road.



Copy from re:SearchTX




Cypress Lake did not flood and includes a large main hall called Jones Hall that was capable of sheltering every camper and counselor from the Guadalupe River campus. It would have taken less than 5 minutes to walk there; and less than 1 minute to drive.

**B. <u>The Commissary Was an Alternative Muster Site for Cile as Options Narrowed</u>**

223. The Commissary, located adjacent to Twins I & II and Bubble Inn, had a second floor accessible by stairs. The stairwell was approximately 20 paces from the door of Twins II—less than a 10-second walk. The second floor was large enough to shelter all campers from those cabins. It has two large rooms with multiple beds. Neither room took on water during the flood.






Copy from re:SearchTX

Despite the close proximity to higher ground, Defendants' written orders required the girls in Twins I & II and Bubble Inn to shelter in place. Edward Eastland reinforced those orders after 3:00 a.m. By the time anyone in management reached Cile and her cabinmates, floodwaters had risen too high to allow safe access to the Commissary stairs. The workers staying there all survived.

**C. <u>The Cricket Corner/Sky High Trail Was a Safe Alternate Muster Site</u>**

224. Cricket Corner/Sky High trail was a marked trail that led up a nearby bluff. The distance up the hill to a height above the top of any cabin is less than 100 feet. The distance to the top of the hill and trailhead is only 291 feet from the Cricket Corner/Sky High trail. Although the trail is fairly steep, it is a short hike. It was a suitable muster site. Indeed, some counselors disregarded the Eastlands' warnings and later used this route independently to escape. Campers and counselors could have waited safely at the top of the bluff for floodwaters to recede or continued an additional 1,242 feet to the covered shelter adjacent to the "Camp Mystic" sign. The girls that chose to follow this route all survived.






Copy from re:SearchTX

**D. The Equipment Shed Was a Safe Alternate Muster Site**

225. Located approximately 550 feet from the office, the equipment shed contained multiple second-floor rooms that did not flood. Those rooms are accessible by exterior stairs. The workers housed there remained safe throughout the storm.




**E. The Recreation "Rec" Hall Was Another Alternate Muster Site**

226. Because the Eastlands had no evacuation plan, campers fled to different locations in the chaos. One such location was Rec Hall. It is unclear why the Eastlands did not immediately direct all campers there. Perhaps it is because Rec Hall was so close to the river and the Eastlands knew there was not enough room on the second floor for everyone in the camp. The lower floor was flooding and the interior second-floor balcony lacked sufficient space for everyone in the Flats. More than 100 girls from the Flats would wind up on the second-floor interior balcony of Rec Hall. There was barely enough room for all of them. The water rose to just below their feet. It was a miracle Rec Hall balcony did not collapse.



Copy from re:SearchTX




227. The distance from the door of Twins I to Rec Hall is approximately 315 feet—roughly the length of a football field. Had Defendants ordered Cile to evacuate to Rec Hall before 3:00 a.m., rather than directing her to shelter in place, she could have reached safety in under 30 seconds. Every camper and counselor that made it to Rec Hall survived the flood.

**F. <u>Like the Man in the Parable, the Eastlands Refused Rescue</u>**

228. Like the man in the parable, the Eastlands were offered numerous rescue attempts. Rather than boats and helicopters, the Eastlands had numerous routes to higher ground which they could have reached long before the flood, and even during its earliest moments. All of these options were there; they just chose to reject them. So, when the flood began, nobody knew what to do or where to go.

## IX.
## A TALE OF TWO CAMPS: UNLIKE CAMP MYSTIC, CAMP MO-RANCH LISTENED TO THE WARNINGS, TOOK ACTION BEFORE THE FLOOD, FOLLOWED SAFETY GUIDELINES AND SAVED EVERY LIFE.

229. These same warnings were sent to other camps. The leadership at Camp Mo-Ranch ("Camp Mo") listened. The contrast between Camp Mo and Camp Mystic could not be starker. Camp Mo is a summer camp located near Hunt, Texas, on the North Fork of the Guadalupe River.



Copy from re:SearchTX

Camp Mo's leadership received the same NWS and Texas Division of Emergency Management warnings on July 2 and July 3 that Camp Mystic received.

230. The differences: Camp Mo was ACA accredited. Camp Mystic was not. Camp Mo listened to warnings. Camp Mystic did not. Camp Mo had an established emergency plan and trained staff to follow it. Camp Mystic did not.

231. Camp Mo took action on July 3rd, well in advance of the point of no return, to move campers from lower-lying areas. When Camp Mo's staff observed the river rising during the early morning hours of July 4, they did not debate whether to act. They followed their plan. With over 500 campers and staff on site, Camp Mo relocated campers from lower-lying areas in stages, consolidated them on higher ground, and maintained staff on duty overnight to monitor the river and respond if conditions worsened. Evacuations were orderly, timely, and coordinated.

232. According to Camp Mo's information director, Lisa Winters, Camp Mo "saw it coming well in advance, and they did something about it." Despite flooding that caused significant damage at Camp Mo, no lives were lost. In fact, Camp Mystic was the only camp on the Guadalupe River that lost campers in the flood.

## X.
## THE EASTLANDS CONTINUED TO RECEIVE WARNINGS AND THEY KEPT IGNORING THEM: 11:36 a.m. JULY 3RD – 2:26 a.m. JULY 4TH.

233. Even though the Eastlands kept ignoring the intensified warnings, warnings kept coming. TDEM put out its increased activity alert at 11:36 a.m. on July 3rd. Then, at 1:18 p.m. on July 3rd, the NWS pushed another warning out on social media platforms:



Copy from re:SearchTX




The notices continued on July 3rd:

- 6:10 p.m.: The Weather Prediction Center (WPC) issued three "Mesoscale Precipitation Discussions" for the excessive rainfall event, that indicated the potential for Flash Flooding. This discussion occurred more than 8 hours before Camp Mystic flooded.

- 6:22 p.m.: The National Water Center issued Area Hydrologic Discussion #144. Discussion #144 indicated locally considerable flooding for areas north and west of San Antonio, including Kerrville. The discussion stated that the "National Water Model (NWM) Short Range Forecast (SRF) has been consistent in signaling the potential for rapid onset flooding in an area from near Brady, TX to Austin, San Antonio and Uvalde, TX. The placement of the NWM's responses have shifted from run to run, however the placement has been consistent in the above area." This discussion occurred more than 8 hours before Camp Mystic flooded.

- 11:41 p.m.: The NWS issued a Flash Flood Warning at 11:41 p.m. on July 3rd for Bandera County. This warning issued more than 4 hours before Camp Mystic flooded. Bandera is 40-50 miles from Camp Mystic.

The Eastlands still continued with business as usual.

## A. <u>The Eastlands Wasted Over 12 Hours of Precious Time From TDEM's Notice Until Midnight on July 3rd</u>

234. Around 10 p.m., **<u>(still more than 4 hours before it was too late to evacuate Cile),</u>** Camp Mystic played "Taps" over the loudspeaker. Even though the loudspeaker worked, Defendants did not tell the counselors and campers about any of the weather warnings they had received. Over 200 young women turned the lights out and prepared to go to sleep, believing they were safe and sound. They were anything but.



Copy from re:SearchTX

235. Incredibly, the Eastlands gave key staff and counselors all or part of the day off on July 3rd despite the intensifying warnings. Seasonal workers left for the day to tour Austin. Several counselors also were allowed to take the evening off and go to Kerrville for dinner. They did not return until after midnight.

236. The Eastlands should have had an "all hands" meeting after TDEM issued its intensified notice. Every able-bodied person should have been notified about the storm and given an updated emergency and evacuation plan. Every counselor and camper should have been notified as well.

237. It also appears that Camp Mystic's leadership went home and went to bed. By all accounts, Tweety Eastland went home and went to bed. Upon information and belief, Richard and Leslie Eastland left campus. If Mary E. Eastland was on property, she stayed in her home as well. Britt and Catie Eastland were either in their home or at the Cypress Lake campus. Other than Edward and Dick—who came after it was too late—none of them, not one, attempted to help any campers or counselors at the Guadalupe River camp during the flood.

238. What were they doing during the hours before the flood? Why didn't they help prepare? Why didn't they stay up and help inform campers and counselors? Why didn't they do anything to help during this extended period of time? There is no good answer.

239. Although the Eastlands did not tell anyone what dangers were looming, and made no preparations to protect the children, they did take decisive action to protect their property. The Eastlands ordered their largest canoes—the war canoes—to be moved to higher ground. Upon information and belief, the Eastlands also opened the stables and corral so their horses could move to higher ground. Clearly, the Eastlands were concerned about the threat of rising water. Tragically, their concern was limited to protecting the property they use to make money, not the children they promised to protect.



Copy from re:SearchTX

**B. The Eastlands Wasted Another Hour From Midnight Until 1:14 a.m.**

240. The Eastlands continued with business as usual for the next several hours. Other than move the war canoes, the Eastlands took no further action to alert campers or counselor or fortify the camp in any way. At approximately 12:40 a.m. on July 4th, several counselors returned to camp. Camp Mystic allows a certain number of counselors to leave Camp on select days off. The counselors generally have a 1:00 a.m. curfew. When they leave Camp, their mobile phones are given back to them; when they return to camp, they must give them back. The counselors reported that they had driven through a severe storm on the way from Kerrville back to Camp. Still, the Eastlands gave no warnings.

**C. The Eastlands Received a Flash Flood Warning at 1:14 a.m.**

241. ***At approximately 1:14 a.m., (still more than 60 minutes before it was too late to evacuate Cile), the NWS issued a flash flood warning for central Kerr County***. The NWS warned of "life threatening" conditions and that "flash flooding is ongoing or expected to begin shortly" and ***instructed recipients to move to higher ground immediately***. According to various news reports, including an interview with Richard Eastland, members of Camp Mystic's staff received this warning. This warning included the "considerable threat" tag.

242. At this time, every muster site and evacuation route was still available. The Eastlands could have moved the entire camp to the Cypress Lake campus. They could have moved Cile. They could have warned her. Still, they told no one and did nothing.

243. **At approximately 1:15 a.m., (still more than 60 minutes before it was too late to evacuate Cile)** Glenn Juenke was near the dam. Mr. Juenke was the Guadalupe River campus night watchman. Mr. Juenke claims he missed the flash flood warning because the Camp did not have cell phone service and there was no Wi-Fi or internet service near the dam (both problems



Copy from re:SearchTX

known to the Eastlands for years). It is inexcusable that the Eastlands maintained a camp full of children without adequate communication services at any time; it is especially egregious that they did not take steps to make sure all Camp personnel had access to working communication services from the moment TDEM issued the first warning on July 2nd. However, Mr. Juenke did have visual cues and could see that Bubble Gum, Cypress and Edmunson Creeks, which were normally dry, were actively rising.

244. The Eastlands did nothing to alert campers or move them to higher ground. Thirty more precious minutes were lost. The Eastlands gave no warnings; they moved no campers.

245. **Incredibly, at approximately 1:45 a.m., (still more than 30 minutes before it was too late to evacuate Cile),** Dick Eastland radioed his son Edward and told him they had received 2 inches of rain in the last hour and needed to move the waterfront equipment. Members of the grounds crew began to move additional canoes and equipment to higher ground. Despite this threat of imminent danger to human life, the Eastlands again chose to protect canoes, but not children.

246. **Also, around 1:45 a.m., (still more than 30 minutes before it was too late to evacuate Cile),** Dick Eastland told Glenn Juenke to go home because his shift was ending at 2:00 a.m. It was beyond reckless to send one of the few available able-bodied men home 30 minutes after receiving a flash flood warning. Fortunately, Mr. Juenke did not leave. His decision—in the face of the grossly negligent instruction by Dick Eastland—saved lives. After moving the equipment, Edward drove back to the office where Dick and Juenke were still located.

## D. The Eastlands Ignored Three More Warnings From 2:00 to 2:26 a.m.

247. By this time, at least 45 minutes had passed since the NWS told the Eastlands to move to higher ground immediately. The warnings kept coming. The Eastlands kept ignoring them.



Copy from re:SearchTX

248. **<u>At or around 2:20 a.m.</u>**, counselors from Bug House cabin gave the Eastlands another warning when they alerted Camp leadership that their cabin was taking on water. They drove back over to Bug House in Dick Eastland's Tahoe and observed water rushing off the steep hill into the Bug House cabin like a waterfall. The counselors were instructed to put towels down, get belongings off the floor and stay put. Dick and Edward returned to the Main Office.

249. **<u>At or around 2:21 a.m., (still more than 30 minutes before it was too late to evacuate Cile),</u>** Edward Eastland sent his wife a text message stating he could not return home because Bubble Gum Creek was overflowing. Bubble Gum Creek is small—not much wider than a post card. By this time, it was raging.



250. Why Edward was concerned about his own safe return home and not evacuating his campers is beyond comprehension. But, again, once he witnessed this normally dry creek turn into a raging river, he knew the entire camp was in danger. By then, escape to the Cypress Lake campus was shut off. However, the Eastlands still could have safely moved every camper and counselor to the alternate muster sites: the Cricket Corner/Sky High trail, the Equipment Shed, Rec Hall, or the Commissary.



Copy from re:SearchTX

251. **<u>At approximately 2:25 a.m.</u>**, Edward Eastland received another warning. This time, he received a call on his radio from the Camp's gatehouse guard, Ms. Blackwell, who was at the entrance of Camp Mystic and Highway 39. She reported water coming into the gatehouse. Edward told her to get out of the gatehouse and to go up the hill towards Senior Hill. The gatekeeper was frantic—she could not open the gatehouse door. Suddenly, her communications ceased. She was swept away and survived by clinging to a tree for hours. Still, even then, the Eastlands warned no one.

## E. <u>Like the Man in the Parable, the Eastlands rejected these Final Warnings to Avoid Catastrophic Loss of Life</u>

252. The NWS gave the Eastlands explicit, clear instructions: MOVE TO HIGHER GROUND IMMEDIATELY. The only things they moved were canoes. Then they received more warnings, one after the other. Still, the Eastlands did nothing. There was plenty of time between 1:14 a.m. and 1:45 a.m. to move Cile and everyone else to the Cypress Lake campus before Bubble Gum and Edmunson Creeks flooded. It would have taken them less than 5 minutes to walk there, or 1 minute to drive there. And after Bubble Gum Creek began to flood out of its banks after 2:00 a.m., there was still plenty of time for Cile to walk the 20 paces to the Commissary or take any of the other routes to safety. The Eastlands deprived her of the chance.

253. The Eastlands publicly defend their actions by claiming that, as the storm was raging, Dick Eastland was "monitoring" the weather on his phone from 12:42 a.m. to 2:26 a.m. Phone data provided by the Eastlands show Mr. Eastland checked the weather 14 times during that period. Nine of the fourteen times, he used a weather monitoring device called AcuRite. This is an at home weather monitoring device one can buy on Amazon. It is essentially a digital rain gauge for a home weather station limited to its precise location; it is not a device capable of measuring river and stream data over a 700–800-acre ranch. Nor does it measure stream and river levels or predict



Copy from re:SearchTX

flooding. It provides no data about what is happening upstream or in the many flood sources that feed into the Camp Mystic chokepoint. As Mr. Eastland knew from his prior experience on the Upper Guadalupe River Authority Board, that data is what mattered most and he knew he didn't have it. So, he had to heed the warnings God gave him via TDEM, the NWS and his own eyes.

254. At most, all the Eastlands did to prepare for the flood was move property and monitor a digital rain gauge.

## XI.
## AS THE WATER ROSE, THE EASTLANDS DOUBLED DOWN: THEIR ONLY PLAN WAS TO SHELTER IN PLACE.

255. By 2:26 a.m. on July 4, 2025, the Eastlands had wasted all the precious minutes they had been given to prepare for a flash flood and move Cile to higher ground. Cile was still in her cabin. The Eastlands never told Cile that there was a flash flood warning or that she was in danger.

256. As is discussed above, the Eastlands knew that Texas law required Camp Mystic to do more than merely order their campers to shelter in place during a flood. Camp Mystic also had to have an evacuation plan, train every camper and counselor how to execute that plan, and give every staff member and counselor specific assignments for handling a flood emergency. But Camp Mystic did none of those things.

257. Quite the contrary, the only information Camp Mystic provided Cile and her counselors was the seven-sentence shelter in place mandate.

258. With hundreds of children's lives dependent on a real evacuation plan, that paragraph was the sum of the Eastlands' preparation.

259. The Eastlands knew Cile would obey these instructions and do exactly as she was told. Camp Mystic's culture was built on obedience to a rigid hierarchy. Campers were taught that leadership, belonging, and advancement in their particular "tribe" depended on following



Copy from re:SearchTX

instructions—without question—from those above them. Cile had just found out which "tribe" she would join for life.




At the top of that hierarchy were the Eastlands, followed by the "Big Three," counselors, and older campers. At the bottom were the youngest, most vulnerable children: the eight-year-olds housed in Bubble Inn and Twins I & II, three cabins located in the low-lying "Flats" section of the camp.

260. Compliance was not optional. It was reinforced through a point system that rewarded obedience and penalized deviation—often affecting an entire "tribe." These children were trained, incentivized, and conditioned to follow rules.

261. Because of their age—especially in moments of fear—these campers were natural rule-followers. The Eastlands knew this. They knew that Cile and her cabinmates would trust and obey emergency instructions issued by "the office," particularly when those instructions were written, categorical, and absolute:

> **Campers and counselors NEVER wander away from your cabin. Those on the flats must also stay in their cabins unless told otherwise by the office. All cabins are constructed on high, safe locations.**

These instructions were false and fatally flawed: the cabins were not safe; the instructions violated every concept of reasonableness for a camp.

262. When the Eastlands promised they would issue emergency instructions over loudspeakers, they knew these children would wait for them. When the Eastlands told them their cabins were



Copy from re:SearchTX

"high" and "safe," they knew these girls would believe it, even as the water rose and kept rising to the ceiling. And when the Eastlands ordered the youngest campers in the Flats to remain inside their cabins unless told otherwise, they knew that command would be obeyed.

263. In a flood, this forced obedience to a reckless rule became lethal. This mandatory instruction was a death sentence. Cile did exactly what she had been ordered to do. She stayed in her cabin. She waited for instructions from "the office" or her counselors to receive instructions from "the office." With each passing minute, her escape routes narrowed. Had she been warned, been given a plan, been told the truth, before any kind of fighting chance, she would have made it. She was plucky—she would have had ample time to reach higher ground.

## XII.
## THE TERROR AND CHAOS AT CAMP MYSTIC: CILE'S FINAL HOUR OF LIFE ON JULY 4, 2025.

264. The Eastlands' negligent and grossly negligent failure to plan, prepare, warn, or evacuate—combined with their mandatory shelter in place order—left Camp Mystic's campers and counselors in complete terror.

### A. The Eastlands' Desperate Attempt at an Improvised Evacuation

265. **At approximately 3:00 a.m.**, Dick Eastland, Edward and Glenn Juenke began to evacuate. They drove back to the cabin and observed the water right at the Bug House porch. They had no plan. So, they improvised. They decided to evacuate only the cabins closest to the river, by vehicle, one cabin at a time: Bug House, then Look Inn, then Hangout, then Tumble Inn, and then Jumble House.



Copy from re:SearchTX




266. Why only three adults were available to evacuate the entire camp remains a mystery. At minimum, staff from the Commissary—just 20 paces away from Twins II—were available and not stranded. The distance from Twins II to the Commissary, which had a safe second floor, is only twenty paces.

267. But, with no plan, more precious minutes were racing by. They instructed the Bug House campers and counselors to get in their vehicles, two trucks and Dick's Tahoe. They drove them around to the Main Office and told them to run into Rec Hall.

268. Rec Hall was located perilously close to the river's edge. It made no sense why the Eastlands would pick a spot closest to the river as an evacuation spot. When the evacuation began, Dick, Edward, and Glenn told the campers they are staying in Rec Hall because "their stuff is getting wet." They did not tell them they may be in mortal danger.

269. Even though Rec Hall was not the safest choice for a muster site, it somehow held during the flood. Cile could have run there in 30 seconds or less. The distance from Bug House to Rec



Copy from re:SearchTX

Hall is approximately 1,000 feet. The distance from the Twins I door to Rec Hall is 315 feet, about the length of a football field. However, despite the beginning of an evacuation and the clear and present dangers posed to the entire camp, Camp Mystic made no announcement over the loudspeakers.

270. By this time, many of the girls in Twins I and II were no longer sleeping. Thunder was booming and lightning was cracking across the sky. Counselors were moving around the cabin, peering outside the cabin door, not knowing what was happening or what to do.

271. A clear evacuation route for all cabins remained open and passable.

272. Yet in that hour, even as water was clearly rising, Dick and Edward ordered the remaining cabins to stay put and wait for instructions. The counselors were not trained what to do. One counselor remembered turning to her Camp Mystic manual for guidance. The manual confirms the instructions given: stay put, do not leave the cabin, wait for instructions. The manual does not say that the "high ground" the cabins are supposedly built on is, in fact, in a known floodplain. Nor did the manual identify an evacuation route or safe muster site.

273. Cile and the other campers in Twins II could see the lights of Dick, Edward, and Glenn's vehicles as they passed back and forth between other cabins and Rec Hall. Flashes of lightning revealed creeping levels of water and canoes floating over the soccer field.

274. Some counselors were taking turns getting up and telling the frightened campers to go back to sleep every twenty minutes. After the Bug House evacuation began, the campers and counselors in Twins II could hear the voices of other campers yelling and shrieking as they walked *past their cabin* on the way to Rec Hall. The Twins II counselors came into the Twins I cabin and told the Twins I counselors they are going to be evacuated and to stay put because someone was coming.



Copy from re:SearchTX

So, the Twins I counselors told their campers to stay put and go on the porch to look and see what was happening. Water was rising over the first step of their porch.

275. The campers and counselors of Nut Hut, Chatter Box, Wiggle Inn, Giggle Box, Twins I, Twins II, and Bubble Inn began to panic. There was no coordinated movement. No communication. No loudspeaker announcement. No cabin-to-cabin direction. As one counselor later put it: "Every single cabin on the Flats had a different experience and none was really alike and every single one was horrible."

276. After evacuating Hangout, Glenn Juenke decided it was too dangerous to continue driving in the rising water. At some point in their "evacuation hour," the ad-hoc chaotic evacuation plan disintegrated. Counselors began to realize help was not coming. They realized the entire campus was left to fend for itself. Counselors—sixteen- to eighteen-year-old girls themselves who had received no training whatsoever—were left to make snap decisions. On counselor remembered: "Everybody thought flooding was a possibility, but we never got training." The counselors of several of the older cabins engaged in heroics, leading their campers out up their cabins and scrambling up the cliffside abutting their cabins.



*Photograph of muddy handprints outside cabin along route to Sky High trail.*



Copy from re:SearchTX

277. In "Nut Hut," the counselors tried to leave the cabin to find help. Clinging to the sides of cabins, the current was too strong and the counselors turned back. They ultimately broke the cabin's screen with a rock, evacuated themselves and their campers through a window, and scrambled up the steep hill behind their cabin connected to the Cricket Corner/Sky High trail. In the darkness, the only way to know where they were going was to watch for lightning. When it struck, the counselors could see the "Camp Mystic" sign at the top of the Sky High trail. Because the campers and counselors had never been through an evacuation drill, had no safe evacuation location, and no evacuation route, the counselor was leading them "blind" in the chaos. She had never hiked to the top of this hill. Yet, she was able to get all sixteen of her campers to safety.

278. In "Chatter Box," counselors decided to evacuate on their own. Counselors used rocks to break windows, pass campers through the window one by one, and another counselor helped them scramble up the same steep hill.

279. In "Giggle Box," a counselor defied orders to stay and decided on her own it was not safe to wait. She told her girls to put on their shoes and rain jackets. Screens were hastily ripped from the windows. The counselors, working together, handed campers out the window one-by-one and made multiple trips through waist-high water and up the steep hill to evacuate all sixteen campers.

280. The Twins counselors were still left in the dark about what to do. They were stuck in the cabin, obeying Edward Eastland's mandate to "stay until you possibly cannot." They waited for the "office" to tell them what to do as the waters rose. They turned the cabin lights on and went outside to the porch with flashlights. One counselor began flashing SOS with her flashlight while the other counselors yelled for help.

281. At approximately **3:30 a.m.,** Edward Eastland drove back from Rec Hall after evacuating Jumble House. He saw Dick Eastland parked outside of Bubble Inn. Dick directed Edward to



Copy from re:SearchTX

take the Bubble Inn and Twins cabins. The water was rising but not yet to the porch. Over walkie-talkies, Dick agreed to take Bubble Inn; Edward agreed to take the Twins cabins.

282. Edward backed his truck up to Giggle Box and walked to Twins from the Giggle Box porch. The counselors anxiously waited on the Twins' porch. They saw Edward walking toward them and began pleading to him for instruction.

283. At approximately **3:35 a.m.**, Edward climbed up onto the Twins' shared porch, where the water reached his ankles.



*Photograph of Twins I and II combined porch.*

284. By the time Edward finally arrived to help the Twins' cabins, he decided the campers needed to remain in the cabins and wait for the waters to recede. Although the Eastlands had rejected every single warning, now he decided to pray that the water will stop.

285. The counselors pleaded with him to evacuate. "The water will start going down," he said. Of course, Edward was wrong. That command reinforced the terribly conceived shelter in place



Copy from re:SearchTX

order. It could not have come at a worse time. The water pinned the Twins I door closed. Edward tried to open it but could not.

286. Edward then left Twins I and went to Twins II. Water was running over his legs but walking from door to door was still feasible. The Twins II counselors and campers were able to open their door.

287. At some point in the intervening minutes, Dick called Edward on the walkie talkie, stuck, struggling, and needing help. Edward told him he could not move either.

288. The Twins I and II campers were all still alive in their respective cabins. Edward and the counselors tried to keep the water out, but it started coming in through a window. Edward told the Twins II campers to get on the top bunks. He yelled the instruction through the slats to the Twins I campers as well.

289. At **3:57 a.m.**, Kerr County 911 received the first call to emergency services from Camp Mystic, a report that campers were stranded on a hill seeking evacuation. This is not a call from the Eastlands but from terrified counselors on Senior Hill. At this point, no Camp Mystic official had ever called any first responder to report a problem or ask for help. The first call from the Eastlands would not come until 7:22 a.m.—more than 6 hours after the Flash Flood Warning.

290. The water kept coming. The girls' trunks were floating. The girls huddled on two top bunks by the windows, terrified and desperate.

291. The water in Twins I rose faster than in Twins II. A Twins I counselor screamed that girls were being swept out the Twins I door onto the shared porch.

292. Edward was at the Twins II doorframe, holding the doorframe, facing out toward the river. Twins I campers floated down the porch toward the Twins II door. Girls started fleeing through the Twins I door on the shared porch, rather than drown.



Copy from re:SearchTX

293. Edward caught two Twins I campers and held on to them and the doorframe.

294. At or by **4:09 a.m**., Edward was swept away from the Twins II doorframe and downstream with two Twins I campers clinging to him. The water was churning and violent. It was a vortex of currents from the 4 raging bodies of water and the sheets of water coming down the hill, all of which converged on the flats. Edward tried to swim down the soccer field and to the cabins and trees to the right. His path was similar to many of those that survived from the Twins cabins. He was led to a row of different trees aligning the road he had earlier been using to evacuate campers. He held on to these trees, one to the next, until he ultimately arrived at a tree about 200 yards downstream at the archery range near Bug House (the "Bug House Tree"). Although he was swept away early, Edward would be the last to arrive at the Bug House Tree.

**B. <u>Cile's Final Moments</u>**

295. Cile and the other Twins II campers were still in their cabin.

296. The waters continued to rise. The ceilings were flat, not vaulted, so the girls were quickly running out of room and air. They were terrified. Some were silent, so shocked they could not speak. Most were crying hysterically, wanting to go home, wanting to be with their parents. Some were screaming "help" so often that those who survived were hoarse the next day.

297. The counselors realized that if they stayed in the cabin, everyone would drown.

298. Eventually, the water rose high enough to float and tip the bunks, spilling the girls into the water inside the cabin. The girls could not stand. The water was less than two feet from the ceiling. The girls swam toward their counselors.

299. Once the water rose to the counselor's shoulder height, she decided she could not stay any longer and broke out the side windows with a camper's trunk. The water continued to rise to above the top of the Twins II front door.



Copy from re:SearchTX



300. The counselors prepared to guide the campers downriver out of the second Twins II window on top of inflatable mattresses they had been using in their bunks. They told the girls to be brave and to hold on to anything they can get their hands on, including clotheslines. They put girls on mattresses and pushed them underwater to get them through the window. Some girls were sucked out of the window by the current.

301. One of the three counselors in Twins II was swept out of the window, grabbed the roof of Twins II, and tried to hold on and help with the window evacuation. She and another Twins II camper were swept away together after losing their grip on the roof. Another counselor was sucked out and grabbed onto a clothesline pole outside the window.

302. The water was so high before they were able to get out that some girls could barely breathe. The water in Twins ultimately rose to just six inches below the ceiling. For some of the girls, the current carried them to the cabins and a stand of trees lining the road and soccer field. Some girls were flung from tree to tree, holding on as long as they could, until they reached the Bug House Tree where most of the survivors would be found. Upon arriving at the tree, the girls performed a kind of "pull up" to climb into the branches. Some campers reported being approximately thirty feet high in the tree but still touching water.



Copy from re:SearchTX

303. Cile was on a mattress with two or three other Twins II campers. At one point, Cile fell off of the mattress.

304. On information and belief, Cile did not go from tree to tree but took a more direct path to the Bug House Tree. She made it to the tree where the majority of the survivors were found. She was so close to survival. She almost made it.

305. But Cile was swept away.

306. She was eight years old.

307. At **11:28 a.m.**, the Eastlands sent their first official post-flood email to Camp Mystic's parents: "If you have not been personally contacted then your daughter is accounted for."

308. Despite the steadfast commitment of dozens of workers and volunteers, Cile has not been found.

309. Cile, and all the young girls in Twins I, Twins II and Bubble Inn, were waiting for instructions and help that never came. And when someone finally came—Edward Eastland—he doubled down: he told the entire cabin to stay there until the water rose so high they could not stay. That order, like all of the Eastlands' other failures, sealed her fate.

## XIII.
## POST-FLOOD: THE EASTLANDS CHASE ACCOUNTS INSTEAD OF ACCOUNTABILITY.

310. After the flood, it was business as usual for the Eastlands. They wasted no time reopening. They need the cash from tuition to sustain their lifestyles, and they will stoop to just about any level to get it.

### A. The Eastlands Prioritize Reopening Over Reflection and Responsibility

311. On September 22, 2025, the Eastlands launched a public relations campaign to entice parents into believing Camp Mystic is safe and faultless. The Eastlands sent letters via email to



Copy from re:SearchTX

Camp Mystic families announcing plans to reopen the Cypress Lake campus and build a memorial at the Guadalupe River campus. These letters promised a memorial for the lives lost without seeking approval from the Stewards or other families and without mentioning Cile's name or that she was still unrecovered. The Eastlands' first letter went to the Heaven's 27 parents. The Eastlands promised it was a private, personal communication about a memorial. A few hours later, the Eastlands' true purpose became clear: they sent a letter to all parents to solicit public support for reopening, so they do not go bankrupt.

312. The Stewards responded the next day:

> To promote reopening less than three months after the tragedy—while one camper remains missing—is unthinkable. Our families remain trapped in the deepest throes of grief, yet your communications treat our never-ending nightmare as little more than a brief pause before resuming business as usual.

313. The Eastlands did not listen. Even after this email, the Eastlands admitted in the November 15th *New York Times* article, "Swept Away," that no plan existed for how to evacuate campers, the chaotic July 4th attempt to evacuate was improvised, and the camp was planning to create a plan—in the future.

314. On October 14, 2025, Tweety Eastland mailed another letter—this time directly to minor children who survived July 4th, *without first obtaining permission from their parents*. The letter encouraged these traumatized children to remember they are "Mystic Girls." At other moments, the Eastlands have stated that attending Camp Mystic would honor those lost, that those who drowned would want them to return, and that re-opening would bring healing. The parents of those children disagree.

315. On December 2, 2025, the Eastlands sent yet another letter soliciting parents to return their children to Camp Mystic. The letter claimed that returning to camp is part of a child's "healing journey"—despite the Eastlands having no training in trauma psychology.



Copy from re:SearchTX

## B. The "New" Safety Measures Only Reinforce its Failures

316. The Eastlands' December letter announced "new" safety measures for Cypress Lake—measures that prove exactly what was missing at the Guadalupe River facility on July 4, 2025:

- Flood warning river monitors — Not present on July 4th
- Elevated muster station — Not present on July 4th
- Far-reaching outdoor PA system and cabin speakers — Not working on July 4th
- Hand-held two-way radios with NOAA weather alerts — Not present on July 4th
- Redundant internet backed by satellite — Not present on July 4th
- Higher-capacity backup generators — Not present on July 4th
- Cabins on high ground above floodplain — Not true on July 4th

317. That the Eastlands "saw the light" about safety five months after they killed 27 children doesn't change the outcome. These policies and procedures were within the scope of what any reasonably prudent camp owner should have implemented decades ago—especially one located in the middle of Flash Flood Alley.

318. Thankfully, other camps will be safer in the future thanks to the Texas Legislature, which passed the HEAVEN'S 27 SAFETY ACT during the Second Special Legislative Session of 2025. These new laws will help ensure that all summer camps throughout Texas take the necessary steps to keep children safe while under their care.

## C. The Eastlands Have No Business Watching Over Children Ever Again

319. In the aftermath of the July 4th tragedy, the Eastlands have claimed that the Cypress Lake camp is "completely independent from the Guadalupe River camp." This claim is patently false and deliberately misleading.

320. Both camps share the same operating license from The State of Texas.

321. Beyond the ownership being the same, the location is the same as well. The two camps share the same land, same culture, same ranch hands, same equipment, same philosophy, same



Copy from re:SearchTX

tribes and most importantly the same leadership. The two camps' offices are separated by a single gravel road that spans the length of a few football fields. Regardless of the slightly different name, the supervision, control and governance remain under the same reckless family.

322. The Eastlands—as an entire family—have engaged in a letter writing, social media and press campaign to entice parents to send their children back. All of the Eastlands—from both camps—signed these letters. The same family owns and operates both camps. All of them made decisions that killed 27 children. All of them signed these letters. All of them benefit financially from the money paid by the parents they seek to entice back to Camp Mystic. And none of them should ever be put in charge of other people's children ever again. At any location.

323. There is simply no context in which a business owner could cause the loss of so many children's lives and ever be allowed to operate their business again. That three months later, they aggressively push for re-opening without investigating, reflecting or accounting for their myriad failures, is evidence of the continued hubris and complacency that insults the legacies of those lost and confirms the Eastlands' inadequacies as shepherds of children.

324. Moreover, the Eastlands are attempting to pull the wool over impressionable eyes, attempting to distinguish Camp Mystic as two different entities, Cypress Creek and Guadalupe, as if it makes a difference. The only reason the Cypress Creek campus did not also suffer massive losses was not a difference in training, planning or monitoring. Just sheer luck of elevation. The idea that the two campuses are two separate operations is fiction and fantasy.

325. As with any mass casualty event involving children, the entire Camp Mystic management and leadership structure must be examined. The Captain bears the final burden to see the ship safely to port, or metaphorically, sink with it. The Eastlands are not leaders. The Eastlands are



Copy from re:SearchTX

not protectors. Camp Mystic must be nothing but a memory and a memorial to those lost in the wake of the Eastlands' negligence.

**D. <u>The Eastlands Have Spoliated Evidence</u>**

326. In their eagerness to reopen, the Eastlands also have intentionally altered material evidence at the disaster scene. The Eastlands' communications that they are "continuing to evaluate plans to rebuild Camp Mystic Guadalupe River" is patently false. They have already decided to rebuild. They are actively working on the property every day. Regardless of this and countless other litigation proceedings, the active and ongoing search of Cile, the Joint House and Senate Investigative Committee and the potential criminal investigations, the Eastlands have treated the camp site with no reverence. They have scrubbed entire offices, cleaned out cabins, and significantly altered evidence.

327. The Main Office has been completely remodeled. All existing camp communication systems, radios, and announcement equipment are gone. Fresh paint and walls show no signs of storm damage. The watermark lines from the flood at Rec Hall have disappeared, seemingly cleaned or painted over. The Commissary, a potential escape route for Cile less than 20 paces from her cabin, has a new exterior staircase. Several cabins have entirely new framing. Other than the watermark lines in Cile's cabin, it has been cleaned, no mattresses, bunks, or bed frames remain.



Copy from re:SearchTX











Copy from re:SearchTX





328. Make no mistake: the entire camp site is an evidence scene, and Defendants have failed to preserve it. Plaintiffs intend to seek injunctive relief to prevent further spoliation.

## XIV.
## CAUSES OF ACTION

329. Plaintiffs assert the following causes of action against all Defendants, jointly and severally, based on their ownership, operation, management, and control of Camp Mystic and related entities.

### A. Negligence

330. All prior material fact allegations are incorporated.

331. Defendants owed a duty of reasonable care to protect Cile Steward and all campers and staff at Camp Mystic. Defendants owed a duty to provide a safe environment, to implement and follow adequate safety and evacuation procedures, to monitor and respond to known flood risks, and to warn of known dangers. Defendants breached every one of these duties.

332. Defendants committed negligent acts and omissions, including but not limited to the following:

a. failure to implement and maintain adequate emergency and evacuation plans;
b. failure to ensure camp facilities were constructed in safe locations;
c. failure to enforce policies and procedures related to camper safety;



Copy from re:SearchTX

d. failure to take proper preventative measures to mitigate the known flood risks;
e. failure to adequately staff the Camp with properly trained oversight, management, and counselors;
f. failure to assess, monitor, and respond to flood risks, despite repeated prior flooding and official warnings;
g. failure to timely evacuate campers and staff when flooding was foreseeable or imminent;
h. failure to train employees and/or counselors in emergency action plans;
i. failure to provide lifesaving equipment and maintain safe facilities;
j. failure to warn campers, staff, and parents of the dangerous condition of the camp being located in or near a known flood zone.

333. Defendants' negligence proximately caused the injuries and death of Cile Steward, and Plaintiffs seek survival and wrongful death damages.

**B. <u>Negligence *Per Se*</u>**

334. All prior material fact allegations are incorporated.

335. Defendants violated applicable statutes and regulations designed to protect against the type of harm suffered by Cile Steward.

336. Chapter 265 of the TEXAS ADMINISTRATIVE CODE is titled "Texas Youth Camps Safety and Health." Within that chapter, section 265.15(k) expressly requires a written "plan of procedures to be implemented in case of disaster" including "evacuation of each occupied building and the facility."

337. TEXAS ADMINISTRATIVE CODE § 265.15(k) expressly requires every youth camp to maintain a written disaster plan. The Code also requires that even if a camp has a written policy that includes sheltering in place, a camp "shall" also have procedures for evacuation of each occupied building and the facility as a whole. This requirement reflects a basic and universally accepted safety principle: when children are housed in foreseeable danger zones, evacuation planning is not optional. The Eastlands had no flood emergency plan. And they had no evacuation plan.



Copy from re:SearchTX

338. This section was drafted with the safety of children attending camps in mind—it was drafted precisely to avoid the type of needless deaths that occurred at Camp Mystic. But Defendants ignored this obligation. By avoiding a regulatory requirement specifically designed to protect camp attendees from natural disasters, Defendants defied reasonable care, common sense, and Texas law.

339. Additionally, section 265.13(a) states that a camp's "buildings, structures, and grounds shall not present a fire, health, or safety hazard." 25 TEX. ADMIN. CODE § 265.13. In violation of this requirement, Camp Mystic's cabins presented a safety hazard by being built within a known floodplain without adequate protections in place.

340. Section 265.12(d) also requires written personnel policies and practices for both campers and staff. 25 TEX. ADMIN. CODE § 265.12(d). Camp Mystic failed to maintain these mandatory written policies.

341. Lastly, section 141.011 of the TEXAS HEALTH AND SAFETY CODE states that a youth camp operator "shall provide each camper with safe and healthful conditions, facilities, and equipment that are free from recognized hazards that cause or may tend to cause death, serious illness, or bodily harm." TEX. HEALTH & SAFETY CODE § 141.011. Camp Mystic breached this statutory duty by exposing campers to a known, life-threatening flood hazard without adequate protections.

342. Cile Steward, as a youth camp attendee, belonged to the class of persons these statutes and regulations were designed to protect, and her death is precisely the type of harm these rules were designed to prevent.

343. Defendants' violation of these rules proximately caused the injuries and death of Cile Steward.



Copy from re:SearchTX

344. All of the foregoing statutes or regulations were in effect at the time of the July 4, 2025 flood.

C. **Gross Negligence**

345. All prior material fact allegations are incorporated.

346. Defendants' acts and omissions, viewed objectively from their standpoint, involved an extreme degree of risk considering the probability and magnitude of potential harm to campers and staff, including Cile Steward. Defendants' acts and omissions constituted "Gross Negligence" as defined in the TEXAS CIVIL PRACTICE & REMEDIES CODE § 41.001(11).

347. Defendants had actual, subjective awareness of the risk but proceeded with conscious indifference to the rights, safety, and welfare of Cile Steward and others. Specifically, Defendants knew that the campers' cabins were in the flood plains and knew of severe flood warnings, but even with the lives of young children at stake, Defendants proceeded with conscious indifference to their safety.

348. Cile Steward is presumed to be deceased as a direct and proximate result of Defendants' grossly negligent conduct.

349. Plaintiffs seek exemplary damages for Defendants' gross negligence.

D. **Premises Liability**

350. All prior material fact allegations are incorporated.

351. Under Texas law, a property owner or occupier owes a duty to invitees, such as Cile Steward, to exercise reasonable care to protect them from conditions that create an unreasonable risk of harm that the owner/occupier knew or should have known about through reasonable inspection.



Copy from re:SearchTX

352. Defendants owned, occupied, possessed, managed, and/or controlled the area where Cile Steward sustained injuries and ultimately died.

353. The condition of the area, including the location of cabins in a known floodplain and lack of adequate safety infrastructure, posed an unreasonable risk of harm. Defendants had actual knowledge or reasonably should have known of the unreasonably dangerous condition.

354. Defendants breached their duty by failing to warn or make the condition reasonably safe, proximately causing the death of Cile Steward.

**E. Intentional Infliction of Emotional Distress**

355. All prior material fact allegations are incorporated.

356. Defendants are liable for intentional infliction of emotional distress because they acted intentionally or recklessly, their conduct was extreme and outrageous, and their conduct caused Will and CiCi Steward severe emotional distress.

357. Defendants prioritized reopening Camp Mystic and preserving their profits over the dignity of the deceased children and the emotional well-being of their families. Despite pending recovery efforts, active lawsuits, and ongoing governmental investigations, Defendants launched a coordinated public-relations campaign designed to rehabilitate Camp Mystic's image and solicit future campers.

358. Defendants, in letters signed by Tweety Eastland herself, repeatedly communicated with the Steward parents and the public in ways that were misleading, self-serving, and designed to rehabilitate Camp Mystic's image.

359. Tweety Eastland personally authored, approved, and sent multiple letters and communications to the Steward parents, child survivors, and the broader Camp Mystic community.



Copy from re:SearchTX

She used these communications to announce reopening plans and a proposed memorial. In doing so, she invoked Cile Steward's memory without consent to promote a return to Camp Mystic.

360. When the Steward parents objected and asked Defendants to halt reopening efforts, Defendants ignored them and escalated their conduct, including contacting traumatized child survivors and later asserting that returning to Camp Mystic could be part of a child's "healing journey," despite Defendants' lack of any trauma-related training or expertise.

361. Defendants knew or should have known that this conduct, directed at parents whose child had died and remained missing, would cause severe emotional distress, but proceeded with reckless disregard for the Steward parents' well-being.

362. Defendants' conduct directly and proximately caused the Steward parents severe emotional distress beyond that ordinarily associated with the loss of a child.

**F. <u>Respondeat Superior, Agency, and Ratification</u>**

363. All prior material fact allegations are incorporated.

364. All agents, servants, and/or employees of Defendants were acting within the course and scope of their employment and in furtherance of the Defendants' business. Accordingly, Defendants are liable for their acts and omissions under the doctrine of *respondeat superior*.

365. Further, Defendants ratified the negligent acts and/or omissions of other Defendants and their agents. Accordingly, Defendants are liable for these acts or omissions. Namely, Defendants approved unsafe Camp facility locations, approved dangerous camp procedures, and accepted the benefits from campers paying to use these unsafe facilities. By failing to repudiate such negligent conduct, Defendants are jointly and severally liable for their tortious conduct resulting in Cile Steward's injuries and damages.



Copy from re:SearchTX

**G. <u>Joint Enterprise</u>**

366. All prior material fact allegations are incorporated.

367. At all relevant times, Defendants operated a Joint Enterprise such that each individual party thereto should be held responsible for the negligent acts of the other.

368. Defendants operated under (i) an express or implied agreement; (ii) to carry out a common purpose; (iii) a community pecuniary interest in that common purpose; and (iv) an equal right to direct and control the enterprise. Defendants collectively shared control and pecuniary benefits from the enterprise. As members of the joint enterprise, Defendants committed numerous torts against Cile Steward. Thus, as members of the tortious joint enterprise, Defendants are jointly and severally liable to Plaintiffs for the death and damages sustained therefrom.

**H. <u>Veil Piercing and Alter Ego</u>**

369. All prior material fact allegations are incorporated.

370. The Eastlands have abused the corporate privilege and should not be able to avail themselves of the benefit therefrom.

371. At all relevant times, Defendants Dick and Tweety Eastland exercised total dominion and control over the Defendant entities in a manner indistinguishable from their own personal affairs and are using the corporate fictions as a means of evading a legal obligation. Dick and Tweety Eastland were known to be the owners, president, managers, and directors of the Camp Mystic entities, and the ones actually in control over the facilities and operations of the Camp Mystic entities.

372. Dick and Tweety Eastland created a web of corporate entities to separate ownership of assets from the Camp's operations, intentionally operating entities that were under-capitalized and under-insured. This structure was designed to shield assets, limit liability, and maximize personal



Copy from re:SearchTX

profits, thereby perpetuating a fraud for their personal benefit. Allowing the Eastlands to maintain the legal fiction of separate entities would promote injustice and allow them to evade accountability.

373. Ultimately, Dick and Tweety Eastland are the "alter ego" of the Entity Defendants, as the entities were organized and operated as mere tools for the Eastlands' personal benefit. The various Defendant Entities, including Camp Mystic, LLC, Natural Fountains Properties, Inc., Mystic Camps Family Partnership, Ltd., and Mystic Camps Management, LLC, should be disregarded and their corporate forms deemed not separate. Because these entities are mere shams, organized and operated by the Eastlands in their individual capacities to perpetrate fraud upon Plaintiffs, they should be disregarded.

374. Alternatively, Camp Mystic Family Partnership, Ltd. used its subsidiaries, including Camp Mystic, LLC and Natural Fountains Properties, Inc., to perpetrate an actual fraud for the primary benefit of the Eastlands individually, and not for any legitimate corporate purpose.

## XV.
## DAMAGES

### A. Wrongful Death

375. All prior material fact allegations are incorporated.

376. Plaintiffs, as wrongful death beneficiaries, seek to recover the following damages resulting from the death of Cile Steward:

a. Mental anguish sustained in the past and future;
b. Pecuniary loss sustained in the past and future;
c. Loss of companionship and society sustained in the past and future;
d. Loss of household services sustained in the past and future;
e. Any other damages available to wrongful death beneficiaries

### B. Survival Action

377. All material factual allegations are incorporated.



Copy from re:SearchTX

378. Plaintiffs seek to recover the following elements of survival damages:

a. Physical pain and mental anguish sustained by Cile Steward before death;
b. Funeral and burial expenses;

C. **Exemplary Damages**

379. Plaintiffs incorporate and re-allege the above paragraphs and all subsequent paragraphs as if stated fully here.

380. Because of Defendants' gross negligence, they should have exemplary damages under Chapter 41 of TEXAS CIVIL PRACTICE AND REMEDIES CODE assessed against them in an amount deemed appropriate by the jury.

381. Additionally, because Defendants' acts and/or omissions—for which the Entity Defendants are vicariously liable—constitute an intentional and/or knowing violation of TEXAS PENAL CODE § 22.04(a), Plaintiffs are entitled to recover exemplary damages without limitation as provided for under TEXAS CIVIL PRACTICE AND REMEDIES CODE § 41.008(c)(7).

## XVI.
## INJUNCTIVE RELIEF AND PRESERVATION OF EVIDENCE SOUGHT

382. Plaintiffs incorporate all prior material fact allegations herein. Plaintiffs seek all injunctive relief to which they may be justly entitled.

383. More specifically, as set forth above, Defendants have already altered, destroyed, and removed material physical evidence at the Camp Mystic disaster scene. Plaintiffs therefore seek injunctive relief to prevent further spoliation of evidence at Camp Mystic.

384. Plaintiffs hereby demand that Defendants preserve and maintain all evidence pertaining to any claim or defense related to the incident made the basis of this lawsuit, or the damages resulting therefrom. This demand includes but is not limited to preserving and maintaining all parts of the site of the incident, the campsite, signs, statements, photographs, video footage, audio,



Copy from re:SearchTX

surveillance, security footage, information, business records, incident reports, equipment (including weather monitoring equipment), invoices, checks, correspondence, facsimile, email, voice-mail, text messages and any evidence whatsoever involving or relating to the incident in question. Failure to preserve and maintain such evidence will constitute spoliation of evidence, and Plaintiffs will seek appropriate relief from the Court for any such spoliation.

## XVII.
## NOTICE OF SELF-AUTHENTICATION

385. Pursuant to Rule 193.7 of the TEXAS RULES OF CIVIL PROCEDURE, Plaintiffs give notice of intent to use documents produced by any party hereto in any pretrial proceeding and at trial against the producing party.

## XVIII.
## RESERVATION OF RIGHTS

386. Plaintiffs reserve the right to prove the amount of damages at trial. Plaintiffs reserve the right to amend their petition to add additional counts and/or parties upon further discovery and as this investigation continues.

## XIX.
## PRE-JUDGMENT AND POST-JUDGMENT INTEREST

387. Plaintiffs request pre- and post-judgment interest as may be permitted by law.

## XX.
## REQUEST FOR JURY TRIAL

388. Plaintiffs, in accordance with Rule 216 of the TEXAS RULES OF CIVIL PROCEDURE, request a trial by jury. Plaintiffs have tendered the required jury fee.



Copy from re:SearchTX

## XXI.
## CONDITIONS PRECEDENT

389. Pursuant to Rule 54 of the TEXAS RULES OF CIVIL PROCEDURE, all conditions precedent to Plaintiffs' right to recover herein and to Defendants' liability have been performed or have occurred.

## XXII.
## CLAIM FOR RELIEF

390. Plaintiffs are seeking monetary relief in excess of $1,000,000.00 in actual and punitive damages.

## XXIII.
## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully request that Defendants be cited to appear and answer, and after trial or final hearing, the Court enter judgment for Plaintiffs for:

a. Full actual damages as set forth above;
b. Exemplary damages as allowed by law;
c. Pre-judgment and post-judgment interest at the maximum rates allowed by law;
d. Costs of court;
e. Injunctive relief to preserve physical evidence and to prohibit operation or reopening of Camp Mystic pending resolution of this action;
f. Such other and further relief, at law or in equity, to which Plaintiffs may show themselves justly entitled.



Copy from re:SearchTX

Respectfully submitted,

By: */s/ Brad Beckworth*

Bradley E. Beckworth
State Bar No. 24001710
Christina Yarnell
State Bar No. 24071973
NIX PATTERSON, LLP
8701 Bee Cave Road
Seven Oaks East, Suite 500
Austin, Texas 78746
Telephone: (512) 328-5333
Telecopier: (512) 328-5335
bbeckworth@nixlaw.com
cyarnell@nixlaw.com

*and*

Blair Townsend, *pro hac forthcoming*
THE TOWNSEND LAW FIRM, LLC
50 SW Pine Street, Suite 400
Portland, Oregon 97204
Telephone: (503) 715-1896
Telecopier: (503) 907-6904
blair@thetownsendlawfirm.com

***Attorneys for Plaintiffs***



Copy from re:SearchTX

# EXHIBIT 3

Copy from re:SearchTX

By: Flores S.R. No. 2

SENATE RESOLUTION

BE IT RESOLVED, That the General Investigating Committee on the July 2025 Flooding Events be hereby created; and, be it further

RESOLVED, That the committee consist of five senators appointed by the President of the Senate, and that the President of the Senate designate from among the members of the committee the senators to serve as chair and vice chair; and, be it further

RESOLVED, That the committee make a complete and thorough examination of the facts and circumstances surrounding the flooding events which occurred on or about July 4, 2025, and which resulted in the tragic loss of life and injuries to Texans; and, be it further

RESOLVED, That the committee have all the powers and duties and operate according to the procedures prescribed by Subchapter B, Chapter 301, Government Code, and the Rules of the Senate, as applicable.



Copy from re:SearchTX

S.R. No. 2

______________________________
President of the Senate

I hereby certify that the above Resolution was adopted by the Senate on September 4, 2025, by the following vote: Yeas 26, Nays 0.

______________________________
Secretary of the Senate



Copy from re:SearchTX

H.R. No. 177

R E S O L U T I O N

BE IT RESOLVED, That the House of Representatives of the 89th Legislature, 2nd Called Session, hereby creates a general investigating committee on disaster response; and, be it further

RESOLVED, That the committee be composed of five members of the house to be appointed by the speaker of the house of representatives and that the speaker shall also designate the chair and vice-chair of the committee; and, be it further

RESOLVED, That the committee shall conduct all inquiries into the 2025 flooding disasters, including investigating:

(1) factors contributing to the floods;

(2) allocation of resources to and effectiveness of flood disaster preparedness and response; and

(3) operations of and coordination between local, state, and federal governmental entities with regard to flood prevention, disaster preparedness, and response; and, be it further

RESOLVED, That the committee is granted the investigatory powers of a general investigating committee under the house rules of procedure and Chapter 301, Government Code, and that the committee is granted all powers granted to committees by the house rules of procedure and Chapter 301, Government Code.

Geren



Copy from re:SearchTX

H.R. No. 177

______________________________
Speaker of the House

I certify that H.R. No. 177 was adopted by the House on September 3, 2025, by the following vote: Yeas 132, Nays 0, 1 present, not voting.

______________________________
Chief Clerk of the House



Copy from re:SearchTX

# EXHIBIT 4

Copy from re:SearchTX

**From:** Camp Mystic <office@campmystic.com>

**Subject: A Message from Camp Mystic**
**Date:** September 22, 2025 at 4:31:36 PM CDT
**To:** [redacted]

Camp Mystic

Dear Camp Mystic Family,

We are writing today to share some updates related to Camp and the next summer season. Thank you so much for your love, support and patience with us during this unprecedented time. We have prayed about next summer daily.

First and foremost, we will be designing and creating a memorial dedicated to the lives of the campers and counselors lost on July 4th. We hope this space will serve as a place of reflection and remembrance of these beautiful girls. We continue to pray for the grieving families and all those who lost loved ones.

Second, Camp Mystic Cypress Lake will be open for Summer 2026. We are working to implement new safety protocols and other changes that comply with the requirements of the recently passed camp safety legislation, the Heaven's 27 Camp Safety Act. We will share more details as they become available in the coming weeks.

Because of the devastating damage sustained by Camp Mystic Guadalupe River, we will not be able to re-open in 2026. However, we are finalizing plans that would allow Camp Mystic Guadalupe River campers to attend Camp Mystic Cypress Lake next summer. We will release our 2026 camp dates in early October.

We continue to evaluate plans to rebuild Camp Mystic Guadalupe River. Our planning and procedures will reflect the catastrophic 1,000-year weather event that occurred on July 4, including never having campers return to cabins that had floodwaters inside them. And, as at Camp Mystic Cypress Lake, our plans will comply with the requirements of the new camp safety legislation.

The heart of Camp Mystic has never stopped beating, because *you* are Mystic. We are not only rebuilding cabins and trails, but also a place where laughter, friendship and spiritual growth will continue to flourish. As we work to finalize



Copy from re:SearchTX

plans, we will do so in a way that is mindful of those we have lost.

You are all part of the mission and the ministry of Camp Mystic. You mean the world to us, and we look forward to welcoming you back inside the green gates.

We will have more information to share soon on how to sign up and get your girls on the lists for their terms.

With love,
Tweety Eastland
Mary Liz and Edward Eastland
Catie and Britt Eastland
Leslie and Richard Eastland

www.campmystic.com • office@campmystic.com
2689 Highway 39 • Hunt, Texas 78024
TEL: (830) 238-4660

powered by campminder



Copy from re:SearchTX

CAUSE NO. D-1-GN-26-000758

| | | |
|---|---|---|
| WILL and CiCi STEWARD, Individually and as Representatives and Heirs of the Estate of CILE STEWARD, a Deceased Minor<br><br>Plaintiffs,<br><br>v.<br><br>CAMP MYSTIC, LLC, NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc. MYSTIC CAMPS FAMILY PARTNERSHIP, LTD., MYSTIC CAMPS MANAGEMENT, LLC, GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased, WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC. EDWARD S. EASTLAND, MARY E. EASTLAND and WILLIAM NEELY BONNER, III<br><br>Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | IN THE DISTRICT COURT OF<br><br>TRAVIS COUNTY, TEXAS<br><br>200th JUDICIAL DISTRICT |

**[PROPOSED] ORDER GRANTING TEMPORARY INJUNCTION**

On this date the Court heard Plaintiffs' Application for Temporary Restraining Order and Temporary Injunction against Defendants CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased; WILLETTA A. EASTLAND, Individually and as Director and Vice President of CAMP MYSTIC, LLC and Secretary of NATURAL FOUNTAINS PROPERTIES, INC.; EDWARD S. EASTLAND; MARY E. EASTLAND; and WILLIAM NEELY BONNER, III (collectively, "Defendants"). The

Copy from re:SearchTX

application was presented with notice to the Defendants. The Court, after considering Plaintiffs' application, the response, the pleadings, the affidavits, the evidence submitted, and arguments of counsel, finds that the application is well-taken and should be **GRANTED**.

In particular, the Court finds the following:

1. Plaintiffs provided proper and sufficient notice to the Defendants.

2. The Court finds that Plaintiffs have demonstrated a probable right to the relief sought on their claims for negligence, gross negligence, and premises liability. This finding is supported by facts tending to show that Defendants owed a duty of care to Cile Steward and other minor campers, which they breached by operating Camp Mystic in a high-risk zone without adequate flood protections. Furthermore, the Court finds that Defendants potentially violated TEXAS ADMINISTRATIVE CODE § 265.15(k) by failing to maintain a written evacuation plan or provide documented safety training which supports a finding of negligence *per se*. At this preliminary stage, Plaintiffs have sufficiently alleged causes of action and presented evidence that justifies the preservation of the status quo.

3. The Court finds that Plaintiffs will suffer probable, imminent, and irreparable injury in the interim before a trial on the merits unless Defendants are immediately enjoined. The threatened harm is imminent because Plaintiffs have presented evidence that Defendants are presently engaged in material alterations to the Camp Mystic site. The physical condition of the Camp Mystic site is material to the adjudication of Plaintiffs' claims. The Court finds this injury to be irreparable because once this physical evidence is altered or destroyed, it cannot be recreated, and no adequate remedy at law exists to restore the evidence or eliminate the resulting prejudice to the Plaintiffs. The Court finds that a later spoliation instruction is not an adequate remedy at this juncture because it cannot prevent



Copy from re:SearchTX

or undo the permanent loss of physical evidence. The injunctive relief granted herein is necessary to preserve the status quo.

4. It is necessary to enjoin the Defendants as ordered herein because the acts of altering, demolishing, repairing, or removing structures and topographical features on the Camp Mystic property are the direct and primary causes of the irreparable harm identified by this Court. A nexus exists between the Defendants' ongoing construction activities and the imminent destruction of material evidence, such as cabin elevations, communication system locations, and flood watermark lines, which are material to the Plaintiffs' claims.

It is therefore, **ORDERED** that Defendants CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased; WILLETTA A. EASTLAND; EDWARD S. EASTLAND; MARY E. EASTLAND; and WILLIAM NEELY BONNER, III; and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of this order, are immediately enjoined from directly or indirectly performing the following acts at Camp Mystic, located at 2689 Hwy 39, Hunt, Texas 78024-3412:

- Altering, demolishing, repairing, remodeling, reconstructing, or removing any structure or physical feature of the specific cabins where minor campers were housed during the July 4, 2025 flood event, specifically identified as the "Twins I," "Twins II," "Bubble Inn," "Bug House," "Look Inn," "Hangout," and "Jumble House" cabins.

- Using the site for any commercial purpose, including but not limited to camp operations. Any person granted access to the Camp Mystic site must be informed of this Order.

- Modifying the Main Office building, the Rec Hall building, or the Commissary building, including the newly constructed exterior staircase on



Copy from re:SearchTX

the Commissary, to ensure that existing waterlines, communication systems, and structural elevations remain in their current state for forensic inspection.

- Reshaping the topography or using heavy machinery to modify the terrain and ground conditions surrounding the Twins I and II and Bubble Inn cabin clusters or altering any access routes leading from these cabins to higher ground.

It is further **ORDERED** that the Clerk of the Court issue a Writ of Injunction to Defendants CAMP MYSTIC, LLC; NATURAL FOUNTAINS PROPERTIES, INC. d/b/a Camp Mystic, Inc.; MYSTIC CAMPS FAMILY PARTNERSHIP, LTD.; MYSTIC CAMPS MANAGEMENT, LLC; GEORGE ALBRITTON EASTLAND, as Representative of the Estate of RICHARD G. EASTLAND, Deceased; WILLETTA A. EASTLAND; EDWARD S. EASTLAND; MARY E. EASTLAND; and WILLIAM NEELY BONNER, III in accordance with the terms of this Order.

It is further **ORDERED** that this Temporary Injunction shall remain in full force and effect until final judgment in this cause or further order of this Court.

It is further **ORDERED** that Plaintiffs file a bond payable to Defendants in the amount of $______________ with two or more sureties as security for this temporary injunction. The bond must be filed and approved by the Clerk of the Court before any Writ of Injunction may be issued pursuant to this Order. The Plaintiffs may post a cash deposit in lieu of a bond under TEXAS RULE OF CIVIL PROCEDURE 14c.

It is further **ORDERED** that this cause is set for trial on the merits on the ____ day of _______________, _______ in the District Court of Travis County, Texas.

EXECUTED this ____ day of _________________, 20__, at _____ o'clock.

_______________________________________
HONORABLE JUDGE PRESIDING



Copy from re:SearchTX

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Donna Fernandez-Abshere on behalf of Bradley Beckworth
Bar No. 24001710
dfabshere@nixlaw.com
Envelope ID: 110978139
Filing Code Description: Amended Filing
Filing Description: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION
Status as of 2/9/2026 9:47 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Donna Fernandez-Abshere | | dfabshere@nixlaw.com | 2/6/2026 5:21:14 PM | SENT |

Copy from re:SearchTX